

**Everything Michigan**

# How is Allegan County directly impacted by the census count?

Published: Tuesday, March 01, 2011, 8:34 AM



By   **Penasee Globe staff**

*Editor's Note: This article was written and submitted by Allegan County Clerk Joyce Watts*

The State of Michigan will lose a representative in Congress, because the state has lost population in the last decade.

This spring, states and county governments are charged with reviewing the population figures gathered and apportioning the representation based on the recent 2010 population count.

The apportionment of governmental representation also requires an adjustment to the State Senate, State Representative districts, and the number of County Commissioner districts and boundaries at the county level.

This is to ensure as much as possible that residents of the state have identical access to the individuals they elect at the federal, state and county level.

**BUT, HOW DOES THIS PROCESS WORK?**

Seats in the Congressional House of Representatives are allotted to states based on the state population as it compares to other states. Because of our population loss, the State of Michigan will go from 15 seats to 14 seats in Congress.

The new lines for congressional representation will be drawn at the state level by state legislators, who will oversee not only drawing the congressional lines, but also drawing the lines for the State House and Senate districts. Michigan's redistricting plans have routinely been challenged in the courts and often decided by the state Supreme Court.

County Commissioner districts are apportioned by the County Apportionment Committee, required by law to consist of the County Prosecuting Attorney, Clerk, Treasurer and the Chairpersons of the county Republican and Democratic parties.

This five-member panel will convene in late March, and voters can watch the roll out of final census information by logging on to the census website, **www.2010census.gov/2010census/data/**.

Further, the meeting schedule will be posted and the public is welcome to comment on if they want more county commissioners, fewer commissioners, or should the number of commissioners - set at 11 in 2001 - remain unchanged.

Rules for creating the districts include making a good faith effort to achieve districts of equal population and be contiguous, compact and as nearly square in shape as
practicable.

**THE QUESTION IS, HOW MUCH REPRESENTATION DO WE WANT AND CAN WE AFFORD?**

Also taken into account is the cost to local and county governments when municipalities are divided into separate precincts to achieve equal population. If the plan forces a township or city to create a new precinct, there are additional costs associated with the change.

Those costs include the purchase of approximately up to $7,000 in election equipment, the cost to staff yearly elections, increased costs to the local municipality for accuracy testing prior to the election, and the cost of containers to store the ballots after the election.

At the county level, adding additional precincts increases the annual election costs for programming, providing election supplies for the precinct, and an increase in the total number of printed ballots.

These added costs are paid by taxes collected by the local municipality and the county. Every additional dollar spent for supporting that additional precinct means one less dollar available to spend on fire, law enforcement services or road repair at the local level.

This process impacts all of us!

For more information, contact Joyce Watts, (269) 673-0450.

© 2011 MLive.com. All rights reserved.

Redistricting: drawing the political maps | Michigan Radio

ON AIR NOW
**The Diane Rehm Show**

On Air Schedule    Programs    Events



POLITICS
Amash says he's gaining
support for plan to balance
federal budget



Stories from the North Woods



INVESTIGATIVE
Fewest traffic fatalities in
Michigan since the 1940s.

ONGOING COVERAGE:    Share Your Story    Michigan Watch    Lessenberry    What's Working    Environment Report    Changing
Gears    Newsmaker Interviews    Detroit    Grand Rapids

INVESTIGATIVE

# Redistricting: drawing the political maps

By Lester Graham (/people/lester-graham?rel=author) and Michigan Watch
(/people/michigan-watch?rel=author)



(http://media0.publicbroadcasting.net/p/michigan/files/201105/House01-state-
E_117278_7.jpg)

Michigan's 110 House Districts. Plans are underway to  Enlarge image (javascript:void(0))
redraw the district lines after the results of the 2010
Census.
*Michigan Geographic Framework*

Audio (http://stream.publicbroadcasting.net/production/mp3/michigan/local-michigan-967518.mp3)

States must redraw congressional and legislative maps (http://www.michigan.gov/cgi/0,1607,7-158-52927_53037_12540_13083---,00.html) to adjust for the shifts in population when the census numbers (http://www.census.gov/newsroom/releases/archives/2010_census/cb11-cn132.html) are released every ten years.  This time Michigan lost population (http://news.michiganradio.org/post/census-shows-michigan-only-state-lose-population) while other states gained.  That means Michigan will lose a representative in Congress.  But there were also shifts of population within the state which means the state house and senate districts will have to be redrawn.

In Michigan, the state legislature is responsible for redrawing the maps that define voting districts for the legislature and Congress.  It's kind of complicated.  There are federal requirements.  There are state requirements (http://www.michigan.gov/cgi/0,1607,7-158-54534-252541--,00.html).  Eric Swanson is the Director of Michigan's Center for Shared Solutions and Technology Partnerships.  Among other things, that state office collects the population data from the federal Census Bureau.  Swanson says the legislature does have to meet those federal and state requirements such as not splitting cities down the middle.

"Breaking as few communities as possible, population equality across districts, maintaining communities of interest, protecting minority voting rights, minority representation, etc."

*LG:  What do you mean by communities of interest?*

So, for example, Saginaw, Bay City, Midland together if at all practically possible."

*LG:  Okay, so regional areas that have much in common that--*

"Regional areas, much in common.  Similar with keeping jurisdictions intact."

Swanson does not talk about the big elephant in the middle of the room.  Politics.  Every member of Congress and every member of the legislature who's not at the end of term limits has something at stake.

John Bebow is with the Center for Michigan (http://www.thecenterformichigan.net/).  It's a non-partisan think tank.  Actually it calls itself a 'think and do' tank.  Bebow and his colleague Susan Demas looked at the effects of the last redistricting (http://www.thecenterformichigan.net/wp-content/uploads/2011/02/CFM_redistricting_report_feb_2011.pdf).  Bebow says redrawing the maps in Michigan is one of the most political endeavors there is and it affects politics in the state for the entire next decade.

"This is engineered for partisan advantage.  Democrats did it in previous decades and Republicans clearly acknowledge that they've done it and they did it in 2000.  We talked to one of the architects for the 2000 redistricting for our report and he said, "Yeah.  That's the way it is.  If you don't like it, get the majority.

They're pretty open about it.  This is part of politics.  If you are a leader in the Michigan House or the Senate right now, your party expects you to deliver on redistricting.  You better not screw this up.  You better not let the boundaries be what loses you the majority."

"Everyone sees it as being so political, but it's really not."

That's the chair of the House Redistricting and Elections Committee, Representative Pete Lund (http://www.gophouse.com/welcome.asp?District=36) .

"The process of redistricting really is not about politics and winning elections.  It's about trying to reflect the change in population and seeing how that actually reflects.  And you're trying to accurately measure that change and make sure you have equal representation for people as they live now."

Representative Lund says people have moved.  District boundaries have to move.  His committee will work to make sure those people are properly represented in Congress and the legislature.

But, John Bebow at the Center for Michigan says the past ten years indicate it's much more than that.  It's about giving one party or the other political advantage.  The process comes down to the politicians choosing their voters, instead of the voters choosing the representatives.

Redistricting: drawing the political maps | Michigan Radio    Exhibit 421
Case 1:11-cv-02938-RJL-BMK-CKK   Document 1-11   Filed 11/03/11   Page 5 of 133

Page 5 of 6

Ten years ago, when Republicans controlled the process, the maps were drawn to give them political advantage and the numbers from the last decade of elections show it worked.

"Republicans garnered 47% of the statewide votes in the House of Representatives for the past decade, but maintained almost 51% of the seats. In the Senate they had 49% of the statewide vote for Senate and 60% of the seats. So, there is a differential there.

The Senate has been held by the Republicans for the entire decade. Democrats only gained control of the House during the last term of Governor Jennifer Granholm. Bebow says if the districts were more competitive, politicians would have to worry more about everyone in their district instead of just their party faithful. He says we'd see more politicians in the middle of the political spectrum rather than from the extremes of each party.

Representative Pete Lund says this time around --hey, the people have spoken.

"You might not like the fact that it currently is a Republican legislature. But, that's they way the people made it. And we're going to follow the laws and we're going to make sure we do things to the letter of the law and draw fair lines that are legal and meet court approval."

While there are public hearings on the redistricting process, it's hard for the typical voter to offer much in the way of influence. Not a lot of us have the skills or tools to redraw the maps on our own. So, one group is offering some help. The Michigan Center for Election Law and Administration is holding a competition. Jocelyn Benson (http://law.wayne.edu/profile/jocelyn.benson/), who unsuccessfully ran for Secretary of State as a Democrat last year, is the founder and CEO of the organization. She says this Michigan Citizens' Redistricting Competition (http://michiganredistricting.org/?page_id=12) is an attempt to get people involved in the process.

"Normally when you have an issue and you're trying to hold your elected official accountable, you call them up and tell them what your opinion is, how you want them to vote and why. But, you can't do that with redistricting because a lot of it is done behind closed doors and there's software and data and all the rest. So, we're trying to open up those doors just a little bit, give citizens the tools to draw their own maps and in that way hold their elected officials accountable by communicating to them what they'd like to see on the drawing board."

Benson says she hopes citizens come up with better maps than the politicians. They have until May 23rd to turn in their maps for the legislature's consideration. And Benson believes that could be the first step in removing redistricting from a partisan exercise to something that better represents the people.

"Other states like California, Iowa, Arizona, Florida have solved this problem by allowing citizens to have a say."

Those states and others have created independent redistricting commissions to draw the maps.

"So, my hope is that this competition can perhaps lay the groundwork for making a case to the fact that we do need citizens to have a greater say in the process because without that voice the elected officials and politicians making these districting decisions will make them in their own self-interests, not preserving the interests of the citizens."

The six states that rely on commissions to redraw the districts instead of the legislatures have had varying degrees of success. According to an analysis (http://www.ncsl.org/default.aspx?tabid=16644) by the National Conference of State Legislatures (http://www.ncsl.org/default.aspx?TabID=746&tabs=1116,115,66#1116), some of the commissions' maps ended up being thrown out because they didn't meet federal or state requirements. Some of the commissions are made up of partisan appointees, hardly removing politics from the process.

But, in Iowa, where they've already redrawn their political districts, they do it differently. The legislature does vote on the plans, but non-partisan legislative staff develop the maps for the state House and Senate as well as the U.S. House districts without any political or election data. The National Conference of State Legislatures reports no other state does it quite like Iowa. And... it seems to work.

*CORRECTION: An earlier version incorrectly indicated Democrats controlled the House after the first election of Governor Granholm and again*

*when President Barack Obama was elected.  The above story has been corrected.*

Tags:
redistricting (/term/redistricting) Michigan (/term/michigan) legislative districts (/term/legislative-districts) congressional districts (/term/congressional-districts)

Like

Add New Comment                                    (#)                  Login (#)

Type your comment here.

Showing 0 comments                          Sort by popular now

✉ Subscribe by email (#)
🔊 RSS (http://npr-michigan.disqus.com/non_partisan_redistricting/latest.rss)



**MICHIGAN**
**HOUSE OF REPRESENTATIVES**
P.O. BOX 30014
LANSING, MICHIGAN 48909-7514

# Notice

STANDING COMMITTEE MEETING
## REDISTRICTING AND ELECTIONS
Rep. Pete Lund, Chair

Date:   **Tuesday, April 12, 2011**

Time:   **9:00 a.m.**

Place:  **521 House Office Building, Lansing, MI**

### AGENDA

Testimony Only:

2010 Census Results for Michigan by Kenneth Darga, State Demographer

OR ANY BUSINESS PROPERLY BEFORE THIS COMMITTEE

Individuals who wish to bring written testimony need to supply a minimum of thirty copies for distribution.

Individuals needing special accommodations to participate in the meeting may contact the Chair's office.

Mary Lou Terrien, Committee Clerk, 517-373-1260
Date posted: 04/07/2011

Schedule changes or cancellations available at *http://www.legislature.mi.gov* or 24-hours at (517) 373-8140.
Subscribe to electronic notices at *www.house.mi.gov/CommitteeSubscribe.asp*





MICHIGAN
HOUSE OF REPRESENTATIVES
P.O. Box 30014
LANSING, MICHIGAN 48909-7514

# Notice
STANDING COMMITTEE MEETING
## REDISTRICTING AND ELECTIONS
Rep. Pete Lund, Chair

Date:   **Tuesday, April 26, 2011**

Time:   **9:00 a.m.**

Place:  **521 House Office Building, Lansing, MI**

## AGENDA

Subject: The Federal Voting Rights Act

Testimony by Butch Hollowell, of the Detroit NAACP and
Alan L. Canady, of Clark Hill PLC concerning Section 2 of the Voting Rights Act

Testimony by Chris Thomas, Director, Bureau of Elections, Secretary of State
concerning Section 5 of the Voting Rights Act

### OR ANY BUSINESS PROPERLY BEFORE THIS COMMITTEE

Individuals who wish to bring written testimony need to supply a minimum of thirty copies for distribution.

Individuals needing special accommodations to participate in the meeting may contact the Chair's office.

Mary Lou Terrien, Committee Clerk, 517-373-1260
Date posted: 04/21/2011

Schedule changes or cancellations available at *http://www.legislature.mi.gov* or 24-hours at (517) 373-8140.
Subscribe to electronic notices at *www.house.mi.gov/CommitteeSubscribe.asp*





MICHIGAN
HOUSE OF REPRESENTATIVES
P.O. Box 30014
LANSING, MICHIGAN 48909-7514

# Notice

STANDING COMMITTEE MEETING
## REDISTRICTING AND ELECTIONS
Rep. Pete Lund, Chair

Date:   **Tuesday, May 10, 2011**

Time:   **9:00 a.m.**

Place:   **521 House Office Building, Lansing, MI**

### AGENDA

HB 4005   Heise            Elections; school; dates of school elections; require to be in November of even numbered years.

HB 4006   Heise            Elections; school; technical amendments to revised school code concerning school board elections; provide for.

Gary P. Gordon of Dykema Gossett PLLC testifying to constitutional and statutory standards and criteria for redistricting

### OR ANY BUSINESS PROPERLY BEFORE THIS COMMITTEE

Individuals who wish to bring written testimony need to supply a minimum of thirty copies for distribution.

Individuals needing special accommodations to participate in the meeting may contact the Chair's office.

Mary Lou Terrien, Committee Clerk, 517-373-1260
Date posted: 05/05/2011

Schedule changes or cancellations available at *http://www.legislature.mi.gov* or 24-hours at (517) 373-8140.
Subscribe to electronic notices at *www.house.mi.gov/CommitteeSubscribe.asp*



**MICHIGAN**
**HOUSE OF REPRESENTATIVES**
P.O. Box 30014
LANSING, MICHIGAN 48909-7514

# Notice

STANDING COMMITTEE MEETING
## REDISTRICTING AND ELECTIONS
Rep. Pete Lund, Chair

Date:   **Tuesday, May 17, 2011**

Time:   **9:00 a.m.**

Place:   **521 House Office Building, Lansing, MI**

## AGENDA

Public Testimony on Redistricting

Written testimony will be accepted from anyone.  Public comment will be allowed to
the extent time permits

### OR ANY BUSINESS PROPERLY BEFORE THIS COMMITTEE

Individuals who wish to bring written testimony need to supply a minimum of thirty copies for distribution.

Individuals needing special accommodations to participate in the meeting may contact the Chair's office.

Mary Lou Terrien, Committee Clerk, 517-373-1260
Date posted:  05/12/2011

Schedule changes or cancellations available at *http://www.legislature.mi.gov* or 24-hours at (517) 373-8140.
Subscribe to electronic notices at *www.house.mi.gov/CommitteeSubscribe.asp*



**MICHIGAN**
## HOUSE OF REPRESENTATIVES
P.O. Box 30014
Lansing, Michigan 48909-7514

# Notice

STANDING COMMITTEE MEETING
## REDISTRICTING AND ELECTIONS
Rep. Pete Lund, Chair

Date:   **Tuesday, June 21, 2011**

Time:   **9:00 a.m.**

Place:   **521 House Office Building, Lansing, MI**

## AGENDA

HB 4780   Lund                Legislature; apportionment; redistricting of congressional districts;
                              provide for.

OR ANY BUSINESS PROPERLY BEFORE THIS COMMITTEE

Individuals who wish to bring written testimony need to supply a minimum of thirty copies for distribution.

Individuals needing special accommodations to participate in the meeting may contact the Chair's office.

Mary Lou Terrien, Committee Clerk, 517-373-1260
Date posted: 06/16/2011

Schedule changes or cancellations available at *http://www.legislature.mi.gov* or 24-hours at (517) 373-8140.
Subscribe to electronic notices at *www.house.mi.gov/CommitteeSubscribe.asp*



MICHIGAN HOUSE OF REPRESENTATIVES

PETE LUND

STATE REPRESENTATIVE

36TH DISTRICT
STATE CAPITOL
P.O. BOX 30014
LANSING, MI 48909-7514
PHONE: (517) 373-0843
FAX: (517) 373-5892
E-MAIL: petelund@house.mi.gov

FOR IMMEDIATE RELEASE

Contact: Matt Patton (517) 373-5192

April 7, 2011

# House Redistricting and Elections Committee to hold public hearings on redistricting issues

State Rep. Pete Lund, House Redistricting and Elections Committee chair, today announced public hearings on Michigan's redistricting process.

The first of a series of public hearings, intended to review Michigan's census results, the Federal Voting Rights Act, and Michigan's Constitutional and statutory standards for redistricting is scheduled for Tuesday, April 12, beginning at 9 a.m.

"Maintaining accurate representation for our state's changing population centers is an essential component of a functioning democracy," said Lund, R-Shelby Township. "This process will be fair and follow the law."

Michigan's redistricting process is governed by Michigan's constitution, Apol standards in Michigan statute, and federal law. Michigan law requires that the redistricting process be completed by Nov. 1.

(MORE)

The hearings will provide background and information on the overriding concepts in redistricting and will continue throughout the coming weeks.  The April 12 hearing will focus on Michigan's 2010 Census results and issues associated with them.

"I look forward to these hearings and a fair, effective redistricting process for our state," Lund said.

#####



## MICHIGAN HOUSE REPUBLICANS

P.O. BOX 30014 I LANSING, MICHIGAN 48909-7514 I WWW.GOPHOUSE.COM

FOR IMMEDIATE RELEASE                                                   April 25, 2011
Contact: Matt Patton (517) 373-5192

# House Redistricting and Elections Committee announces redistricting plan submission details

House Redistricting and Elections Committee chair, Pete Lund, R-Shelby Township, today announced details for those wishing to submit congressional or state legislative redistricting plans.

Plan submissions can be sent to the Clerk of the House of Representatives at, Office of the Clerk of the House of Representatives, Capitol Building, Room 70, P.O. Box 30014 Lansing, MI 48909-7514.

Plans should be submitted by May 23, 2011. A plan should include proposed districts for the entire state and should include the following, at minimum:

- A map depicting the statewide configuration of proposed districts and a detailed map depicting proposed districts in Southeast Michigan. Maps should be on 8-1/2" x 11" paper or, alternatively, 20 copies of each map should be submitted;
- The population of each proposed district;
- The maximum population deviation among proposed districts; and
- Other descriptive details that would be useful to the committee.

Plans will be reviewed by committee staff. Additional detailed maps may also be submitted. Plans may be submitted to the full committee at the discretion of committee members.

#####



36TH DISTRICT
STATE CAPITOL
P.O. BOX 30014
LANSING, MI 48909-7514
PHONE: (517) 373-0843
FAX: (517) 373-5692
E-MAIL: petelund@house.mi.gov

MICHIGAN HOUSE OF REPRESENTATIVES

## PETE LUND

STATE REPRESENTATIVE

FOR IMMEDIATE RELEASE                                                   June 10, 2011
Contact: Matt Patton (517) 373-5192

# Lund announces release of redistricting plans and Redistricting Committee Hearing

House Redistricting and Elections Committee chair, Pete Lund, R-Shelby Township, today forecasted a timetable for Michigan's redistricting process that must be completed by November 1.

"We have held numerous open hearings over the past two months to ensure Michigan's redistricting plans would be completed fairly and in accordance to state and federal law," said Lund. "As we begin the consideration of specific plans, state and federal law will continue to guide our decisions."

Lund will submit maps to the Clerk of the House and Senate on June 17 in order to ensure fair consideration before a hearing on the Congressional plan. He joined House Speaker Jase Bolger, R-Marshall, in asking House Democrats to submit their maps on the same day.

After plans have been submitted, the House redistricting committee will meet on June 21 and 22, respectively, to discuss redistricting plans.

#####



SECRETARY OF SENATE
BILL CLERKS

2011 JUN 27 P 12: 51

**MEMBERS:**

SEN. RICK JONES, VICE CHAIRMAN
SEN. DAVE HILDENBRAND
SEN. JIM MARLEAU
SEN. JOHN MOOLENAAR
SEN. JOHN PROOS
SEN. STEVE BIEDA, MINORITY VICE CHAIR
SEN. BERT JOHNSON
SEN. VIRGIL SMITH

# THE SENATE

### REDISTRICTING COMMITTEE
### SENATOR JOE HUNE
### CHAIRMAN

505 FARNUM
P.O. BOX 30036
LANSING, MICHIGAN 48909-7536
PHONE: (517) 373-2420
FAX: (517) 373-2784

## **Please note the date and time**
## NOTICE OF SCHEDULED MEETING

| | |
|---|---|
| **COMMITTEE:** | Redistricting |
| **DATE:** | Tuesday, June 28, 2011 |
| **TIME:** | 2:30 p.m. |
| **PLACE:** | Senate Hearing Room, Boji Tower, 124 W. Allegan Street, Lansing, MI 48933 |
| **PHONE:** | Scott Jones (373-5307) Committee Clerk |

## AGENDA

HB 4780  Rep. Lund      Legislature; apportionment; redistricting of congressional districts; provide for.

*And any other business to come properly before the committee.*

*In the spirit of compliance with the Americans With Disabilities Act (ADA), individuals with a disability should feel free to contact the Office of the Secretary of the Senate by phone [(517) 373-2400) or by TDD [(517) 373-0543] if requesting special services to effectively participate in the meeting.*

MINUTES OF THE COMMITTEE ON REDISTRICTING AND ELECTIONS

April 12, 2011                          9:00 a.m.                  Room 521 House Office Building

Chair Lund called the meeting to order.

Present were: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Nathan, Stanley,

Absent and excused:  None.

Rep. Knollenberg moved to approve the minutes of the meeting held March 15, 2011.   The motion prevailed.

Chair Lund recognized Kenneth Darga, State of Michigan Demographer, for a presentation on the 2010 Census Results for Michigan. (attached to the minutes)

Questions followed.

With no further business to come before the Committee Chair Lund adjourned the meeting, the time being 10:00 a.m.


                                                    _____
                                                    Representative Pete Lund, Chair

Mary Lou Terrien, Clerk

MINUTES OF THE COMMITTEE ON REDISTRICTING AND ELECTIONS

April 26, 2011                    9:00 a.m.              Room 521 House Office Building

Chair Lund called the meeting to order.

Present were: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Nathan, Stanley,

Absent and excused: None.

Rep. Byrum moved to approve the minutes of the meeting held April 12, 2011. The motion prevailed.

Chair Lund recognized Rep. Fred Durhal, Chair of the Michigan Legislative Black Caucus for testimony concerning the Voting Rights Act and to introduce the Legal Counsel representing the Michigan Legislative Black Caucus.

Chair Lund recognized the following people for a presentation concerning Section 2 of the Voting Rights Act.

Melvin Butch Hollowell, Legal Counsel representing the Michigan Legislative Black Caucus
Alan Canady, Legal Counsel representing the Michigan Legislative Black Caucus

Questions followed.

Chair Lund recognized the following person for a presentation concerning Section 5 of the Voting Rights Act.

Chris Thomas, Director of the Bureau of Elections, Secretary of State

With no further business to come before the Committee Chair Lund adjourned the meeting, the time being 10:02 a.m.

_____
Representative Pete Lund, Chair

Mary Lou Terrien, Clerk

MINUTES OF THE COMMITTEE ON REDISTRICTING AND ELECTIONS

May 10, 2011                    9:00 a.m.                    Room 521 House Office Building

Chair Lund called the meeting to order.

Present were: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Nathan, Stanley,

Absent and excused:  None.

Rep. McBroom moved to approve the minute of the meeting held April 26, 2011.  The motion prevailed.

Chair Lund laid before the Committee the following 2 bills.

HB 4005 - Heise - Elections; school dates of school elections; require to be in November of even numbered years.

HB 4006 - Heise - Elections; school; technical amendments to revise the school code concerning school board elections; provide for.

The following people filled out testimony cards in support of HB 4005 and HB 4006 but did not want to testify.

Chris Hackbarth representing the Michigan Department of State
Bill Zaagman representing the Michigan Association of County Clerks and the Michigan Association of Municipal Clerks

The following person filled out a testimony card in opposition to HB 4005 and HB 4006 but did not want to testify.

Peter Spadofore representing the Michigan Association of School Boards

Rep. Nathan moved to amend HB 4005 as follows:

1.  Amend page 3, line 7, after "**642C**" by striking out "**BEGINNING**" and inserting "**EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, BEGINNING**".
2.  Amend page 3, line 9, after "**ELECTION**" by inserting '**THE PROVISIONS OF THIS SECTION DO NOT APPLY TO A FIRST CLASS SCHOOL DISTRICT.**".

The motion did not prevail, the vote being 3-6-0.

Minutes of the Committee on Redistricting and Elections
May 10, 2011
Page 2

UNFAVORABLE ROLL CALL:

Yeas: Reps. Byrum, Nathan, Stanley,

Nays: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman,

Pass:  None.

Rep. Byrum moved to amend HB 4005 as follows:

1.  Amend page 3, line 7, by striking out all of section **642C** and inserting:

"**Sec. 642C. (1) EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION,
BEGINNING JANUARY 1, 2012, A SCHOOL DISTRICT SHALL HOLD ITS REGULAR
ELECTION FOR THE OFFICE OF SCHOOL BOARD MEMBER AT THE GENERAL
NOVEMBER ELECTION.
(2) A SCHOOL DISTRICT THAT HOLDS ITS REGULAR ELECTION FOR THE
OFFICE OF SCHOOL BOARD MEMBER AT THE SAME TIME THAT A CITY THAT
IS LOCATED IN THE SCHOOL DISTRICT HOLDS ITS REGULAR ELECTION FOR
THE OFFICE OF CITY COUNCIL MEMBER OR CITY COMMISSION MEMBER
MAY, BY THE SCHOOL DISTRICT'S SCHOOL BOARD ADOPTING A
RESLOUTION BEFORE MARCH 31,2012, CONTINUE TO HOLD ITS REGULAR
ELECTION FOR THE OFFICE OF SCHOOL BOPARD MEMBER ON ITS CURRENT
REGULAR ELECTION DATE.  IF A SCHOOL DISTRICT'S SCHOOL BOARD DOES
NOT ADOPT A RESOLUTION AS PROVIDED IN THIS SUBSECTION, BEGINNING
MARCH 31, 2012, THAT SCHOOL DISTRICT SHALL HOLD ITS REGULAR
ELECTION FOR THE OFFICE OF SCHOOL BOARD MEMBER AT THE GENERAL
NOVEMBER ELECTION.".**

The motion did not prevail, the vote being 3-6-0.

UNFAVORABLE ROLL CALL:

Yeas: Reps. Byrum, Nathan, Stanley,

Nays:  Reps. Lund, McBroom, Knollenberg, Scott, Tyler,

Pass:  None.

Rep. Knollenberg moved to report out HB 4005 with the recommendation that it pass.  The
motion prevailed, the vote being 5-4-0.

Minutes of the Committee on Redistricting and Elections
May 10, 2011
Page 3

FAVORABLE ROLL CALL:

Yeas: Reps. Lund, Knollenberg, Scott, Tyler, Outman,

Nays: Reps.  McBroom, Byrum, Nathan, Stanley,

Pass:  None.

Rep. Knollenberg moved to report out HB 4006 with the recommendation that it pass.  The motion prevailed, the vote being 5-4-0.

FAVORABLE ROLL CALL:

Yeas: Reps. Lund, Knollenberg, Scott, Tyler, Outman,

Nays:  Reps. McBroom, Byrum, Nathan, Stanley,

Pass:  None.

Chair Lund recognized Mr. Gary Gordon of Dykema Gossett PLLC for a presentation concerning the constitutional and statutory standards and criteria for redistricting.

Questions and discussion followed.

With no further business to come before the Committee Chair Lund adjourned the meeting, the time being 9:55 a.m.


_____
Representative Pete Lund, Chair

Mary Lou Terrien, Clerk

MINUTES OF THE COMMITTEE ON REDISTRICTING AND ELECTIONS

May 17, 2011                          9:00 a.m.                    Room 521 House Office Building

Chair Lund called the meeting to order.

Present were: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Stanley,

Absent and excused:  Rep. Nathan.

Chair Lund stated that there was an accident on the I-96 expressway and some of the people who wanted to testified today are running late.

Chair Lund recessed the meeting until 9:35 a.m. without objection.

Chair Lund reconvened the meeting, the time being 9:35 a.m.  A quorum was present.

Rep. Byrum moved to approve the minutes of the meeting held May 10, 2011.  The motion prevailed.

Chair Lund recognized the following people who testified on the redistricting process.

Sue Smith representing the League of Women Voters of Michigan
Christina Kuo representing Common Cause of Michigan
Jocelyn Benson, ESQ., Founder and CEO, Michigan Center for Election Law and Director, Michigan Citizens' Redistricting Competition

The following person submitted written testimony but did not want to testify.

Rich Robinson representing the Michigan Campaign Finance Network

Questions and discussion followed.

Rep. Byrum stated the date set by Chair Lund for public redistricting maps be submitted is May 23, 2011.  Rep. Byrum stated that she is again requesting how county breaks will be counted.

Chair Lund stated that he will get that information to Rep. Byrum.

Minutes of the Committee on Redistricting and Elections
May 17, 2011
Page 2

Rep. Knollenberg moved to excuse the member that was absent.   The motion prevailed.

With no further business to come before the Committee Chair Lund adjourned the meeting, the time being 10:00 a.m.

_____
Representative Pete Lund, Chair

Mary Lou Terrien, Clerk

MINUTES OF THE COMMITTEE ON REDISTRICTIING AND ELECTIONS

June 21, 2011                    9:00 a.m.                    Room 521 House Office Building

Chair Lund called the meeting to order.

Present were: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Nathan, Stanley,

Absent and excused:  None.

Rep. McBroom moved to approve the minutes of the meeting held May 17, 2011.  The motion prevailed.

Chair Lund laid before the Committee HB 4780 - Legislature; apportionment; redistricting of congressional districts; provide for.

Rep. McBroom moved to adopt the substitute H-1 to HB 4780.  The motion prevailed, the vote being 5-3-1.

FAVORABLE ROLL CALL:

Yeas: Reps. Lund, McBroom, Knollenberg, Tyler, Outman,

Nays:  Byrum, Nathan, Stanley,

Pass:  None.

Chair Lund recognized Terry Marquardt from the Senate Republican Caucus and Dan McMaster from the House Republican Caucus to explain the map that was drawn for the congressional districts. (map attached to the minutes)

Questions followed

Chair Lund recognized the following people who testified to a neutral position to HB 4780.

Susan Smith representing the League of Women Voters
Stephanie Chang representing the Asian Pacific Islander American Vote - Michigan

Chair Lund recognized the following people who testified in opposition to HB 4780.

Minutes of the Committee on Redistricting and Elections
June 21, 2011
Page 2

Alan Canady representing Congressman John Conyers
Richard Olson representing himself
Marjorie Mitchell representing the Michigan Universal Health Care Access Network
Cyndi Roper representing Clean Water Action
Jocelyn Benson representing Michigan Center for Election Law
Christina Kuo representing Common Cause
Dr. Jerome Reide representing the NAACP
Kevin Rex Heine representing Independent Caucus of Kent County
Thomas Norton representing Independent Caucus of Kent County
Frank Houston representing the Oakland County Democratic Party

The follow person filled out a testimony card in support of HB 4780 but did not want to testify.

Scott Hagersfrom representing Americans for Prosperity - Michigan

The following person filled out a testimony card in opposition to HB 4780 but did not want to testify.

Mark Brewer representing the Michigan Democratic Party

Rep. Stanley moved to amend HB 4780 as follows:

1. Amend page 190, line 18, after "STATES" by striking out the period and inserting a coma and "AS SET FORTH IN SHAW V RENO, 509 US 630 (1993), AND SUBSEQUENT CASES CONCERNING RACIAL GERRYMANDERING, IN LIGHT OF THESE DUAL OBLIGATIONS, THE PLAN AVOIDS ANY PRACTTICE OR DISTRICT LINES THAT RESULT IN THE DENIAL OF ANY RACIAL OR ETHNIC GROUP'S EQUAL OPPORTUNITY TO ELECT A REPRESENTATIVE OF ITS CHOICE AND, AT THE SAME TIME, DOES NOT SUBORDINATE TRADITIONAL REDISTRICTING PRINCIPLES FOR THE PURPOSE OF ACCOMPLISING A RACIAL GERRYMANDER OR CREATE A MAJORITY-MINORITY DISTRICT.  AS A CONSQUENCE, THE PLAN DOES NOT RESULT IN RETROGRESSION OR DILUTION OF MINORITY VOTING STRENGTH, PARTICULARLY IN THE LIGHT OF THE DEMOGRAPHIC LIMITATIONS CAUSE BY RELATIVE POPULATION LOSSES AND THE NEUTRAL CRITERIA SET FORTH IN SECTION 3 OF THE CONGRESSIONAL REDISTRICTING ACT, 1999 PA 221, MCL 3.63.".

The motion prevailed, the vote being 9-0-0.

Minutes of the Committee on Redistricting and Elections
June 21, 2011
Page 3

FAVORABLE ROLL CALL:

Yeas: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Nathan, Stanley,

Nays:  None,

Pass:  None.

Rep. Byrum moved to amend HB 4780 as follows:

1.  Amend page 189, line 14, after "Sec. 3." by striking out "(1)".
2.  Amend page 189, line 23, by striking out all of subsection (2).

The motion did not prevail, the vote being 3-5-1.

UNFAVORABLE ROLL CALL:

Yeas: Reps. Byrum, Nathan, Stanley,

Nays: Reps. Lund, McBroom, Knollenberg, Tyler, Outman,

Pass:  Rep. Scott.

Rep. McBroom moved to report out HB 4780, substitute H-2 with the recommendation that it pass.  The motion prevailed, the vote being 6-0-3.

FAVORABLE ROLL CALL:

Yeas: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman,

Nays:  Reps. Byrum, Nathan, Stanley,

Pass:  None.

With no further business to come before the Committee, Chair Lund adjourned the meeting, the time being 10:45 a.m.

_____
Representative Pete Lund, Chair

Mary Lou Terrien, Clerk



**MEMBERS:**
SEN. RICK JONES, VICE CHAIRMAN
SEN. DAVE HILDENBRAND
SEN. JIM MARLEAU
SEN. JOHN MOOLENAAR
SEN. JOHN PROOS
SEN. STEVE BIEDA, MINORITY VICE CHAIR
SEN. BERT JOHNSON
SEN. VIRGIL SMITH

# THE SENATE

**REDISTRICTING COMMITTEE**
**SENATOR JOE HUNE**
**CHAIRMAN**

605 FARNUM
P.O. BOX 30036
LANSING, MICHIGAN 48909-7536
PHONE: (517) 373-2420
FAX: (517) 373-2764

## \*\* DRAFT \*\*
## COMMITTEE MEETING MINUTES
### June 28, 2011

A meeting of the Senate Committee on Redistricting was scheduled for Tuesday, June 28, 2011, at 2:30 p.m., in the Senate Hearing Room of the Boji Tower.

---

**The agenda summary is as follows:**

1) Reported HB 4780 with recommendation and immediate effect.

---

The Chairman called the meeting to order at 2:35 p.m. He instructed the Clerk to call the roll. At that time, the following members were present; Chairman Hune, Sen.(s) Hildenbrand, Marleau, Moolenaar, Proos, Bieda, Johnson and Smith, a quorum.

At 2:36 p.m., the Chairman invited Congressmen Sander Levin to present testimony opposing HB 4780.

At 2:49 p.m., the Chairman invited Dan McMaster of the House Republicans and Terry Marquardt of the Senate Republicans to present testimony regarding HB 4780.

At 3:00 p.m., the Chairman moved to take a recess, so the committee's members could return to Senate Session.

At 4:52 p.m., the Chairman called the committee to back to order.

At 4:52 p.m., the Chairman invited Mark Brewer of the Michigan Democratic Party to present testimony opposing HB 4780.

At 4:52 p.m., the Chairman invited Mark Brewer of the Michigan Democratic Party to present testimony opposing HB 4780.

At 5:02 p.m., the Chairman read into the record the cards of those people no longer in attendance.

Oppose:
Christina Kuo, Common Cause Michigan
Jocelyn Benson, Michigan Center for Election Law

At 5:03 p.m., the Chairman invited Susan Smith of the League of Women Voters to present testimony opposing SB 498.

At 5:10 p.m., the Chairman invited Frank Houston of the Oakland County Democratic Party to present testimony opposing HB 4780.

At 5:24 p.m., the Chairman entertained a motion to adopt the meeting minutes from June 22, 2011. Sen. Bieda so moved.
        Yeas: Sen.(s) Hune, Jones, Hildenbrand, Marleau, Moolenaar, Proos, Bieda, Johnson and Smith
        Nays: None
The minutes were adopted.

At 5:25 p.m., the Chairman entertained a motion to report HB 4780 with recommendation that the bill pass. Sen. Jones so moved.
        Yeas: Sen.(s) Hune, Jones, Hildenbrand, Marleau, Moolenaar and Proos
        Nays: Sen.(s) Bieda, Johnson and Smith
HB 4780 was reported with recommendation.

At 5:27 p.m., the Chairman entertained a motion to give HB 4780 immediate effect. Sen. Jones so moved.
        Yeas: Sen.(s) Hune, Jones, Hildenbrand, Marleau, Moolenaar and Proos
        Nays: Sen.(s) Bieda, Johnson and Smith
Immediate effect was granted.

There being no further business before the committee, the Chairman adjourned the meeting at 5:29 p.m., on a voice vote, without objection.

(An audio recording of this committee meeting is available upon request for a minimal fee.)


Date Adopted by Committee:

# ALTERNATIVE PLANS WILL BE SUBMITTED UNDER SEPARATE COVER

4/12/2011

1

## Outline

1.) Overview of Data Releases

2.) Data:   Population Totals

Race Distribution

Housing and Vacancy

3.) The Count Question Resolution Process

## Major Data Releases

| | |
|---|---|
| 1) Apportionment Counts | 12/10 |
| 2) Redistricting Counts | 3/11 |
| 3) Group Quarter Counts | 4/11 |
| 4) Local Profiles | 5/11 |
| 5) Detailed Tables | summer |
| 6) American Community Survey | |
| 2010   (population 65k+) | 9/11 |
| 2008-10 (population 20k+) | 10/11 |
| 2006-10 (all areas) | 12/11 |

## 2010 Census Data for Michigan

Presentation to the House Redistricting
and Elections Committee

April 12, 2011

## Major Data Releases

| | |
|---|---|
| 1) Apportionment Counts | 12/10 |
| 2) Redistricting Counts | 3/11 |

• Population totals
• Race distribution
• Population over and under age 18
• Housing unit counts
• Vacancy data

4/12/2011



Michigan Population as Percent of U.S.: 1970-2010



Estimated Population of Michigan, 2000-2010



## Access to Data

www.michigan.gov/census

www.census.gov



## Data: Population Totals

- Michigan lost 55,000 residents from 2000 to 2010
- Only state to lose population
- 10th slowest rate of growth 2000-04
- 2nd fastest rate of decline 2004-10 (behind Rhode Island)

4/12/2011

---

## Data: Race Distribution

### Distribution of Michigan Population by Race and Hispanic Origin

| | % of Tot. | Ch. 00-10 |
|---|---|---|
| Total Population | 100.0% | - 0.6% |
| Hispanic | 4.4% | +34.7% |
| Non-Hispanic White Alone | 76.6% | -3.0% |
| Non-Hispanic Black Alone | 14.0% | -1.3% |
| Non-Hispanic Native American Alone | 0.6% | +2.3% |
| Non-Hispanic Asian/Pacific Alone | 2.4% | +34.5% |
| Non-Hispanic Multiracial | 1.9% | +16.5% |

---

## Data: Population Totals

**Some General Patterns:**

- Most university counties gained population

- Large cities generally lost population while surrounding communities often gained

- Central cities generally performed slightly better than had been estimated.

---

## Data: Housing and Vacancy

**Selected Vacancy Statistics:**

- Lowest: Westphalia          2.5%
- Highest: Mackinac Island          76%
- Statewide: up from 10.6% to 14.6%
- Cities:     up from  6.7% to 12.2%
- Detroit:    up from 10.3% to 22.8%
- 95% of cities and villages had higher vacancy in 2010 than in 2000

---

## Data: Housing and Vacancy

**Change from 2000 to 2010:**

| | |
|---|---|
| Population: | - 0.6% |
| Housing Units: | + 7.0% |
| Occupied Units: | + 2.3% |
| Vacant Units: | +47.1% |

4/12/2011

## Count Question Resolution

**Time Frame:**
- Issues can be submitted: June 2011 – June 2013
- Issues should be resolved by end of 2013.

**Impact:**
Changes WILL:
- be official census counts
- affect federal funding and program eligibility
- affect state revenue sharing
- be reflected in annual population estimates
- be suitable for all official purposes
- be published in an "Errata" document

## Count Question Resolution

**Types of Correctible Error:**
- Boundary errors
- Geocoding errors (living quarters assigned to wrong block)
- Processing errors
  Corrections will "add or delete specific living quarters and people associated with them, identified during the census process but erroneously included as duplicates or excluded due to processing errors."

## Count Question Resolution

**Impact:**

Changes WILL NOT:
- affect redistricting files or any other census products published online or by other means (aside from Errata document)
- be available by age, race, sex, or other characteristics



Michigan Population as Percent of U.S.: 1970-2010



### Population Growth
### in Michigan Counties: 1990-2000

Legend:
- Less than -5.0%
- -5.0% to 0%
- 0% to +5.0%
- +5.0% to +10.0%
- Greater than +10.0%

Source: U.S. Census Bureau

Produced by: Center for Shared Solutions and Technology Partnerships, Michigan Department of Technology, Management, and Budget, 03/03/11



# Population Growth
## in Michigan Counties: 2000-2010

Less than -5.0%

-5.0% to 0%

0% to +5.0%

+5.0% to +10.0%

Greater than +10.0%

Source: U.S. Census Bureau, final corrected population counts for 1990 and 2000, 2010 PL 94-171

Produced by Center for Shared Solutions and Technology Partnerships, Michigan Department of Technology, Management, and Budget, 03/23/11



# Hispanic Population in Michigan: 2000

**Percentage by Census Tract**

- Less than 1.50% (1,158)
- 1.50% to 2.99% (916)
- 3.00% to 5.99% (364)
- 6.00% to 11.99% (159)
- 12.00% to 77.14% (107)
- - - - City
- —— County
- Water Body

Total number of census tracts identified in parenthesis.
Source: U.S. Census Bureau, final corrected
population counts for 1990 and 2000

## Detroit Tri-County Area

Produced by:
Center for Shared Solutions and Technology Partnerships
Michigan Department of Technology, Management, and Budget
03/15/11





# Non-Hispanic Black Population in Michigan: 2000

**Percentage by Census Tract**

- Less than 2.00% (1,390)
- 2.00% to 4.99% (354)
- 5.00% to 19.99% (386)
- 20.00% to 84.99% (288)
- 85.00% or More (256)
- City
- County
- Water Body

Total number of census tracts identified in parenthesis
Source; U.S. Census Bureau, final corrected
population counts for 1990 and 2000

## Detroit Tri-County Area

See Inset Map

25 Miles

10 Miles

Produced by:
Center for Shared Solutions and Technology Partnerships
Michigan Department of Technology, Management, and Budget
03/14/11



Non-Hispanic Black Population in Michigan: 2010



# Vacant Housing Units in Michigan: 2000

**Percentage of Vacant Housing Units by Census Tract**

- Less than 5.00% (1,236)
- 5.00% to 7.99% (566)
- 8.00% to 14.99% (462)
- 15.00% to 34.99% (271)
- 35.00% or More (167)
- ------- City
- —— County
- Water Body

Total number of census tracts identified in parenthesis
Source: U.S. Census Bureau, final corrected
population counts for 1990 and 2000

## Detroit Tri-County Area

Produced by:
Center for Shared Solutions and Technology Partnerships
Michigan Department of Technology, Management, and Budget
03/14/11



**Vacant Housing Units in Michigan: 2010**

Percentage of
Vacant Housing Units
by Census Tract

Less than 5.00% (416)
5.00% to 7.99% (713)
8.00% to 14.99% (798)
15.00% to 34.99% (598)
35.00% or More (217)

- - - - City
——— County
Water Body

Total number of census tracts identified in parenthesis
Source: U.S. Census Bureau, 2010 PL 94-171

**Detroit Tri-County Area**

25 Miles

10 Miles

See Inset Map

Produced by:
Center for Shared Solutions and Technology Partnerships
Michigan Department of Technology, Management, and Budget
03/22/11



# Population Density in Michigan: 2000

**Persons per Square Mile by Census Tract**

Less than 200 (630)
200 to 1,249 (516)
1,250 to 2,999 (520)
3,000 to 5,999 (597)
6,000 to 19,393 (449)

------- City
——— County
Water Body

Total number of census tracts identified in parenthesis
Source: U.S. Census Bureau, final corrected
population counts for 1990 and 2000

## Detroit Tri-County Area

25 Miles

10 Miles

Produced by:
Center for Shared Solutions and Technology Partnerships
Michigan Department of Technology, Management, and Budget
03/14/11



## Population Density in Michigan: 2010

**Persons per Square Mile by Census Tract**

- Less than 200 (633)
- 200 to 1,249 (522)
- 1,250 to 2,999 (588)
- 3,000 to 5,999 (699)
- 6,000 to 60,800 (315)
- - - - City
- County
- Water Body

Total number of census tracts identified in parenthesis.
Source: U.S. Census Bureau, 2010 PL 94-171

### Detroit Tri-County Area

Produced by:
Center for Shared Solutions and Technology Partnerships
Michigan Department of Technology, Management, and Budget
03/22/11



# FEDERAL REGISTER

| Vol. 76 | Wednesday, |
|---------|------------|
| No. 27 | February 9, 2011 |

Part III

## Department of Justice

Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act; Notice

## DEPARTMENT OF JUSTICE

**Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act; Notice**

**AGENCY:** Office of the Assistant Attorney General, Civil Rights Division, Department of Justice.

**ACTION:** Notice.

**SUMMARY:** The Attorney General has delegated responsibility and authority for determinations under Section 5 of the Voting Rights Act to the Assistant Attorney General, Civil Rights Division, who finds that, in view of recent legislation and judicial decisions, it is appropriate to issue guidance concerning the review of redistricting plans submitted to the Attorney General for review pursuant to Section 5 of the Voting Rights Act.

**FOR FURTHER INFORMATION CONTACT:** T. Christian Herren, Jr., Chief, Voting Section, Civil Rights Division, United States Department of Justice, Washington, DC 20530, (202) 514–1416.

**SUPPLEMENTARY INFORMATION:** Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, requires jurisdictions identified in Section 4 of the Act to obtain a determination from either the Attorney General or the United States District Court for the District of Columbia that any change affecting voting which they seek to enforce does not have a discriminatory purpose and will not have a discriminatory effect.

Beginning in 2011, these covered jurisdictions will begin to seek review under Section 5 of the Voting Rights Act of redistricting plans based on the 2010 Census. Based on past experience, the overwhelming majority of the covered jurisdictions will submit their redistricting plans to the Attorney General. This guidance is not legally binding; rather, it is intended only to provide assistance to jurisdictions covered by the preclearance requirements of Section 5.

**Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c**

Following release of the 2010 Census data, the Department of Justice expects to receive several thousand submissions of redistricting plans for review pursuant to Section 5 of the Voting Rights Act. The Civil Rights Division has received numerous requests for guidance similar to that it issued prior to the 2000 Census redistricting cycle concerning the procedures and standards that will be applied during review of these redistricting plans. 67 FR 5411 (January 18, 2001). In addition,

in 2006, Congress reauthorized the Section 5 review requirement and refined its definition of some substantive standards for compliance with Section 5. In view of these developments, issuing revised guidance is appropriate.

The "Procedures for the Administration of Section 5 of the Voting Rights Act," 28 CFR Part 51, provide detailed information about the Section 5 review process. Copies of these Procedures are available upon request and through the Voting Section Web site (*http://www.usdoj.gov/crt/voting*). This document is meant to provide additional guidance with regard to current issues of interest. Citations to judicial decisions are provided to assist the reader but are not intended to be comprehensive. The following discussion provides supplemental guidance concerning the following topics:

• The Scope of Section 5 Review;
• The Section 5 Benchmark;
• Analysis of Plans (discriminatory purpose and retrogressive effect);
• Alternatives to Retrogressive Plans; and
• Use of 2010 Census Data.

**The Scope of Section 5 Review**

Under Section 5, a covered jurisdiction has the burden of establishing that a proposed redistricting plan "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in [Section 4(f)(2) of the Act]" (i.e., membership in a language minority group defined in the Act). 42 U.S.C 1973c(a). A plan has a discriminatory effect under the statute if, when compared to the benchmark plan, the submitting jurisdiction cannot establish that it does not result in a "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 125, 141 (1976).

If the proposed redistricting plan is submitted to the Department of Justice for administrative review, and the Attorney General determines that the jurisdiction has failed to show the absence of any discriminatory purpose or retrogressive effect of denying or abridging the right to vote on account of race, color or membership in a language minority group defined in the Act, the Attorney General will interpose an objection. If, in the alternative, the jurisdiction seeks a declaratory judgment from the United States District Court for the District of Columbia, that court will utilize the identical standard

to determine whether to grant the request; i.e., whether the jurisdiction has established that the plan is free from discriminatory purpose or retrogressive effect. Absent administrative preclearance from the Attorney General or a successful declaratory judgment action in the district court, the jurisdiction may not implement its proposed redistricting plan.

The Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person one-vote principle, on the grounds that it violates *Shaw* v. *Reno*, 509 U.S. 630 (1993), or on the grounds that it violates Section 2 of the Voting Rights Act. The same standard applies in a declaratory judgment action. Therefore, jurisdictions should not regard a determination of compliance with Section 5 as preventing subsequent legal challenges to that plan under other statutes by the Department of Justice or by private plaintiffs. 42 U.S.C. 1973c(a); 28 CFR 51.49.

**The Section 5 "Benchmark"**

As noted, under Section 5, a jurisdiction's proposed redistricting plan is compared to the "benchmark" plan to determine whether the use of the new plan would result in a retrogressive effect. The "benchmark" against which a new plan is compared is the last legally enforceable redistricting plan in force or effect. *Riley* v. *Kennedy*, 553 U.S. 406 (2008); 28 CFR 51.54(b)(1). Generally, the most recent plan to have received Section 5 preclearance or to have been drawn by a Federal court is the last legally enforceable redistricting plan for Section 5 purposes. When a jurisdiction has received Section 5 preclearance for a new redistricting plan, or a Federal court has drawn a new plan and ordered it into effect, that plan replaces the last legally enforceable plan as the Section 5 benchmark. *McDaniel* v. *Sanchez*, 452 U.S. 130 (1981); *Texas* v. *United States*, 785 F. Supp. 201 (D.D.C. 1992); *Mississippi* v. *Smith*, 541 F. Supp. 1329, 1333 (D.D.C. 1982), appeal dismissed, 461 U.S. 912 (1983).

A plan found to be unconstitutional by a Federal court under the principles of *Shaw* v. *Reno* and its progeny cannot serve as the Section 5 benchmark, *Abrams* v. *Johnson*, 521 U.S. 74 (1997), and in such circumstances, the benchmark for Section 5 purposes will be the last legally enforceable plan predating the unconstitutional plan. Absent such a finding of unconstitutionality under *Shaw* by a Federal court, the last legally enforceable plan will serve as the benchmark for Section 5 review. Therefore, the question of whether the

benchmark plan is constitutional will not be considered during the Department's Section 5 review.

## Analysis of Plans

As noted above, there are two necessary components to the analysis of whether a proposed redistricting plan meets the Section 5 standard. The first is a determination that the jurisdiction has met its burden of establishing that the plan was adopted free of any discriminatory purpose. The second is a determination that the jurisdiction has met its burden of establishing that the proposed plan will not have a retrogressive effect.

### Discriminatory Purpose

Section 5 precludes implementation of a change affecting voting that has the purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group defined in the Act. The 2006 amendments provide that the term "purpose" in Section 5 includes "any discriminatory purpose," and is not limited to a purpose to retrogress, as was the case after the Supreme Court's decision in *Reno v. Bossier Parish* ("*Bossier II*"), 528 U.S. 320 (2000). The Department will examine the circumstances surrounding the submitting authority's adoption of a submitted voting change, such as a redistricting plan, to determine whether direct or circumstantial evidence exists of any discriminatory purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group defined in the Act.

Direct evidence detailing a discriminatory purpose may be gleaned from the public statements of members of the adopting body or others who may have played a significant role in the process. *Busbee v. Smith*, 549 F. Supp. 494, 508 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983). The Department will also evaluate whether there are instances where the invidious element may be missing, but the underlying motivation is nonetheless intentionally discriminatory. In the *Garza* case, Judge Kozinski provided the clearest example:

Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't

matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza and United States v. County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied*, 498 U.S. 1028 (1991).

In determining whether there is sufficient circumstantial evidence to conclude that the jurisdiction has not established the absence of the prohibited discriminatory purpose, the Attorney General will be guided by the Supreme Court's illustrative, but not exhaustive, list of those "subjects for proper inquiry in determining whether racially discriminatory intent existed," outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977). In that case, the Court, noting that such an undertaking presupposes a "sensitive inquiry," identified certain areas to be reviewed in making this determination: (1) The impact of the decision; (2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; (3) the sequence of events leading up to the decision; (4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and (5) contemporaneous statements and viewpoints held by the decision-makers. *Id.* at 266–68.

The single fact that a jurisdiction's proposed redistricting plan does not contain the maximum possible number of districts in which minority group members are a majority of the population or have the ability to elect candidates of choice to office, does not mandate that the Attorney General interpose an objection based on a failure to demonstrate the absence of a discriminatory purpose. Rather, the Attorney General will base the determination on a review of the plan in its entirety.

### Retrogressive Effect

An analysis of whether the jurisdiction has met its burden of establishing that the proposed plan would not result in a discriminatory or "retrogressive" effect starts with a basic comparison of the benchmark and proposed plans at issue, using updated census data in each. Thus, the Voting Section staff loads the boundaries of the benchmark and proposed plans into the Civil Rights Division's geographic information system [GIS]. Population data are then calculated for each district in the benchmark and the proposed plans using the most recent decennial census data.

A proposed plan is retrogressive under Section 5 if its net effect would be to reduce minority voters' "effective exercise of the electoral franchise" when compared to the benchmark plan. *Beer v. United States* at 141. In 2006, Congress clarified that this means the jurisdiction must establish that its proposed redistricting plan will not have the effect of "diminishing the ability of any citizens of the United States" because of race, color, or membership in a language minority group defined in the Act, "to elect their preferred candidate of choice." 42 U.S.C. 1973c(b) & (d). In analyzing redistricting plans, the Department will follow the congressional directive of ensuring that the ability of such citizens to elect their preferred candidates of choice is protected. That ability to elect either exists or it does not in any particular circumstance.

In determining whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in the assessment. Rather, in the Department's view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district. As noted above, census data alone may not provide sufficient indicia of electoral behavior to make the requisite determination. Circumstances, such as differing rates of electoral participation within discrete portions of a population, may impact on the ability of voters to elect candidates of choice, even if the overall demographic data show no significant change.

Although comparison of the census population of districts in the benchmark and proposed plans is the important starting point of any Section 5 analysis, additional demographic and election data in the submission is often helpful in making the requisite Section 5 determination. 28 CFR 51.28(a). For example, census population data may not reflect significant differences in group voting behavior. Therefore, election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information are very important to an assessment of the actual effect of a redistricting plan.

The Section 5 Procedures contain the factors that the courts have considered in deciding whether or not a redistricting plan complies with Section 5. These factors include whether minority voting strength is reduced by the proposed redistricting; whether minority concentrations are fragmented

among different districts; whether minorities are overconcentrated in one or more districts; whether alternative plans satisfying the jurisdiction's legitimate governmental interests exist, and whether they were considered; whether the proposed plan departs from objective redistricting criteria set by the submitting jurisdiction, ignores other relevant factors such as compactness and contiguity, or displays a configuration that inexplicably disregards available natural or artificial boundaries; and, whether the plan is inconsistent with the jurisdiction's stated redistricting standards. 28 CFR 51.56–59.

**Alternatives to Retrogressive Plans**

There may be circumstances in which the jurisdiction asserts that, because of shifts in population or other significant changes since the last redistricting (e.g., residential segregation and demographic distribution of the population within the jurisdiction, the physical geography of the jurisdiction, the jurisdiction's historical redistricting practices, political boundaries, such as cities or counties, and/or state redistricting requirements), retrogression is unavoidable. In those circumstances, the submitting jurisdiction seeking preclearance of such a plan bears the burden of demonstrating that a less-retrogressive plan cannot reasonably be drawn.

In considering whether less-retrogressive alternative plans are available, the Department of Justice looks to plans that were actually considered or drawn by the submitting jurisdiction, as well as alternative plans presented or made known to the submitting jurisdiction by interested citizens or others. In addition, the Department may develop illustrative alternative plans for use in its analysis, taking into consideration the jurisdiction's redistricting principles. If it is determined that a reasonable alternative plan exists that is non-retrogressive or less retrogressive than the submitted plan, the Attorney General will interpose an objection.

Preventing retrogression under Section 5 does not require jurisdictions to violate the one-person, one-vote principle. 52 FR 488 (Jan. 6, 1987). Similarly, preventing retrogression under Section 5 does not require jurisdictions to violate Shaw v. Reno and related cases.

The one-person, one-vote issue arises most commonly where substantial demographic changes have occurred in some, but not all, parts of a jurisdiction. Generally, a plan for congressional redistricting that would require a greater overall population deviation than the submitted plan is not considered a reasonable alternative by the Department. For state legislative and local redistricting, a plan that would require significantly greater overall population deviations is not considered a reasonable alternative.

In assessing whether a less retrogressive plan can reasonably be drawn, the geographic compactness of a jurisdiction's minority population will be a factor in the Department's analysis. This analysis will include a review of the submitting jurisdiction's historical redistricting practices and district configurations to determine whether the alternative plan would (a) abandon those practices and (b) require highly unusual features to link together widely separated minority concentrations.

At the same time, compliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain of its redistricting criteria. For example, criteria that require the jurisdiction to make the least possible change to existing district boundaries, to follow county, city, or precinct boundaries, protect incumbents, preserve partisan balance, or in some cases, require a certain level of compactness of district boundaries may need to give way to some degree to avoid retrogression. In evaluating alternative or illustrative plans, the Department of Justice relies upon plans that make the least departure from a jurisdiction's stated redistricting criteria needed to prevent retrogression.

**The Use of 2010 Census Data**

The most current population data are used to measure both the benchmark plan and the proposed redistricting plan. 28 CFR 51.54(b)(2) (Department of Justice considers "the conditions existing at the time of the submission."); City of Rome v. United States, 446 U.S. 156, 186 (1980) ("most current available population data" to be used for measuring effect of annexations); Reno v. Bossier Parish School Board, 528 U.S. 320, 334 (2000) ("the baseline is the status quo that is proposed to be changed: If the change 'abridges the right to vote' relative to the status quo, preclearance is denied * * * .").

For redistricting after the 2010 Census, the Department of Justice will, consistent with past practice, evaluate redistricting submissions using the 2010 Census population data released by the Bureau of the Census for redistricting pursuant to Public Law 94–171, 13 U.S.C. 141(c). Thus, our analysis of the proposed redistricting plans includes a review and assessment of the Public

Law 94–171 population data, even if those data are not included in the submission or were not used by the jurisdiction in drawing the plan. The failure to use the Public Law 94–171 population data in redistricting does not, by itself, constitute a reason for interposing an objection. However, unless other population data used can be shown to be more accurate and reliable than the Public Law 94–171 data, the Attorney General will consider the Public Law 94–171 data to measure the total population and voting age population within a jurisdiction for purposes of its Section 5 analysis.

As in 2000, the 2010 Census Public Law 94–171 data will include counts of persons who have identified themselves as members of more than one racial category. This reflects the October 30, 1997, decision by the Office of Management and Budget (OMB) to incorporate multiple-race reporting into the Federal statistical system. 62 FR 58782–58790. Likewise, on March 9, 2000, OMB issued Bulletin No. 00–02 addressing "Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Enforcement." Part II of that Bulletin describes how such census responses will be allocated by Federal executive agencies for use in civil rights monitoring and enforcement.

The Department will follow both aggregation methods defined in Part II of the Bulletin. The Department's initial review of a plan will be based upon allocating any multiple-item response that includes white and one of the five other race categories identified in the response. Thus, the total numbers for "Black/African American," "Asian," "American Indian/Alaska Native," "Native Hawaiian or Other Pacific Islander" and "Some other race" reflect the total of the single-race responses and the multiple responses in which an individual selected a minority race and white race.

The Department will then move to the second step in its application of the census data to the plan by reviewing the other multiple-race category, which is comprised of all multiple-race responses consisting of more than one minority race. Where there are significant numbers of such responses, we will, as required by both the OMB guidance and judicial opinions, allocate these responses on an iterative basis to each of the component single-race categories for analysis. Georgia v. Ashcroft, 539 U.S. 461, 473, n.1 (2003).

As in the past, the Department will analyze Latino voters as a separate group for purposes of enforcement of the Voting Rights Act. If there are significant numbers of responses which

report Latino and one or more minority races (for example, Latinos who list their race as Black/African-American), those responses will be allocated alternatively to the Latino category and the minority race category.

Dated: February 3, 2011.

Thomas E. Perez,

*Assistant Attorney General, Civil Rights Division.*

[FR Doc. 2011–2797 Filed 2–8–11; 8:45 am]

BILLING CODE 4410–13–P

(1) The sale, distribution, and use of this device are restricted to prescription use in accordance with § 801.109 of this chapter.

(2) The labeling must include specific instructions regarding the proper placement and use of the device.

(3) The device must be demonstrated to be biocompatible.

(4) Mechanical bench testing of material strength must demonstrate that the device will withstand forces encountered during use.

(5) Safety and effectiveness data must demonstrate that the device prevents hemorrhoids in women undergoing spontaneous vaginal delivery, in addition to general controls.

Dated: April 11, 2011.

David Dorsey,

*Acting Deputy Commissioner for Policy, Planning and Budget.*

[FR Doc. 2011–9141 Filed 4–14–11; 8:45 am]

BILLING CODE 4160–01–P

## DEPARTMENT OF JUSTICE

**28 CFR Parts 0 and 51**

[CRT Docket No. 120; AG Order No. 3262–2011]

**Revision of Voting Rights Procedures**

**AGENCY:** Civil Rights Division, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Attorney General finds it necessary to revise the Department of Justice's "Procedures for the Administration of section 5 of the Voting Rights Act of 1965." The revisions are needed to clarify the scope of section 5 review based on recent amendments to section 5, make technical clarifications and updates, and provide better guidance to covered jurisdictions and interested members of the public concerning current Department practices. Proposed revised Procedures were published for comment on June 11, 2010, and a 60-day comment period was provided.

**DATES:** The rule will be effective on April 15, 2011.

**FOR FURTHER INFORMATION CONTACT:** T. Christian Herren, Jr., Chief, Voting Section, Civil Rights Division, United States Department of Justice, Room 7254–NWB, 950 Pennsylvania Avenue, NW., Washington, DC 20530, or by telephone at (800) 253–3931.

**SUPPLEMENTARY INFORMATION:**

Discussion

Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c,

requires certain jurisdictions (listed in the Appendix) to obtain "preclearance" from either the United States District Court for the District of Columbia or the United States Attorney General before implementing any new standard, practice, or procedure that affects voting.

Procedures for the Attorney General's Administration of section 5 were first published in 1971. Proposed Procedures were published for comment on May 28, 1971 (36 FR 9781), and the final Procedures were published on September 10, 1971 (36 FR 18186). As a result of the Department's experience under the 1971 Procedures, changes mandated by the 1975 Amendments to the Voting Rights Act, and interpretations of section 5 contained in judicial decisions, proposed revised Procedures were published for comment on March 21, 1980 (45 FR 18890), and final revised Procedures were published on January 5, 1981 (46 FR 870) (corrected at 46 FR 9571, Jan. 29, 1981). As a result of further experience under the 1981 Procedures, specifically with respect to redistricting plans adopted following the 1980 Census, changes mandated by the 1982 Amendments to the Voting Rights Act, and judicial decisions in cases involving section 5, revised Procedures were published for comment on May 6, 1985 (50 FR 19122), and final revised Procedures were published on January 6, 1987 (52 FR 486).

In the twenty-four years since the previous revisions became final, the Attorney General has had further experience in the consideration of voting changes; the courts have issued a number of important decisions in cases involving section 5, and Congress enacted the 2006 amendments to the Voting Rights Act. This new revision reflects these developments.

### Comments

In response to the Notice of Proposed Rulemaking ("Notice") published on June 11, 2010 (75 FR 33205), we received comments from or on behalf of two national public interest organizations, one research and educational institution, one national political organization composed of attorneys, and one individual. All comments received are available for inspection and copying at www.regulations.gov and at the Voting Section, Civil Rights Division, Department of Justice, Washington DC 20530.

The comments received expressed diverse views and were of great assistance in the preparation of these final revisions to the Procedures. The

final revised Procedures reflect our consideration of the comments as well as further consideration of sections or topics that were not the subject of comments.

### *Section 51.2 Definitions*

The purpose of the revision to the definition of "change affecting voting" or "change" is to clarify the definition of the benchmark standard, practice, or procedure. One commenter recommended we revise this section to reflect that the benchmark is the standard, practice, or procedure in force or effect at the time of the submission or the last legally enforceable standard, practice, or procedure in force or effect in the jurisdiction. We have concluded that no further revision of this section is warranted. The Voting Section's practice is to compare the proposed standard, practice, or procedure to the benchmark. Generally, the benchmark is the standard, practice, or procedure that has been: (1) Unchanged since the jurisdiction's coverage date; or (2) if changed since that date, found to comply with section 5 and "in force or effect." *Riley v. Kennedy,* 553 U.S. 406, 421 (2008); Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 CFR 51.54. Where there is an unsubmitted intervening change, the Attorney General will make no determination concerning the submitted change because of the prior unsubmitted change. In such instances, it is our practice to inform the jurisdiction there is a prior related change that has not been submitted and that simultaneous review is required. A standard, practice, or procedure that has been reviewed and determined to meet section 5 standards is considered to be in force or effect, even if the jurisdiction never implements the change because the change is effective as a matter of federal law and was available for use.

### *Section 51.3 Delegation of Authority*

The purpose of the revisions to the delegation of authority is to make technical corrections to the delegation of authority from the Attorney General to the Assistant Attorney General, and from the Chief of the Voting Section to supervisory attorneys within the Voting Section, and to conform the Procedures to other parts of Title 28. Two commenters objected to the revisions, expressing concern that the delegation of the functions of the Chief to supervisory attorneys in the Voting Section results in the delegation of section 5 legal review authority to non-politically appointed attorneys subordinate to the Section Chief.

The concerns of these commenters are unfounded. The delegation of authority in these Procedures is similar to existing delegations. For example, pursuant to the appendix to 28 CFR Part 0, Subpart J, the Chief may authorize the Deputy Chief to act on his or her behalf. Moreover, under the revised Procedures, the Chief needs the concurrence of the Assistant Attorney General, who is a presidential appointee, to designate supervisory attorneys to perform section 5 functions. Accordingly, we decline to revise the section further.

### Section 51.9   Computation of Time

The purpose of the revisions to this section is to clarify that the review period commences when a submission is received by the Department officials responsible for conducting section 5 reviews and to clarify the date of the response.

One commenter objected to the commencement of the 60-day review period upon receipt of the submission by the Voting Section or the Office of the Assistant Attorney General of the Civil Rights Division as an unwarranted extension of the 60-day review period. The Federal Rules of Civil Procedure provide for the designation of a Department clerical employee to receive summonses on behalf of the Attorney General. Fed. R. Civ. P. 4(i)(1)(A)(i). Similarly, and for the same purpose of prompt and efficient routing, the Attorney General has designated both the Voting Section and the Office of the Assistant Attorney General of the Civil Rights Division as the proper recipients for section 5 submissions.

The Department has made one additional edit to this section. As set forth in the Notice and as described below, a second paragraph is being added to § 51.37 (Obtaining information from the submitting authority). To ensure consistency, the reference to § 51.37, contained in previous versions of the Procedures, is amended to § 51.37(b).

### Section 51.13   Examples of Changes

The purpose of this revision is to clarify that the dissolution or merger of voting districts, de facto elimination of an elected office, and reallocations of authority to adopt or administer voting practices or procedures are all subject to section 5 review.

One commenter suggested that we add the extension of a term of office for an elected official as an example of a covered change in paragraph (i). We concluded that including this example would provide additional clarity. To the extent that the extension of an elected official's term is a discretionary change

that affects the next regularly scheduled election for that office, there is no question that it constitutes a "change affecting voting" covered by section 5. Additionally, extending the term of a particular office affects the ability of voters to elect candidates of choice at regularly scheduled intervals.

The commenter also suggested that paragraph (k), which provides that changes affecting the right or ability of persons to participate in "political campaigns" are covered under section 5, be expanded to include "campaigns or other pre-election activity." We agreed that the phrase "political campaigns," without any elaboration, may carry partisan connotations not envisioned by the statute. Additionally, "political campaigns" may not include all pre-election activity related to voting, and a somewhat broader construction is consistent with the broad scope given to "changes affecting voting" covered under section 5. Such changes include any "voting qualification or prerequisite to voting or standard, practice, or procedure" related to the right to vote, 42 U.S.C. 1973(a), and the Supreme Court has recognized that voting includes "all action necessary to make a vote effective." *Allen v. State Board of Elections*, 393 U.S. 544, 566 (1969) (quoting 42 U.S.C. 1973l). As a result, section 5 coverage extends to "subtle, as well as the obvious," changes affecting voting. *Allen*, 393 U.S. at 565.

Using the phrase "pre-election activity," by itself, however, is too general and nebulous. As a result, we have revised the paragraph to reflect that any change affecting the right or ability of persons to participate in pre-election activity, such as political campaigns, is subject to review under section 5.

Another commenter objected to the inclusion of paragraph (l) as an example of changes affecting voting, stating that this change did not fall within the scope of section 5 coverage. A change in the voting-related authority of an official or governmental entity does alter election law and change rules governing voting. Thus, such changes meet the test of voting relatedness that is at the core of the Court's decision in *Presley v. Etowah County Commission*, 502 U.S. 491 (1992). In addition, a conclusion that such changes are not covered arguably would be inconsistent with the well-established rule that section 5 covers state enabling legislation that transfers authority to adopt a voting change from the state to its subjurisdictions. See *Allen v. State Board of Elections*, 393 U.S. 544 (1969) (holding that section 5 covered a Mississippi statute that granted county

boards of supervisors the authority to change board elections from single-member districts to at-large voting).

### Section 51.18   Federal Court-Ordered Changes

The purpose of the revisions to this section is to clarify the principle that section 5 review ordinarily should precede other forms of court review, that a court-ordered change that initially is not subject to section 5 may become covered through subsequent actions taken by the affected jurisdiction, and that the interim use of an covered change before it is established that such change complies with section 5 should be ordered by a court only in emergency circumstances.

One commenter opposed the changes contained in the section stating that the revisions appear to grant federal courts greater authority to implement voting changes that are subject to, but not yet reviewed under, section 5 on an emergency basis. Although that was not the intent of the revisions, we have modified § 51.18(a) to clarify that it reflects existing judicial precedent. After further consideration, we believe that, other than renumbering the paragraph as § 51.18(d), it is appropriate not to make any change to § 51.18(c) as it currently exists in the Procedures.

### Section 51.28   Supplemental Contents

The proposed revision to paragraph (a) was omitted from the June 11, 2010, Notice of Proposed Rulemaking in error. The purpose of the revision is to make purely technical changes to the format in which information may be submitted to the Attorney General electronically. In addition, since the publication of the Notice, the Census Bureau has renamed the 15-character geographic identifier specified in paragraph (b); the final Procedures reflect this change in nomenclature.

### Section 51.29   Communications Concerning Voting Changes

The purpose of the revisions to this section is to clarify the addresses and methods by which persons may provide written comments on section 5 submissions and to clarify the circumstances in which the Department may withhold the identity of those providing comments on section 5 submissions.

One commenter objected to the nondisclosure of the identity of an individual or entity where an assurance of confidentiality may reasonably be implied from the circumstances of the communication. The Department believes, however, that communications

where confidentiality can reasonably be implied are within the scope of information that "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. 552(b)(7). Accordingly, this determination about confidentiality is within the scope of Section 552(b) concerning exemptions under both the Freedom of Information and the Privacy Acts.

*Section 51.37    Obtaining Information From the Submitting Authority*

The purpose of the revisions to this section is to clarify the procedures for the Attorney General to make oral and written requests for additional information regarding a section 5 submission.

One commenter recommended that we revise the paragraph concerning oral requests to make clear that the Attorney General reserves the authority to restart the 60-day review period upon receipt of material provided in response to the Attorney General's first such request made with respect to a submission, and that responses to an oral request do not affect the running of the 60-day period once a written request for information is made.

We declined to amend the proposed language regarding responses to an oral request because as the Procedures currently exist the Attorney General may request further information within the new 60-day period following the receipt of a response from the submitting authority to an earlier written request, but such a request shall not suspend the running the 60-day period, nor shall the Attorney General's receipt of such further information begin a new 60-day period. Moreover, § 51.39 provides that we may determine that information supplied in response to an oral request in the initial review period materially supplements the pending request such that it does extend the 60-day period.

We did conclude, however, on the basis of the comment that we received, that a reordering of the paragraphs would add clarity to the section and make it more useful.

*Section 51.40    Failure To Complete Submissions*

As described above, the paragraphs of § 51.37 are being reordered. To ensure consistency, the reference to § 51.37(a) in previous versions of the Procedures is amended to § 51.37(b).

*Section 51.48    Decision After Reconsideration*

The purpose of the revisions to this section is to clarify the manner in which the 60-day requirement applies to

reconsideration requests and revise language to conform to the substantive section 5 standard in the 2006 amendments to the Act.

One commenter objected to the revisions in paragraph (a), expressing a concern that the revisions permit the Attorney General to exceed 60 days for the reconsideration of an objection. Section 51.48 provides that the 60-day reconsideration period may be extended to allow a 15-day decision period following a conference held pursuant to § 51.47. Moreover, the courts have held that when a submitting jurisdiction deems its initial submission on a reconsideration request to be inadequate and decides to supplement it, the 60-day period is commenced anew. The purpose of this interpretation is to provide the Attorney General time to give adequate consideration to materials submitted in piecemeal fashion. *City of Rome v. United States*, 446 U.S. 156, 171 (1980).

*Section 51.50    Records Concerning Submissions*

The purpose of the revision to this section is to clarify the procedures regarding access to section 5 records. One commenter opposed the changes to paragraph (b) and conveyed concerns that these changes will result in the removal of record keeping with regard to objection files.

Under paragraph (a), the Voting Section continues to maintain a section 5 file for each submission, including objection files. Accordingly, all appropriate records continue to be maintained with regard to all section 5 submissions.

*Section 51.52    Basic Standard*

The purpose of the revision to this section is to clarify the substantive standard so as to reflect the 2006 amendments to the Act and the manner in which the Attorney General will evaluate submissions under section 5.

One commenter suggested that paragraph (a) be amended further to reflect the fact that the Attorney General "shall apply the same standard of review," instead of "shall make the same determination," that would be made by a court in an action for a declaratory judgment under section 5. The section refers to making a "determination" as the activity that both the Attorney General and the district court undertake, *i.e.*, deciding whether the change complies with section 5, as opposed to the resulting substantive decision. Therefore, we concluded that no further revision to the paragraph is warranted.

Another commenter suggested we replace "purpose and effect" with

"purpose or effect" in paragraph (c). Although we decided not to incorporate the commentator's exact change, we did decide that further refinement of the paragraph would provide more clarity. Therefore, the paragraph will reflect that in those situations where the evidence as to the purpose or effect of the change is conflicting and the Attorney General is unable to determine that the change is free of both the prohibited discriminatory purpose and effect, the Attorney General will interpose an objection. *Evers v. State Board of Election Commissioners*, 327 F. Supp. 640 (S.D. Miss 1971).

*Section 51.54    Discriminatory Purpose and Effect*

One commenter suggested various minor edits to the proposed language. We declined to make these changes. The proposed language reflects our extensive experience gained over the years in our administrative review of section 5 changes, while avoiding redundancy.

We did edit the language of paragraph (c) to reflect that the statutory language refers to a change in a standard, practice, or procedure affecting voting, not only a practice or procedure.

*Section 51.57(e)    Relevant Factors*

One commenter suggested that we include "contemporaneous statements and viewpoints held by decision-makers" in the list of relevant factors. Such statements are an evidentiary source cited by the Court in its opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977), and therefore we have revised the section to reflect the Court's holding more completely.

*Section 51.58(b)(2)    Background Factors*

One commenter suggested that this paragraph be revised to state that whether "election-related activities," instead of "political activities," are racially segregated or exclusionary constitutes important background information when making section 5 determinations. The proposed paragraph provided that the Attorney General will consider the "extent to which voting in the jurisdiction is racially polarized and political activities are racially segregated." Courts in cases assessing whether the constitutional guarantees afforded to persons to exercise the franchise without discrimination have been infringed have often used the words "electoral" and "political" as synonyms for each other. See, *e.g., Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667–68

(1966); *see also Johnson v. Miller,* 864 F. Supp. 1354, 1386–87 (S.D. Ga. 1994) (considering a claim under section 2 of the Voting Rights Act). These terms are similarly synonymous with respect to section 5, which also concerns the ability of voters to participate in the electoral process. After careful consideration of the comment, we determined that "election-related activities" provides greater clarity than "political activities" and revised the section accordingly.

*Section 51.59   Redistricting Plans*

Two commenters recommended various additions or deletions to paragraph 51.59(a). Because these factors are not intended to be exhaustive, not all factors are listed. Rather, the factors that are listed are illustrative, intended to provide guidance to jurisdictions regarding redistricting plans.

Other commenters suggested we delete or revise certain previously existing factors described in the paragraph. The Attorney General has, however, repeatedly cited factors identified in the section in past objection letters. Additionally, courts have cited "traditional redistricting principles," such as preserving recognized communities of interest and maintaining political and geographical boundaries, as relevant factors in a section 5 analysis. *Colleton County Council v. McConnell,* 201 F. Supp. 2d 618, 647 (D.S.C. 2002) (citing *S.C. State Conference of Branches of the NAACP v. Riley,* 533 F. Supp. 1178, 1180 (D.S.C.), *aff'd,* 459 U.S. 1025 (1982)). *See generally Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act,* 76 FR 7470, 7472 (2011).

One commenter suggested we amend paragraph 51.59(a)(7) to focus on whether a proposed plan is inconsistent with the jurisdiction's "long-held" redistricting standards, instead of the jurisdiction's "stated standards." The commenter believes that by adding the term "long-held," jurisdictions will be discouraged from adopting ad hoc redistricting principles to insulate a redistricting plan during section 5 review. The current factors, particularly with regards to discriminatory purpose, encapsulate scenarios where a jurisdiction adopts pretextual or unusual redistricting criteria. The Procedures should not be interpreted to discourage jurisdictions from considering traditional redistricting principles such as one-person, one-vote, or maintaining natural political or geographic boundaries, even if they have not done so in the past. *Bush v.*

*Vera,* 517 U.S. 952, 980–81 (1996). Therefore, we decline to revise these factors further.

*Section 51.59(b)   Discriminatory Purpose*

Several commenters suggested this paragraph be revised in the interest of clarity. After reviewing the language, we agreed that it did not clearly reflect the relevant case law on this point and that some clarification would be helpful. We revised the paragraph accordingly.

*Additional Provisions*

One commenter suggested the addition of several provisions related to the substantive standards to be employed during the review of redistricting plans. The proposed revisions go beyond the scope of these Procedures.

*Administrative Procedure Act*

This rule amends interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice and therefore the notice requirement of 5 U.S.C. 553(b) is not mandatory. Although notice and comment was not required, we nonetheless chose to offer the proposed rule for notice and comment.

*Regulatory Flexibility Act*

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this rule and by approving it certifies that this rule will not have a significant economic impact on a substantial number of small entities because it applies only to governmental entities and jurisdictions that are already required by section 5 of the Voting Rights Act of 1965 to submit voting changes to the Department of Justice, and this rule does not change this requirement. It provides guidance to such entities to assist them in making the required submissions under section 5. Further, a Regulatory Flexibility Analysis was not required to be prepared for this rule because the Department of Justice was not required to publish a general notice of proposed rulemaking for this matter.

*Executive Order 12866*

This rule has been drafted and reviewed in accordance with Executive Order 12866, "Regulatory Planning and Review," section 1(b). Principles of Regulation. The Department of Justice has determined that this rule is not a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and accordingly this rule has not been

reviewed by the Office of Management and Budget. The amendments made by this rule clarify the scope of section 5 review based on recent amendments to section 5, make certain technical clarifications and updates, and provide better guidance to covered jurisdictions and citizens. In many instances, the amendments describe longstanding practices of the Attorney General in his review of section 5 submissions.

*Executive Order 13132—Federalism*

This rule does not have federalism implications warranting the preparation of a Federalism Assessment under section 6 of Executive Order 13132 because the rule does not alter or modify the existing statutory requirements of section 5 of the Voting Rights Act imposed on the States, including units of local government or political subdivisions of the States.

*Executive Order 12988—Civil Justice Reform*

This document meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions are necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**List of Subjects in 28 CFR Parts 0 and 51**

Administrative practice and procedure, Archives and records, Authority delegations (government agencies), Civil rights, Elections, Political committees and parties, Voting rights.

Accordingly, by virtue of the authority vested in me as Attorney General, including 5 U.S.C. 301, 28 U.S.C. 509, 510, and 42 U.S.C. 1973c, 1973c, the following amendments are made to Chapter I of Title 28 of the Code of Federal Regulations:

**PART 0—ORGANIZATION OF THE DEPARTMENT OF JUSTICE**

■ 1. The authority citation for Part 0 continues to read as follows:

    **Authority:** 5 U.S.C. 301; 28 U.S.C. 509, 510.

**Subpart J—Civil Rights Division**

■ 2. In § 0.50, revise paragraph (h) to read as follows:

§ 0.50   General functions.

\*   \*   \*   \*   \*

(h) Administration of sections 3(c) and 5 of the Voting Rights Act of 1965, as amended (42 U.S.C. 1973a(c), 1973c).

\*   \*   \*   \*   \*

## PART 51—PROCEDURES FOR THE ADMINISTRATION OF SECTION 5 OF THE VOTING RIGHTS ACT OF 1965.

■ 3. The authority citation for Part 51 is revised to read as follows:

Authority: 5 U.S.C. 301; 28 U.S.C. 509, 510, and 42 U.S.C. 1973b, 1973c.

■ 4. In § 51.1, revise paragraph (a)(1) to read as follows:

### § 51.1  Purpose.

(a) \* \* \*

(1) A declaratory judgment is obtained from the U.S. District Court for the District of Columbia that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, or

\*   \*   \*   \*   \*

■ 5. In § 51.2, revise the definition for "Act"; remove the definition of "Change affecting voting"; and add a new definition of "Change affecting voting or change" in alphabetical order to read as follows:

### § 51.2  Definitions.

\*   \*   \*   \*   \*

*Act* means the Voting Rights Act of 1965, 79 Stat. 437, as amended by the Civil Rights Act of 1968, 82 Stat. 73, the Voting Rights Act Amendments of 1970, 84 Stat. 314, the District of Columbia Delegate Act, 84 Stat. 853, the Voting Rights Act Amendments of 1975, 89 Stat. 400, the Voting Rights Act Amendments of 1982, 96 Stat. 131, the Voting Rights Language Assistance Act of 1992, 106 Stat. 921, the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, 120 Stat. 577, and the Act to Revise the Short Title of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, 122 Stat. 2428, 42 U.S.C. 1973 *et seq.* Section numbers, such as "section 14(c)(3)," refer to sections of the Act.

\*   \*   \*   \*   \*

*Change effecting voting or change* means any voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on the date used to determine

coverage under section 4(b) or from the existing standard, practice, or procedure if it was subsequently altered and precleared under section 5. In assessing whether a change has a discriminatory purpose or effect, the comparison shall be with the standard, practice, or procedure in effect on the date used to determine coverage under section 4(b) or the most recent precleared standard, practice, or procedure. Some examples of changes affecting voting are given in § 51.13.

\*   \*   \*   \*   \*

■ 6. Revise § 51.3 to read as follows:

### § 51.3  Delegation of authority.

The responsibility and authority for determinations under section 5 and section 3(c) have been delegated by the Attorney General to the Assistant Attorney General, Civil Rights Division. With the exception of objections and decisions following the reconsideration of objections, the Chief of the Voting Section is authorized to perform the functions of the Assistant Attorney General. With the concurrence of the Assistant Attorney General, the Chief of the Voting Section may designate supervisory attorneys in the Voting Section to perform the functions of the Chief.

■ 7. Revise § 51.5 to read as follows:

### § 51.5  Termination of coverage.

(a) *Expiration.* The requirements of section 5 will expire at the end of the twenty-five-year period following the effective date of the amendments made by the Fannie Lou Hamer, Rosa Parks, Coretta Scott King, César E. Chávez, Barbara C. Jordan, William C. Velásquez, and Dr. Hector P. Garcia Voting Rights Act Reauthorization and Amendments Act of 2006 (VRARA), which amendments became effective on July 27, 2006. *See* section 4(a)(8) of the VRARA.

(b) *Bailout.* Any political subunit in a covered jurisdiction or a political subdivision of a covered State, a covered jurisdiction or a political subdivision of a covered State, or a covered State may terminate the application of section 5 ("bailout") by obtaining the declaratory judgment described in section 4(a) of the Act.

■ 8. Revise § 51.6 to read as follows:

### § 51.6  Political subunits.

All political subunits within a covered jurisdiction (e.g., counties, cities, school districts) that have not terminated coverage by obtaining the declaratory judgment described in section 4(a) of the Act are subject to the requirements of section 5.

■ 9. Revise § 51.9 to read as follows:

### § 51.9  Computation of time.

(a) The Attorney General shall have 60 days in which to interpose an objection to a submitted change affecting voting for which a response on the merits is appropriate (*see* § 51.35, § 51.37).

(b) The 60-day period shall commence upon receipt of a submission by the Voting Section of the Department of Justice's Civil Rights Division or upon receipt of a submission by the Office of the Assistant Attorney General, Civil Rights Division, if the submission is properly marked as specified in § 51.24(f). The 60-day period shall recommence upon the receipt in like manner of a resubmission (*see* § 51.35), information provided in response to a written request for additional information (*see* § 51.37(b)), or material, supplemental information or a related submission (*see* § 51.39).

(c) The 60-day period shall mean 60 calendar days, with the day of receipt of the submission not counted, and with the 60th day ending at 11:59 p.m. Eastern Time of that day. If the final day of the period should fall on a Saturday, Sunday, or any day designated as a holiday by the President or Congress of the United States, or any other day that is not a day of regular business for the Department of Justice, the next full business day shall be counted as the final day of the 60-day period. The date of the Attorney General's response shall be the date on which it is transmitted to the submitting authority by any reasonable means, including placing it in a postbox of the U.S. Postal Service or a private mail carrier, sending it by telefacsimile, email, or other electronic means, or delivering it in person to a representative of the submitting authority.

■ 10. In § 51.10, revise paragraph (a) to read as follows:

### § 51.10  Requirement of action for declaratory judgment or submission to the Attorney General.

\*   \*   \*   \*   \*

(a) Obtain a judicial determination from the U.S. District Court for the District of Columbia that the voting change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

\*   \*   \*   \*   \*

■ 11. Revise § 51.11 to read as follows:

### § 51.11  Right to bring suit.

Submission to the Attorney General does not affect the right of the

submitting authority to bring an action in the U.S. District Court for the District of Columbia for a declaratory judgment that the change affecting voting neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

■ 12. Revise § 51.12 to read as follows:

§ 51.12   Scope of requirement.

Except as provided in § 51.18 (Federal court-ordered changes), the section 5 requirement applies to any change affecting voting, even though it appears to be minor or indirect, returns to a prior practice or procedure, seemingly expands voting rights, or is designed to remove the elements that caused the Attorney General to object to a prior submitted change. The scope of section 5 coverage is based on whether the generic category of changes affecting voting to which the change belongs (for example, the generic categories of changes listed in § 51.13) has the potential for discrimination. *NAACP* v. *Hampton County Election Commission*, 470 U.S. 166 (1985). The method by which a jurisdiction enacts or administers a change does not affect the requirement to comply with section 5, which applies to changes enacted or administered through the executive, legislative, or judicial branches.

■ 13. In § 51.13, revise paragraphs (e), (i), and (k) and add paragraph (l) to read as follows:

§ 51.13   Examples of changes.
*    *    *    *    *

(e) Any change in the constituency of an official or the boundaries of a voting unit (*e.g.,* through redistricting, annexation, deannexation, incorporation, dissolution, merger, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections).
*    *    *    *    *

(i) Any change in the term of an elective office or an elected official, or any change in the offices that are elective (*e.g.,* by shortening or extending the term of an office; changing from election to appointment; transferring authority from an elected to an appointed official that, in law or in fact, eliminates the elected official's office; or staggering the terms of offices).
*    *    *    *    *

(k) Any change affecting the right or ability of persons to participate in pre-election activities, such as political campaigns.

(l) Any change that transfers or alters the authority of any official or

governmental entity regarding who may enact or seek to implement a voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting.

■ 14. Revise § 51.18 to read as follows:

§ 51.18   Federal court-ordered changes.

(a) *In general.* Changes affecting voting for which approval by a Federal court is required, or that are ordered by a Federal court, are exempt from section 5 review only where the Federal court prepared the change and the change has not been subsequently adopted or modified by the relevant governmental body. *McDaniel* v. *Sanchez,* 452 U.S. 130 (1981). (*See also* § 51.22.)

(b) *Subsequent changes.* Where a Federal court-ordered change is not itself subject to the preclearance requirement, subsequent changes necessitated by the court order but decided upon by the jurisdiction remain subject to preclearance. For example, voting precinct and polling changes made necessary by a court-ordered redistricting plan are subject to section 5 review.

(c) *Alteration in section 5 status.* Where a Federal court-ordered change at its inception is not subject to review under section 5, a subsequent action by the submitting authority demonstrating that the change reflects its policy choices (*e.g.,* adoption or ratification of the change, or implementation in a manner not explicitly authorized by the court) will render the change subject to review under section 5 with regard to any future implementation.

(d) *In emergencies.* A Federal court's authorization of the emergency interim use without preclearance of a voting change does not exempt from section 5 review any use of that practice not explicitly authorized by the court.

■ 15. Revise § 51.19 to read as follows:

§ 51.19   Request for notification concerning voting litigation.

A jurisdiction subject to the preclearance requirements of section 5 that becomes involved in any litigation concerning voting is requested to notify the Chief, Voting Section, Civil Rights Division, at the addresses, telefacsimile number, or email address specified in § 51.24. Such notification will not be considered a submission under section 5.

■ 16. In § 51.20, revise paragraphs (b) through (e) and add a new paragraph (f) to read as follows:

§ 51.20   Form of submissions.
*    *    *    *    *

(b) The Attorney General will accept certain machine readable data in the

following electronic media: 3.5 inch 1.4 megabyte disk, compact disc read-only memory (CD–ROM) formatted to the ISO–9660/Joliet standard, or digital versatile disc read-only memory (DVD–ROM). Unless requested by the Attorney General, data provided on electronic media need not be provided in hard copy.

(c) All electronic media shall be clearly labeled with the following information:

(1) Submitting authority.

(2) Name, address, title, and telephone number of contact person.

(3) Date of submission cover letter.

(4) Statement identifying the voting change(s) involved in the submission.

(d) Each magnetic medium (floppy disk or tape) provided must be accompanied by a printed description of its contents, including an identification by name or location of each data file contained on the medium, a detailed record layout for each such file, a record count for each such file, and a full description of the magnetic medium format.

(e) Text documents should be provided in a standard American Standard Code for Information Interchange (ASCII) character code; documents with graphics and complex formatting should be provided in standard Portable Document Format (PDF). The label shall be affixed to each electronic medium, and the information included on the label shall also be contained in a documentation file on the electronic medium.

(f) All data files shall be provided in a delimited text file and must include a header row as the first row with a name for each field in the data set. A separate data dictionary file documenting the fields in the data set, the field separators or delimiters, and a description of each field, including whether the field is text, date, or numeric, enumerating all possible values is required; separators and delimiters should not also be used as data in the data set. Proprietary or commercial software system data files (*e.g.,* SAS, SPSS, dBase, Lotus 1-2-3) and data files containing compressed data or binary data fields will not be accepted.

■ 17. Revise § 51.21 to read as follows:

§ 51.21   Time of submissions.

Changes affecting voting should be submitted as soon as possible after they become final, except as provided in § 51.22.

■ 18. Revise § 51.22 to read as follows:

§ 51.22   Submitted changes that will not be reviewed.

(a) The Attorney General will not consider on the merits:

(1) Any proposal for a change submitted prior to final enactment or administrative decision except as provided in paragraph (b) of this section.

(2) Any submitted change directly related to another change that has not received section 5 preclearance if the Attorney General determines that the two changes cannot be substantively considered independently of one another.

(3) Any submitted change whose enforcement has ceased and been superseded by a standard, practice, or procedure that has received section 5 preclearance or that is otherwise legally enforceable under section 5.

(b) For any change requiring approval by referendum, by a State or Federal court, or by a Federal agency, the Attorney General may make a determination concerning the change prior to such approval if the change is not subject to alteration in the final approving action and if all other action necessary for approval has been taken. (See also § 51.18.)

■ 19. Revise § 51.23 to read as follows:

§ 51.23   Party and jurisdiction responsible for making submissions.

(a) Changes affecting voting shall be submitted by the chief legal officer or other appropriate official of the submitting authority or by any other authorized person on behalf of the submitting authority. A State, whether partially or fully covered, has authority to submit any voting change on behalf of its covered jurisdictions and political subunits. Where a State is covered as a whole, State legislation or other changes undertaken or required by the State shall be submitted by the State (except that legislation of local applicability may be submitted by political subunits). Where a State is partially covered, changes of statewide application may be submitted by the State. Submissions from the State, rather than from the individual covered jurisdictions, would serve the State's interest in at least two important respects: first, the State is better able to explain to the Attorney General the purpose and effect of voting changes it enacts than are the individual covered jurisdictions; second, a single submission of the voting change on behalf of all of the covered jurisdictions would reduce the possibility that some State acts will be legally enforceable in some parts of the State but not in others.

(b) A change effected by a political party (see § 51.7) may be submitted by

an appropriate official of the political party.

(c) A change affecting voting that results from a State court order should be submitted by the jurisdiction or entity that is to implement or administer the change (in the manner specified by paragraphs (a) and (b) of this section).

■ 20. Revise § 51.24 to read as follows:

§ 51.24   Delivery of submissions.

(a) Delivery by U.S. Postal Service. Submissions sent to the Attorney General by the U.S. Postal Service, including certified mail or express mail, shall be addressed to the Chief, Voting Section, Civil Rights Division, United States Department of Justice, Room 7254–NWB, 950 Pennsylvania Avenue, NW, Washington, DC 20530.

(b) Delivery by other carriers. Submissions sent to the Attorney General by carriers other than the U.S. Postal Service, including by hand delivery, should be addressed or may be delivered to the Chief, Voting Section, Civil Rights Division, United States Department of Justice, Room 7254– NWB, 1800 G Street, NW, Washington, DC 20006.

(c) Electronic submissions. Submissions may be delivered to the Attorney General through an electronic form available on the website of the Voting Section of the Civil Rights Division at www.justice.gov/crt/voting/. Detailed instructions appear on the website. Jurisdictions should answer the questions appearing on the electronic form, and should attach documents as specified in the instructions accompanying the application.

(d) Telefacsimile submissions. In urgent circumstances, submissions may be delivered to the Attorney General by telefacsimile to (202) 616–9514. Submissions should not be sent to any other telefacsimile number at the Department of Justice. Submissions that are voluminous should not be sent by telefacsimile.

(e) Email. Submissions may not be delivered to the Attorney General by email in the first instance. However, after a submission is received by the Attorney General, a jurisdiction may supply additional information on that submission by email to vot1973c@usdoj.gov. The subject line of the email shall be identified with the Attorney General's file number for the submission (YYYY–NNNN), marked as "Additional Information," and include the name of the jurisdiction.

(f) Special marking. The first page of the submission, and the envelope (if any), shall be clearly marked: "Submission under Section 5 of the Voting Rights Act."

(g) The most current information on addresses for, and methods of making, section 5 submissions is available on the Voting Section website at www.justice.gov/crt/voting/.

■ 21. In § 51.25, revise paragraph (a) to read as follows:

§ 51.25   Withdrawal of submissions.

(a) A jurisdiction may withdraw a submission at any time prior to a final decision by the Attorney General. Notice of the withdrawal of a submission must be made in writing addressed to the Chief, Voting Section, Civil Rights Division, to be delivered at the addresses, telefacsimile number, or email address specified in § 51.24. The submission shall be deemed withdrawn upon the Attorney General's receipt of the notice.

*     *     *     *     *

■ 22. In § 51.27, revise paragraphs (a) through (d) to read as follows:

§ 51.27   Required contents.

*     *     *     *     *

(a) A copy of any ordinance, enactment, order, or regulation embodying the change affecting voting for which section 5 preclearance is being requested.

(b) A copy of any ordinance, enactment, order, or regulation embodying the voting standard, practice, or procedure that is proposed to be repealed, amended, or otherwise changed.

(c) A statement that identifies with specificity each change affecting voting for which section 5 preclearance is being requested and that explains the difference between the submitted change and the prior law or practice. If the submitted change is a special referendum election and the subject of the referendum is a proposed change affecting voting, the submission should specify whether preclearance is being requested solely for the special election or for both the special election and the proposed change to be voted on in the referendum (see §§ 51.16, 51.22).

(d) The name, title, mailing address, and telephone number of the person making the submission. Where available, a telefacsimile number and an email address for the person making the submission also should be provided.

*     *     *     *     *

■ 23. In § 51.28, revise paragraph (a)(5), add (a)(6), and revise paragraph (c) to read as follows:

§ 51.28   Supplemental contents.

*     *     *     *     *

(a) * * *

(5) Demographic data on electronic media that are provided in conjunction

with a redistricting plan shall be contained in an ASCII, comma

delimited block equivalency import file with two fields as detailed in the

following table. A separate import file shall accompany each redistricting plan:

| Field No. | Description | Total length | Comments |
|---|---|---|---|
| 1 .................... | PL94–171 reference number: GEOID10 ............................................... | 15 | |
| 2 .................... | District Number .................................................................................... | 3 | No leading zeroes. |

(i) *Field 1:* The PL 94–171/GEOID10 reference number is the state, county, tract, and block reference numbers concatenated together and padded with leading zeroes so as to create a 15-digit character field; and

(ii) *Field 2:* The district number is a 3 digit character field with no padded leading zeroes.

*Example:* 482979501002099,1 482979501002100,3 482979501004301,10 482975010004305,23 48297501004302,101

(6) Demographic data on magnetic media that are provided in conjunction with a redistricting can be provided in shapefile (.shp) spatial data format.

(i) The shapefile shall include at a minimum the main file, index file, and dBASE table.

(ii) The dBASE table shall contain a row for each census block. Each census block will be identified by the state, county, tract and block identifier (GEOID10) as specified by the Bureau of Census. Each row shall identify the district assignment and relevant population for that specific row.

(iii) The shapefile should include a projection file (.prj).

(iv) The shapefile should be sent in NAD 83 geographic projection. If another projection is used, it should be described fully.

\*    \*    \*    \*    \*

(c) *Annexations.* For annexations, in addition to that information specified elsewhere, the following information:

(1) The present and expected future use of the annexed land (*e.g.,* garden apartments, industrial park).

(2) An estimate of the expected population, by race and language group, when anticipated development, if any, is completed.

(3) A statement that all prior annexations (and deannexations) subject to the preclearance requirement have been submitted for review, or a statement that identifies all annexations (and deannexations) subject to the preclearance requirement that have not been submitted for review. *See* § 51.61(b).

(4) To the extent that the jurisdiction elects some or all members of its governing body from single-member districts, it should inform the Attorney General how the newly annexed

territory will be incorporated into the existing election districts.

\*    \*    \*    \*    \*

■ 24. In § 51.29, revise paragraphs (b) and (d) to read as follows:

**§ 51.29   Communications concerning voting changes.**

\*    \*    \*    \*    \*

(b) Comments should be sent to the Chief, Voting Section, Civil Rights Division, at the addresses, telefacsimile number, or email address specified in § 51.24. The first page and the envelope (if any) should be marked: "Comment under section 5 of the Voting Rights Act." Comments should include, where available, the name of the jurisdiction and the Attorney General's file number (YYYY–NNNN) in the subject line.

\*    \*    \*    \*    \*

(d) To the extent permitted by the Freedom of Information Act, 5 U.S.C. 552, the Attorney General shall not disclose to any person outside the Department of Justice the identity of any individual or entity providing information on a submission or the administration of section 5 where the individual or entity has requested confidentiality; an assurance of confidentiality may reasonably be implied from the circumstances of the communication; disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy under 5 U.S.C. 552; or disclosure is prohibited by any applicable provisions of federal law.

\*    \*    \*    \*    \*

■ 25. Revise § 51.35 to read as follows:

**§ 51.35   Disposition of inappropriate submissions and resubmissions.**

(a) When the Attorney General determines that a response on the merits of a submitted change is inappropriate, the Attorney General shall notify the submitting official in writing within the 60-day period that would have commenced for a determination on the merits and shall include an explanation of the reason why a response is not appropriate.

(b) Matters that are not appropriate for a merits response include:

(1) Changes that do not affect voting (*see* § 51.13);

(2) Standards, practices, or procedures that have not been changed (*see* §§ 51.4, 51.14);

(3) Changes that previously have received preclearance;

(4) Changes that affect voting but are not subject to the requirement of section 5 (*see* § 51.18);

(5) Changes that have been superseded or for which a determination is premature (*see* §§ 51.22, 51.61(b));

(6) Submissions by jurisdictions not subject to the preclearance requirement (*see* §§ 51.4, 51.5);

(7) Submissions by an inappropriate or unauthorized party or jurisdiction (*see* § 51.23); and

(8) Deficient submissions (*see* § 51.26(d)).

(c) Following such a notification by the Attorney General, a change shall be deemed resubmitted for section 5 review upon the Attorney General's receipt of a submission or other written information that renders the change appropriate for review on the merits (such as a notification from the submitting authority that a change previously determined to be premature has been formally adopted). Notice of the resubmission of a change affecting voting will be given to interested parties registered under § 51.32.

■ 26. Revise § 51.37 to read as follows:

**§ 51.37   Obtaining information from the submitting authority.**

(a) *Oral requests for information.* (1) If a submission does not satisfy the requirements of § 51.27, the Attorney General may request orally any omitted information necessary for the evaluation of the submission. An oral request may be made at any time within the 60-day period, and the submitting authority should provide the requested information as promptly as possible. The oral request for information shall not suspend the running of the 60-day period, and the Attorney General will proceed to make a determination within the initial 60-day period. The Attorney General reserves the right as set forth in § 51.39, however, to commence a new 60-day period in which to make the requisite determination if the written information provided in response to such request materially supplements the submission.

(2) An oral request for information shall not limit the authority of the Attorney General to make a written request for information.

(3) The Attorney General will notify the submitting authority in writing when the 60-day period for a submission is recalculated from the Attorney General's receipt of written information provided in response to an oral request as described in § 51.37a(1), above.

(4) Notice of the Attorney General's receipt of written information pursuant to an oral request will be given to interested parties registered under § 51.32.

(b) *Written requests for information.* (1) If the Attorney General determines that a submission does not satisfy the requirements of § 51.27, the Attorney General may request in writing from the submitting authority any omitted information necessary for evaluation of the submission. *Branch* v. *Smith,* 538 U.S. 254 (2003); *Georgia* v. *United States,* 411 U.S. 526 (1973). This written request shall be made as promptly as possible within the original 60-day period or the new 60-day period described in § 51.39(a). The written request shall advise the jurisdiction that the submitted change remains unenforceable unless and until preclearance is obtained.

(2) A copy of the request shall be sent to any party who has commented on the submission or has requested notice of the Attorney General's action thereon.

(3) The Attorney General shall notify the submitting authority that a new 60-day period in which the Attorney General may interpose an objection shall commence upon the Attorney General's receipt of a response from the submitting authority that provides the information requested or states that the information is unavailable. The Attorney General can request further information in writing within the new 60-day period, but such a further request shall not suspend the running of the 60-day period, nor shall the Attorney General's receipt of such further information begin a new 60-day period.

(4) Where the response from the submitting authority neither provides the information requested nor states that such information is unavailable, the response shall not commence a new 60-day period. It is the practice of the Attorney General to notify the submitting authority that its response is incomplete and to provide such notification as soon as possible within the 60-day period that would have commenced had the response been complete. Where the response includes

a portion of the available information that was requested, the Attorney General will reevaluate the submission to ascertain whether a determination on the merits may be made based upon the information provided. If a merits determination is appropriate, it is the practice of the Attorney General to make that determination within the new 60-day period that would have commenced had the response been complete. *See* § 51.40.

(5) If, after a request for further information is made pursuant to this section, the information requested by the Attorney General becomes available to the Attorney General from a source other than the submitting authority, the Attorney General shall promptly notify the submitting authority in writing, and the new 60-day period will commence the day after the information is received by the Attorney General.

(6) Notice of the written request for further information and the receipt of a response by the Attorney General will be given to interested parties registered under § 51.32.

■ 27. Revise § 51.39 to read as follows:

**§ 51.39  Supplemental information and related submissions.**

(a)(1) *Supplemental information.* When a submitting authority, at its own instance, provides information during the 60-day period that the Attorney General determines materially supplements a pending submission, the 60-day period for the pending submission will be recalculated from the Attorney General's receipt of the supplemental information.

(2) *Related submissions.* When the Attorney General receives related submissions during the 60-day period for a submission that cannot be independently considered, the 60-day period for the first submission shall be recalculated from the Attorney General's receipt of the last related submission.

(b) The Attorney General will notify the submitting authority in writing when the 60-day period for a submission is recalculated due to the Attorney General's receipt of supplemental information or a related submission.

(c) Notice of the Attorney General's receipt of supplemental information or a related submission will be given to interested parties registered under § 51.32.

■ 28. Revise § 51.40 to read as follows:

**§ 51.40  Failure to complete submissions.**

If after 60 days the submitting authority has not provided further information in response to a request made pursuant to § 51.37(b), the

Attorney General, absent extenuating circumstances and consistent with the burden of proof under section 5 described in § 51.52(a) and (c), may object to the change, giving notice as specified in § 51.44.

■ 29. Revise § 51.42 to read as follows:

**§ 51.42  Failure of the Attorney General to respond.**

It is the practice and intention of the Attorney General to respond in writing to each submission within the 60-day period. However, the failure of the Attorney General to make a written response within the 60-day period constitutes preclearance of the submitted change, provided that a 60-day review period had commenced after receipt by the Attorney General of a complete submission that is appropriate for a response on the merits. (*See* § 51.22, § 51.27, § 51.35.)

■ 30. Revise § 51.43 to read as follows:

**§ 51.43  Reexamination of decision not to object.**

(a) After notification to the submitting authority of a decision not to interpose an objection to a submitted change affecting voting has been given, the Attorney General may reexamine the submission if, prior to the expiration of the 60-day period, information comes to the attention of the Attorney General that would otherwise require objection in accordance with section 5.

(b) In such circumstances, the Attorney General may by letter withdraw his decision not to interpose an objection and may by letter interpose an objection provisionally, in accordance with § 51.44, and advise the submitting authority that examination of the change in light of the newly raised issues will continue and that a final decision will be rendered as soon as possible.

■ 31. In § 51.44, revise paragraph (c) to read as follows:

**§ 51.44  Notification of decision to object.**

\*   \*   \*   \*   \*

(c) The submitting authority shall be advised further that notwithstanding the objection it may institute an action in the U.S. District Court for the District of Columbia for a declaratory judgment that the change objected to by the Attorney General neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

\*   \*   \*   \*   \*

■ 32. In § 51.46, revise paragraph (a) to read as follows:

**§ 51.46   Reconsideration of objection at the instance of the Attorney General.**

(a) Where there appears to have been a substantial change in operative fact or relevant law, or where it appears there may have been a misinterpretation of fact or mistake in the law, an objection may be reconsidered, if it is deemed appropriate, at the instance of the Attorney General.

*       *       *       *       *

■ 33. In § 51.48, revise paragraphs (a) through (d) to read as follows:

**§ 51.48   Decision after reconsideration.**

(a) It is the practice of the Attorney General to notify the submitting authority of the decision to continue or withdraw an objection within a 60-day period following receipt of a reconsideration request or following notice given under § 51.46(b), except that this 60-day period shall be recommenced upon receipt of any documents or written information from the submitting authority that materially supplements the reconsideration review, irrespective of whether the submitting authority provides the documents or information at its own instance or pursuant to a request (written or oral) by the Attorney General. The 60-day reconsideration period may be extended to allow a 15-day decision period following a conference held pursuant to § 51.47. The 60-day reconsideration period shall be computed in the manner specified in § 51.9. Where the reconsideration is at the instance of the Attorney General, the first day of the period shall be the day after the notice required by § 51.46(b) is transmitted to the submitting authority. The reasons for the reconsideration decision shall be stated.

(b) The objection shall be withdrawn if the Attorney General is satisfied that the change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

(c) If the objection is not withdrawn, the submitting authority shall be advised that notwithstanding the objection it may institute an action in the U.S. District Court for the District of Columbia for a declaratory judgment that the change objected to by the Attorney General neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

(d) An objection remains in effect until either it is specifically withdrawn by the Attorney General or a declaratory judgment with respect to the change in question is entered by the U.S. District Court for the District of Columbia.

*       *       *       *       *

■ 34. Revise § 51.50 to read as follows:

**§ 51.50   Records concerning submissions.**

(a) *Section 5 files.* The Attorney General shall maintain a section 5 file for each submission, containing the submission, related written materials, correspondence, memoranda, investigative reports, data provided on electronic media, notations concerning conferences with the submitting authority or any interested individual or group, and copies of letters from the Attorney General concerning the submission.

(b) *Objection letters.* The Attorney General shall maintain section 5 notification letters regarding decisions to interpose, continue, or withdraw an objection.

(c) *Computer file.* Records of all submissions and their dispositions by the Attorney General shall be electronically stored.

(d) *Copies.* The contents of the section 5 submission files in paper, microfiche, electronic, or other form shall be available for obtaining copies by the public, pursuant to written request directed to the Chief, Voting Section, Civil Rights Division, United States Department of Justice, Washington, DC. Such written request may be delivered to the addresses or telefacsimile number specified in § 51.24 or by electronic mail to *Voting.Section@usdoj.gov.* It is the Attorney General's intent and practice to expedite, to the extent possible, requests pertaining to pending submissions. Those who desire copies of information that has been provided on electronic media will be provided a copy of that information in the same form as it was received. Materials that are exempt from inspection under the Freedom of Information Act, 5 U.S.C. 552(b), may be withheld at the discretion of the Attorney General. The identity of any individual or entity that provided information to the Attorney General regarding the administration of section 5 shall be available only as provided by § 51.29(d). Applicable fees, if any, for the copying of the contents of these files are contained in the Department of Justice regulations implementing the Freedom of Information Act, 28 CFR 16.10.

■ 35. Revise § 51.52 to read as follows:

**§ 51.52   Basic standard.**

(a) *Surrogate for the court.* Section 5 provides for submission of a voting change to the Attorney General as an alternative to the seeking of a declaratory judgment from the U.S. District Court for the District of Columbia. Therefore, the Attorney General shall make the same determination that would be made by the court in an action for a declaratory judgment under section 5: whether the submitted change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. The burden of proof is on a submitting authority when it submits a change to the Attorney General for preclearance, as it would be if the proposed change were the subject of a declaratory judgment action in the U.S. District Court for the District of Columbia. *South Carolina* v. *Katzenbach,* 383 U.S. 301, 328, 335 (1966).

(b) *No objection.* If the Attorney General determines that the submitted change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, no objection shall be interposed to the change.

(c) *Objection.* An objection shall be interposed to a submitted change if the Attorney General is unable to determine that the change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. This includes those situations where the evidence as to the purpose or effect of the change is conflicting and the Attorney General is unable to determine that the change is free of both the prohibited discriminatory purpose and effect.

■ 36. Revise § 51.54 to read as follows:

**§ 51.54   Discriminatory purpose and effect.**

(a) *Discriminatory purpose.* A change affecting voting is considered to have a discriminatory purpose under section 5 if it is enacted or sought to be administered with any purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group. The term "purpose" in section 5 includes any discriminatory purpose. 42 U.S.C. 1973c. The Attorney General's evaluation of discriminatory purpose under section 5 is guided by the analysis in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977).

(b) *Discriminatory effect.* A change affecting voting is considered to have a discriminatory effect under section 5 if it will lead to a retrogression in the position of a racial or language minority group (*i.e.,* will make members of such a group worse off than

they had been before the change) with respect to their effective exercise of the electoral franchise. *Beer* v. *United States,* 425 U.S. 130, 140–42 (1976).

(c) *Benchmark.* (1) In determining whether a submitted change is retrogressive the Attorney General will normally compare the submitted change to the voting standard, practice, or procedure in force or effect at the time of the submission. If the existing standard, practice, or procedure upon submission was not in effect on the jurisdiction's applicable date for coverage (specified in the Appendix) and is not otherwise legally enforceable under section 5, it cannot serve as a benchmark, and, except as provided in paragraph (c)(4) of this section, the comparison shall be with the last legally enforceable standard, practice, or procedure used by the jurisdiction.

(2) The Attorney General will make the comparison based on the conditions existing at the time of the submission.

(3) The implementation and use of an unprecleared voting change subject to section 5 review does not operate to make that unprecleared change a benchmark for any subsequent change submitted by the jurisdiction.

(4) Where at the time of submission of a change for section 5 review there exists no other lawful standard, practice, or procedure for use as a benchmark (*e.g.,* where a newly incorporated college district selects a method of election) the Attorney General's determination will necessarily center on whether the submitted change was designed or adopted for the purpose of discriminating against members of racial or language minority groups.

(d) *Protection of the ability to elect.* Any change affecting voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race, color, or membership in a language minority group to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of section 5. 42 U.S.C. 1973c.

■ 37. In § 51.55, revise paragraph (a) to read as follows:

§ 51.55   Consistency with constitutional and statutory requirements.

(a) *Consideration in general.* In making a determination under section 5, the Attorney General will consider whether the change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group in light of, and with particular attention being given to, the requirements of the 14th, 15th, and 24th Amendments to the Constitution, 42 U.S.C. 1971(a) and (b), sections 2, 4(a), 4(f)(2), 4(f)(4), 201, 203(c), and 208 of the Act, and other constitutional and statutory provisions designed to safeguard the right to vote from denial or abridgment on account of race, color, or membership in a language minority group.

\*     \*     \*     \*     \*

■ 38. Revise § 51.57 to read as follows:

§ 51.57   Relevant factors.

Among the factors the Attorney General will consider in making determinations with respect to the submitted changes affecting voting are the following:

(a) The extent to which a reasonable and legitimate justification for the change exists;

(b) The extent to which the jurisdiction followed objective guidelines and fair and conventional procedures in adopting the change;

(c) The extent to which the jurisdiction afforded members of racial and language minority groups an opportunity to participate in the decision to make the change;

(d) The extent to which the jurisdiction took the concerns of members of racial and language minority groups into account in making the change; and

(e) The factors set forth in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977):

(1) Whether the impact of the official action bears more heavily on one race than another;

(2) The historical background of the decision;

(3) The specific sequence of events leading up to the decision;

(4) Whether there are departures from the normal procedural sequence;

(5) Whether there are substantive departures from the normal factors considered; and

(6) The legislative or administrative history, including contemporaneous statements made by the decision makers.

■ 39. In § 51.58, revise paragraph (b) to read as follows:

§ 51.58   Representation.

\*     \*     \*     \*     \*

(b) *Background factors.* In making determinations with respect to these changes involving voting practices and procedures, the Attorney General will consider as important background information the following factors:

(1) The extent to which minorities have been denied an equal opportunity to participate meaningfully in the political process in the jurisdiction.

(2) The extent to which voting in the jurisdiction is racially polarized and election-related activities are racially segregated.

(3) The extent to which the voter registration and election participation of minority voters have been adversely affected by present or past discrimination.

■ 40. Revise § 51.59 to read as follows:

§ 51.59   Redistricting plans.

(a) *Relevant factors.* In determining whether a submitted redistricting plan has a prohibited purpose or effect the Attorney General, in addition to the factors described above, will consider the following factors (among others):

(1) The extent to which malapportioned districts deny or abridge the right to vote of minority citizens;

(2) The extent to which minority voting strength is reduced by the proposed redistricting;

(3) The extent to which minority concentrations are fragmented among different districts;

(4) The extent to which minorities are over concentrated in one or more districts;

(5) The extent to which available alternative plans satisfying the jurisdiction's legitimate governmental interests were considered;

(6) The extent to which the plan departs from objective redistricting criteria set by the submitting jurisdiction, ignores other relevant factors such as compactness and contiguity, or displays a configuration that inexplicably disregards available natural or artificial boundaries; and

(7) The extent to which the plan is inconsistent with the jurisdiction's stated redistricting standards.

(b) *Discriminatory purpose.* A jurisdiction's failure to adopt the maximum possible number of majority-minority districts may not be the sole basis for determining that a jurisdiction was motivated by a discriminatory purpose.

■ 41. In § 51.61, revise paragraphs (a) and (b) to read as follows:

§ 51.61   Annexations and deannexations.

(a) *Coverage.* Annexations and deannexations, even of uninhabited land, are subject to section 5 preclearance to the extent that they alter or are calculated to alter the composition of a jurisdiction's electorate. *See, e.g., City of Pleasant Grove* v. *United States,* 479 U.S. 462 (1987). In analyzing annexations and deannexations under section 5, the Attorney General considers the purpose and effect of the annexations and

21250   Federal Register / Vol. 76, No. 73 / Friday, April 15, 2011 / Rules and Regulations

deannexations only as they pertain to voting.

(b) *Section 5 review.* It is the practice of the Attorney General to review all of a jurisdiction's unprecleared annexations and deannexations together. *See City of Pleasant Grove* v. *United States,* C.A. No. 80–2589 (D.D.C. Oct. 7, 1981).

\*       \*       \*       \*       \*

■ 42. Revise the Appendix to Part 51 to read as follows:

**Appendix to Part 51—Jurisdictions Covered Under Section 4(b) of the Voting Rights Act, as Amended**

The requirements of section 5 of the Voting Rights Act, as amended, apply in the following jurisdictions. The applicable date is the date that was used to determine coverage and the date after which changes affecting voting are subject to the preclearance requirement. Some jurisdictions, for example, Yuba County, California, are included more than once because they have been determined on more than one occasion to be covered under section 4(b).

| Jurisdiction | Applicable date | Federal Register citation | |
|---|---|---|---|
| | | Volume and page | Date |
| Alabama | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Alaska | Nov. 1, 1972 | 40 FR 49422 | Oct. 22, 1975. |
| Arizona | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| California: | | | |
| Kings County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Merced County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Monterey County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Yuba County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Yuba County | Nov. 1, 1972 | 41 FR 784 | Jan. 5, 1976. |
| Florida: | | | |
| Collier County | Nov. 1, 1972 | 41 FR 34329 | Aug. 13, 1976. |
| Hardee County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Hendry County | Nov. 1, 1972 | 41 FR 34329 | Aug. 13, 1976. |
| Hillsborough County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Monroe County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Georgia | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Louisiana | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Michigan: | | | |
| Allegan County: | | | |
| Clyde Township | Nov. 1, 1972 | 41 FR 34329 | Aug. 13, 1976. |
| Saginaw County: | | | |
| Buena Vista Township | Nov. 1, 1972 | 41 FR 34329 | Aug. 13, 1976. |
| Mississippi | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| New Hampshire: | | | |
| Cheshire County: | | | |
| Rindge Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Coos County: | | | |
| Millsfield Township | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Pinkhams Grant | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Stewartstown Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Stratford Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Grafton County: | | | |
| Benton Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Hillsborough County: | | | |
| Antrim Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Merrimack County: | | | |
| Boscawen Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Rockingham County: | | | |
| Newington Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| Sullivan County: | | | |
| Unity Town | Nov. 1, 1968 | 39 FR 16912 | May 10, 1974. |
| New York: | | | |
| Bronx County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Bronx County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Kings County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Kings County | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| New York County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| North Carolina: | | | |
| Anson County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Beaufort County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Bertie County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Bladen County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Camden County | Nov. 1, 1964 | 31 FR 3317 | Mar. 2, 1966. |
| Caswell County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Chowan County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Cleveland County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Craven County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Cumberland County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Edgecombe County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Franklin County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |

Federal Register / Vol. 76, No. 73 / Friday, April 15, 2011 / Rules and Regulations　　　21251

| Jurisdiction | Applicable date | Federal Register citation | |
| --- | --- | --- | --- |
| | | Volume and page | Date |
| Gaston County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Gates County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Granville County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Greene County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Guilford County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Halifax County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Harnett County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Hertford County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Hoke County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Jackson County | Nov. 1, 1972 | 40 FR 49422 | Oct. 22, 1975. |
| Lee County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Lenoir County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Martin County | Nov. 1, 1964 | 31 FR 19 | Jan. 4, 1966. |
| Nash County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Northampton County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Onslow County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Pasquotank County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Perquimans County | Nov. 1, 1964 | 31 FR 3317 | Mar. 2, 1966. |
| Person County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Pitt County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Robeson County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Rockingham County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Scotland County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Union County | Nov. 1, 1964 | 31 FR 5081 | Mar. 29, 1966. |
| Vance County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Washington County | Nov. 1, 1964 | 31 FR 19 | Jan. 4, 1966. |
| Wayne County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| Wilson County | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| South Carolina | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |
| South Dakota: | | | |
| Shannon County | Nov. 1, 1972 | 41 FR 784 | Jan. 5, 1976. |
| Todd County | Nov. 1, 1972 | 41 FR 784 | Jan. 5, 1976. |
| Texas | Nov. 1, 1972 | 40 FR 43746 | Sept. 23, 1975. |
| Virginia | Nov. 1, 1964 | 30 FR 9897 | Aug. 7, 1965. |

The following political subdivisions in States subject to statewide coverage are also covered individually:

| Jurisdiction | Applicable date | Federal Register citation | |
| --- | --- | --- | --- |
| | | Volume and page | Date |
| Arizona: | | | |
| Apache County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Apache County | Nov. 1, 1972 | 40 FR 49422 | Oct. 22, 1975. |
| Cochise County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Coconino County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Coconino County | Nov. 1, 1972 | 40 FR 49422 | Oct. 22, 1975. |
| Mohave County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Navajo County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Navajo County | Nov. 1, 1972 | 40 FR 49422 | Oct. 22, 1975. |
| Pima County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Pinal County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Pinal County | Nov. 1, 1972 | 40 FR 49422 | Oct. 22, 1975. |
| Santa Cruz County | Nov. 1, 1968 | 36 FR 5809 | Mar. 27, 1971. |
| Yuma County | Nov. 1, 1964 | 31 FR 982 | Jan. 25, 1966. |

21252      Federal Register / Vol. 76, No. 73 / Friday, April 15, 2011 / Rules and Regulations

The Voting Section maintains a current list of those jurisdictions that have maintained successful declaratory judgments from the United States District Court for the District of Columbia pursuant to section 4 of the Act on its Web site at *http://www.justice.gov/crt/voting*.

Dated: April 8, 2011.

Eric H. Holder, Jr.,

*Attorney General.*

[FR Doc. 2011–9083 Filed 4–14–11; 8:45 am]

BILLING CODE 4410–13–P

---

## PENSION BENEFIT GUARANTY CORPORATION

### 29 CFR Part 4022

Benefits Payable In Terminated Single-Employer Plans; Interest Assumptions for Paying Benefits

**AGENCY:** Pension Benefit Guaranty Corporation.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Pension Benefit Guaranty Corporation's regulation on Benefits Payable in Terminated Single-Employer Plans to prescribe interest assumptions under the regulation for valuation dates in May 2011. PBGC's regulation on Benefits Payable in Terminated Single-Employer Plans prescribes actuarial assumptions—including interest assumptions—for paying plan benefits under terminating single-employer plans covered by title IV of the Employee Retirement Income Security Act of 1974.

**DATES:** Effective May 1, 2011.

**FOR FURTHER INFORMATION CONTACT:** Catherine B. Klion, Manager, Regulatory and Policy Division, Legislative and Regulatory Department, Pension Benefit Guaranty Corporation, 1200 K Street, NW., Washington, DC 20005, 202–326–4024. (TTY/TDD users may call the Federal relay service toll-free at 1–800–877–8339 and ask to be connected to 202–326–4024.)

**SUPPLEMENTARY INFORMATION:** Interest assumptions are also published on PBGC's Web site (*http://www.pbgc.gov*). PBGC's regulation on Benefits Payable in Terminated Single-Employer Plans (29 CFR Part 4022) prescribes actuarial assumptions—including interest assumptions—for paying plan benefits under terminating single-employer plans covered by title IV of the Employee Retirement Income Security Act of 1974.

PBGC uses the interest assumptions in Appendix B to Part 4022 to determine whether a benefit is payable as a lump sum and to determine the amount to pay. Appendix C to Part 4022 contains interest assumptions for private-sector pension practitioners to refer to if they wish to use lump-sum interest rates determined using PBGC's historical methodology. Currently, the rates in Appendices B and C of the benefit payment regulation are the same.

The interest assumptions are intended to reflect current conditions in the financial and annuity markets. Assumptions under the benefit payments regulation are updated monthly. This final rule updates the benefit payments interest assumptions for May 2011.[1]

The May 2011 interest assumptions under the benefit payments regulation will be 2.50 percent for the period during which a benefit is in pay status and 4.00 percent during any years preceding the benefit's placement in pay status. In comparison with the interest assumptions in effect for April 2011, these interest assumptions are unchanged.

PBGC has determined that notice and public comment on this amendment are impracticable and contrary to the public interest. This finding is based on the need to determine and issue new interest assumptions promptly so that the assumptions can reflect current market conditions as accurately as possible.

Because of the need to provide immediate guidance for the payment of benefits under plans with valuation dates during May 2011, PBGC finds that good cause exists for making the assumptions set forth in this amendment effective less than 30 days after publication.

PBGC has determined that this action is not a "significant regulatory action" under the criteria set forth in Executive Order 12866.

Because no general notice of proposed rulemaking is required for this amendment, the Regulatory Flexibility Act of 1980 does not apply. See 5 U.S.C. 601(2).

## List of Subjects in 29 CFR Part 4022

Employee benefit plans, Pension insurance, Pensions, Reporting and recordkeeping requirements.

In consideration of the foregoing, 29 CFR part 4022 is amended as follows:

## PART 4022—BENEFITS PAYABLE IN TERMINATED SINGLE-EMPLOYER PLANS

■ 1. The authority citation for part 4022 continues to read as follows:

**Authority:** 29 U.S.C. 1302, 1322, 1322b, 1341(c)(3)(D), and 1344.

■ 2. In appendix B to part 4022, Rate Set 211, as set forth below, is added to the table.

**Appendix B to Part 4022—Lump Sum Interest Rates for PBGC Payments**

\*      \*      \*      \*      \*

| Rate set | For plans with a valuation date | | Immediate annuity rate (percent) | Deferred annuities (percent) | | | | |
|---|---|---|---|---|---|---|---|---|
| | On or after | Before | | $i_1$ | $i_2$ | $i_3$ | $n_1$ | $n_2$ |
| 211 | 5–1–11 | 6–1–11 | 2.50 | 4.00 | 4.00 | 4.00 | 7 | 8 |

■ 3. In appendix C to part 4022, Rate Set 211, as set forth below, is added to the table.

**Appendix C to Part 4022—Lump Sum Interest Rates for Private-Sector Payments**

\*      \*      \*      \*      \*

---

[1] Appendix E to PBGC's regulation on Allocation of Assets in Single-Employer Plans (29 CFR part 4044) prescribes interest assumptions for valuing benefits under terminating covered single-employer plans for purposes of allocation of assets under ERISA section 4044. Those assumptions are updated quarterly.

Testimony of Melvin Butch Hollowell

Legal Counsel, Michigan Legislative Black Caucus

Redistricting Committee

Michigan House of Representatives

April 26, 2011

Page 2

Good morning Mr. Chairman. I would like to take this opportunity to thank you and the Members of the House Redistricting Committee for inviting me to provide testimony to this body on the application of the Voting Rights Act of 1965 on the state's legislative redistricting process.

I am appearing today in my capacity as Counsel to the Michigan Legislative Black Caucus, which represents twenty two (22) Members of the Michigan State Legislature. And I would like to acknowledge Caucus Chair Fred Durhal, as well as Representatives David Nathan and Woodrow Stanley, Members of this Committee, who also serve as Co-Chairs of the Caucus' redistricting efforts, and my Co-counsel Alan Canady, who you will also hear from.

As an overview, the newly-released census figures show that America is a more diverse nation. And likewise, Michigan – though smaller – is a more diverse state. While Michigan's overall population declined over the past 10 years (the only state to lose population) its minority population percentage increased significantly during this period, from 21.4% in 2000, to 23.4% in 2010. The position of the Michigan Legislative Black Caucus is that these significant gains should be reflected in the maps that are drawn in this redistricting process.

These gains in diversity look different than they did in the past. More people of color now live in the suburbs. No longer is there just a concentration in our city centers. Voters of color moved across the street and across the state.

For example, between 2000 and 2010 there was a 389% increase in the number of African Americans living in Warren, a 496% increase in Eastpointe, and a 260% increase in Melvindale. Western Michigan saw similar gains. In Grand Rapids the Hispanic population increased by 13.3%. In Wyoming the Hispanic population increased 109% and the African-American population increased by 48.4%. The same is true in Kentwood, which saw a 135% increase in its Hispanic population, and an 80% increase in the number of African-American residents.

All of this has implications under the Voting Rights Act of 1965. First I will give an overview of the Voting Rights Act, and then I will address the 9 questions sent to me yesterday by the Redistricting Committee. The 1965 Voting Rights Act was passed by Congress and signed into law by President Lyndon Johnson just weeks after the attacks on men women and children, as they crossed Selma, Alabama's Edmund Pettis Bridge, in March of 1965, to peacefully protest laws aimed at

Page 3

disenfranchising African American voters.  This law, a cornerstone of the American civil rights movement, is credited with giving millions access to the ballot and full participation in the democratic process.

In 2006 the Act was re-authorized for 25 years (until 2031) by Congress and signed into law by President George W. Bush. I was in attendance at the NAACP National Convention in Washington, DC that day, when President Bush made the announcement to us that he would be signing the legislation.

Section 2 of the Act is at the core of protecting minority voting rights in the redistricting process.  In essence Section 2 provides that minority voting strength is not to be diluted in the drawing of district boundaries in the redistricting process. Based on the totality of circumstances, if it can be shown that district lines were drawn to limit the chances of minorities to elect candidates of their choosing, that would constitute a violation of Section 2.  Amendments to Section 2 of the Act, adopted in 1982, provide that district lines that are drawn with either a racially discriminatory intent or effect will be struck down by the courts. (42 USC Section 1973(a)(2000 ed.).

As a general rule, minority vote dilution occurs when African-Americans are put in a district where the majority votes as a bloc to cancel out or minimize the effectiveness of minority voters.

Section 5 of the Voting Rights Act is known as the "Pre-clearance provision."  This means that any major change to laws affecting voting rights – such as redistricting maps - in certain states with a history of discrimination, called "Covered Jurisdictions," must first submit those proposed changes to the U.S. Attorney General for his approval.  Michigan has two (2) such Covered Jurisdictions: Clyde Township in Allegan County and Buena Vista Township in Saginaw County.

The process is initiated by the Michigan Attorney General who has a duty to submit a letter notifying the Department of Justice of the proposed change and requesting approval of same.  The Department of Justice then conducts a review process which examines the proposed changes and allows for public comment and input, before making a determination of whether the proposed changes are consistent with the Voting Rights Act.

Page 4

In this process the burden is on the Covered Jurisdiction to show that the new law does not have a "retrogressive" or discriminatory effect on minority voting rights. The U.S. Attorney General has 60 days to respond to the request.  If it is denied, the proposed changes are barred from taking effect.  The other option available to the Covered Jurisdiction is to request a judicial review of the proposed changes from a special panel of the United States District Court for the District of Columbia.

At this point I will address the nine questions submitted by this Committee.

1.  We understand that you have been retained by the Legislative Black Caucus.  Do you represent anyone else besides the Black Caucus in redistricting matters?

    Answer: No. I serve as legal counsel to the Michigan Legislative Black Caucus exclusively in redistricting matters.

2.  Is there a legal requirement that the Legislature create majority African-American districts?

    Section 2 of the Voting Rights Act includes a requirement that African-American voting strength not be diluted in the drawing of district lines to ensure that minority voters have the opportunity to elect a candidate of their choice.  Furthermore, when there has been an increase in the minority population, as we have seen here in Michigan, the courts have consistently invalidated map boundaries which are drawn to "pack" too many voters of color into one district, and they have invalidated map boundaries that are drawn to unfairly divide voters of color into separate districts, called "cracking."

3.  Is the Legislature required to create as many majority African-American districts as possible?

    While race cannot be the pre-dominant factor in drawing district boundaries, it must be an important factor in drawing district boundaries.

Page 5

Plans must fairly reflect voting populations so that voters can have the candidates of their choosing. (See, *Johnson v. Miller*).

Other non-racial factors can be included in the term "Communities of Interest," where the following should be considered: (A) socio-economic levels, (B) faith-based institutions, (C) community-based organizations, block clubs, and neighborhood associations, (D) ethnic communities, (E) cultural interests, (F) interests in legislation, and (G) as far as the City of Detroit goes, preserving a strong voice for the largest city in the state (713,777) as a matter of public policy.

4. Is it legal to use race as a factor in drawing districts?

In *Shaw v. Reno* the Court, once again, clearly held that race can be a factor so long as it is not the predominant factor. The Legislature cannot not consider race in determining whether the drawing of district boundaries complies with the Voting Rights Act in legislative redistricting.

5. What percentage of African-Americans should a district have to give minorities a reasonable chance to elect a candidate of their choice?

While it is difficult to give a precise percentage, at least three (3) factors must be employed: (1) The percentage of African-Americans within the proposed district, (2) the percentage of African-American registered voters in the proposed district, and (3) the voter turn-out rates in the proposed district. If registration levels and historic turn-out rates are low, the percentage above fifty percent (50%) will need to be adjusted up-ward. As a practical matter, in the neighborhood of sixty percent (60%) is probably close, though the state will need to consult with statistical experts.

6. Where in the state, other than Detroit, can majority African-American districts be created?

Page 6

Assuming you mean outside of Detroit and its adjacent suburbs with significant African-American populations, so-called "Opportunity Districts" can be created in Pontiac, Flint, Saginaw, and Grand Rapids.

7. State law says county, city and township boundaries should not be broken. Is [the] creation of majority African-American districts a justification for breaking political subdivision boundaries?

Yes. The creation of majority-minority districts is a justification under the Voting Rights Act where supported by population. The requirements of Federal law always trump state law requirements like contiguity (adjacency), political boundaries and compactness.

Fortunately, in Michigan there is no conflict in light of the provisions in our state's very progressive redistricting statute. MCL Sections 3.54(c) and (d) specifically requires the application of the Voting Rights Act, and the equal protection clauses of the XIV Amendments to the Federal and state constitutions. With the exception of California, which has its own Voting Rights Act, and New York which has excellent voter protections, Michigan's statute is fairly unique in the country.

8. Are there any parts of the state where Hispanic or other minority districts be created?

Yes. They can be created in Southwest Detroit, Dearborn, Flint, and Grand Rapids.

9. Is evidence of racial bloc voting necessary before majority African-American districts can be created?

No. Not at the map-drawing stage that we are in presently. Majority African American districts can be created as a reflection of the African-American population.



Testimony on Redistricting
By
Sue Smith, League of Women Voters of Michigan
Christina Kuo, Common Cause of Michigan

House Committee on Redistricting and Elections
May 17, 2011

On behalf the Michigan Redistricting Collaborative, thank you for the opportunity to testify today regarding the need for a transparent and open redistricting process.

My name is Sue Smith and I am the President-Elect of the League of Women Voters of Michigan and a member of the Michigan Redistricting Collaborative.

As you may already know, the Michigan Redistricting Collaborative is a coalition of nonprofits from all segments of the community, including business, labor and public interest, that believe redistricting must be more transparent and open, with more involvement from the public.

More than 35 organizations are members of the Collaborative, working together because we all believe that voters should choose their elected officials, not the other way around.

Unfortunately, Michigan, unlike other states, does not have a history of providing opportunities for public input on redistricting plans.

Iowa, for example, has finished its congressional and legislative redistricting exercise, following public meetings and input – and the plan adopted had widespread support from Republicans and Democrats.

In Illinois, the state Senate is holding two public hearings after maps are drawn, and before they are approved – different than the usual process where the public is an afterthought.

Here in Michigan, however, we haven't seen any maps. Our concern is that this redistricting process will be similar to the one in 2001 when redistricting legislation was adopted by a legislative conference committee, with no members of the public being afforded a chance to even look at the maps, let alone offer any significant input, and then approved on straight party line votes and sent to Gov. John Engler for prompt signature. The secretive actions only added to public skepticism about the political process – and rightly so.

Thank you again for the opportunity to speak today, I'd now like to ask Christina Kuo with Common Cause to speak regarding the Collaborative's specific recommendations.

Good Morning. I'm Christina Kuo, Executive Director of Common Cause Michigan and member of the Michigan Redistricting Collaborative.

The Redistricting Collaborative is recommending the Legislature take the following small steps to ensure a transparent and open redistricting process:

- Require redistricting plans to be available on the Legislature's website for 30 days before passage.

- Mandate each chamber to hold at least two committee meetings to receive testimony about the plan.

- Hold four public hearings around the state to allow direct comment by the public.

- Provide a statement for each district explaining how the boundaries were drawn and how the district has been changed.

These simple steps would allow for redistricting plans to be more transparent, open and accountable to the public.  It would also decrease the level of public scrutiny that is likely to occur if the process is a closed one.

In addition to the states mentioned earlier, counties in Michigan are also taking action to ensure public input.

The counties have just as much statutory and legal guidance as the legislature in regard to redistricting, however, a number of counties (including Ingham, Kalamazoo, and Oakland counties) have gone above what is required of them and embraced our core principles of transparency and citizen participation.  Oakland County, especially, is at the forefront of this.  Their redistricting commission added a page to the county clerk's website to house all minutes, actions, maps, analyses, and data relating to redistricting in that county.  They have adopted procedures that open up the process to citizen input and scrutiny: the maps must be publicly posted on the website for a minimum of 72 hours before the commissioners can deliberate on them.  They have held two night meetings, one solely devoted to public feedback on proposed plans by members of the county redistricting commission.

Oakland County shows how simple it is to have a transparent process that provides ample opportunities for citizens to participate and provide feedback on maps, when those charged with redistricting truly want an open and transparent redistricting process.
On behalf of the Michigan Redistricting Collaborative, I urge you to provide opportunity for input on proposed redistricting maps. Transparency is a buzzword often heard in Lansing these days. Here is a chance to have it put into action.

Thank you again for the opportunity to testify today.



Asian & Pacific Islander American Vote- Michigan

**Written Testimony for the Michigan State House Redistricting & Elections Committee**

Sally Kim, Redistricting Project Coordinator, Asian & Pacific Islander American Vote –
Michigan
May 17, 2011

Thank you for the opportunity to be here today and share some information with you as you make very important decisions about redistricting.

Asian and Pacific Islander American Vote - Michigan is a nonpartisan nonprofit 501(c)(3) organization that serves the Asian Pacific Islander American (APIA) community through civic participation, advocacy, and education. The APIA community includes Pacific Islanders and Native Hawaiians, South Asians, Southeast Asians, East Asians, multiracial Asians, and anyone who self-identifies as Asian.

As you may know, the Census 2010 data showed that the APIA population is the fastest growing population in Michigan. Our state's APIA population grew by 34.9% from 2000 to 2010. In some cities, the APIA population more than doubled in that time span. More detail about our state's APIA demographic is provided later in this testimony.

Our growing APIA communities should be kept geographically together to avoid vote dilution in areas of density and growth. APIA community members and voters deserve to be able to elect representatives that will be held accountable to our communities' needs and issues. In this testimony, I will describe why APIAs should be considered a community of interest.

We believe that redistricting can be done to empower voters to choose candidates they feel best represents them and their community; if done wrongly redistricting can result in politicians choosing their own voters and not feeling particularly responsible for other voters.

We hope this committee will keep our growing APIA communities in mind while drafting new maps, so that our communities can elect candidates that we believe best represent our shared interests and needs. As an organization dedicated to encouraging the APIA Michigan community to be informed, educated and engaged voters, we want to make sure our votes – our voices -- are counted. We urge this committee to keep APIA communities geographically together as much as possible during the redistricting process. We look forward to sharing proposed district maps with you in the coming weeks; these maps are in the process of being

developed.

<u>Our Community:</u>

The U.S. Census Bureau released Michigan's Census 2010 data in March. We learned that the APIA community is the fastest growing population in Michigan, growing 34.9% between 2000 and 2010. The APIA community is also the fastest growing population nationwide, at 43%.

- Asian + NHPI alone                                          240,803
- Asian & NHPI multiracial only           52,963 (18% of total API population is multiracial)
- Asian + NHPI, multiracial together      293,766
- The highest APIA population is in Oakland County with 68,082 APIAs, followed next by Wayne with 46,319, Washtenaw with 27,237, and Macomb County with 25,242.
- The fastest APIA growth is in Macomb at 48.3%, Ingham at 41.25%, Oakland at 37%, Ottawa at 35.27%, and Washtenaw County at 33.1% growth rates.
- Macomb County saw the fastest growth in the state, more than doubling in population at 55.3%, including multiracial APIAs, or 48.3% of APIA alone.
- Novi saw 113.22% growth in APIA population, followed by Hamtramck at 100.96% and Canton at 91.08%.
- 22% of the growth in the Asian American population from 2000-2010 (grew by 61,689 people) is accounted for by the growth in the Asian American population younger than 18 years old.
- These figures would be higher if we included the increasing multiracial APIA populations.

<u>Communities of Interest:</u>

APIA Vote-Michigan considers the growing APIA communities in Michigan as communities of interest that should be kept geographically together as practicable.  We consider APIA communities as communities of interest based on shared racial, ethnic, cultural similarities and needs, languages spoken and language access needs and issues, policy concerns, voting patterns, what industry they work in and types of jobs they hold, and can also include geographically-relevant centers and facilities serving these communities such as places of worship, schools, and community service centers.

We also recognize that these communities of interest may be considered politically cohesive, a claim we are investigating further. In 2008, 9 out of 10 Asian and Arab voters in Michigan voted Democratic for President Obama, and 81 percent voted for Democratic Congressional candidates. Asian American voters were concerned with 3 top issues during the presidential race, including Economy/Jobs, Foreign Policy/War in Iraq, and Health Care[1].

In 2008, 98% of Asian and Arab American voters voted for the Democratic incumbent while

2% voted for the Republican challenger in the 13th Congressional District. That same year, 84% of Asian and Arab American voters voted for the Democratic incumbent while 12% voted for the Republican challenger in the 15th Congressional district. 82% of Asian and Arab American voters voted for the Democratic candidate in the Eleventh Congressional District, while 68% of Asian and Arab American voters polled voted for the Democratic candidate for Congress in the Ninth Congressional District. In 2006, the majority of Asian Americans in Southeast Michigan exit polled were also Democrats. Unfortunately, there is no 2002 API exit poll data found so far for Michigan as that exit poll data was scrapped due to problems. The Roper Center for Public Opinion Research's 2000 exit poll for Asian Americans in Michigan found that 13.4% voted for Gore, 78.0% for Bush, and 8.6% for Nader.

APIAs have had historic barriers to voting and participating fully in the political process. From the 1790s when Asian Americans were "aliens ineligible for citizenship," to the Chinese Exclusion Act of the late 1800s that was later extended to most other Asian Americans by 1924[2]; to Asian-only segregated schools for Asian American youth that only ended nationwide in 1954[2], Asian Americans have faced institutional and legal barriers to participating fully in civic life.

During their 2008 Presidential and US Congressional election exit poll, the Asian and American Legal Defense and Education Fund found instances of limited English proficiency within Michigan's APIA population. Sixteen percent of respondents throughout Michigan were limited English proficient (LEP). Among native Bengali speakers in Detroit, 45% were LEP, with 27% preferring to vote with language assistance. In Hamtramck, 40% of native Arabic speakers were LEP, with 29% preferring to vote with language assistance.[1] Many of the respondents preferred voting with language assistance or used an interpreter, as the list below describes[3]

| Locality | Language Minority Group | Limited English Proficient | Prefers Voting with Language Assistance | Used an Interpreter | Used Translated Materials | |
|----------|------------------------|---------------------------|----------------------------------------|---------------------|---------------------------|---|
| Dearborn | Arabic | 27% | 18% | 21% | 11% | |
| Detroit | Bengali | 45% | 27% | * | * | |
| Hamtramck | Arabic | 40% | 29% | 16% | * | |

72% of APIA voters surveyed in AALDEF's exit poll were foreign-born naturalized U.S. citizens, with 28% born in the U.S. 8% had no formal U.S. education. 43% were first-time voters. The five largest ethnic groups surveyed in Michigan were Asian Indian (25%), Arab (24%), Chinese (23%), Bangladeshi (15%), and Korean (5%).[1]

Even today, Asian Americans face discrimination and language access issues voting. Michigan does not provide bilingual voting ballots for APIA voters, nor does any Michigan county voluntarily provide bilingual assistance (in an Asian language) on Election Day that we know of. APIA Vote does provide some bilingual assistance where we have the capacity to, to assist in completing voter registration forms, however, and has helped coordinate the translation of voter education information in the past.

Our communities have particular needs and deserve the ability to elect representatives who will feel responsible and be responsive to APIA communities' needs. We are concerned about the

possibility of having our communities split up during redistricting. Should that be the case, some APIA voters' ballots cast may be diluted politically.

We recall a classic worst-case scenario in history, when the only Los Angeles APIA City Councilmember had his district redrawn in 1980's. His district was split up into four City Council and five State Assembly districts. After the Los Angeles race riots in 1992, there was $1 billion worth of damages concentrated in Asian and Korea town businesses. When Asian Americans appealed to their local representatives, each representative passed the buck saying it was someone else's district. No legislator felt primarily responsible or accountable to the Asian American community there. We hope that such a problem would not happen here, and this is just one example of why we think it's important to keep APIA communities together.

In drafting new maps, we urge this Committee to adhere to making compact and contiguous districts while respecting city and township boundaries, and as close to equal population as possible. We propose that APIA communities of interest kept together by block groups from the census data. We also propose that APIA communities of interest with similar densities are kept together as much as possible, unless population guidelines necessitate otherwise.

We are in the process of drawing proposed state house and senate district lines for areas in the state with the highest APIA populations and very much look forward to sharing these with you in the near future.

Thank you for your time and consideration.

---

[1] Asian and American Legal Defense and Education Fund, *The Asian & Arab American Vote in Michigan 2008*.
[2] Asian American Justice Center, Senate Hearing http://www.advancingequality.org/files/VRA_Senate_Hearing_Statement_7b.pdf
[3] See page 19, Asian and American Legal Defense and Education Fund, *The Asian American Vote in the 2008 Presidential Election, NY, NJ, MA, PA, VA, MD, DC, MI, IL, LA, TX, NV*. http://www.aaldef.org/docs/AALDEF_ExitPoll-2008.pdf
[4] Battle State--Michigan General Election Exit Poll: Roper Center for Public Opinion Research, University of Connecticut. http://www.ropercenter.uconn.edu/elections/2004/battle_states/michigan.html
[5] Center for Urban Studies, January 2001 Wayne State University. Working Paper No. 7; http://data.memberclicks.com/site/apacc/asians_wayne2001.pdf

www.apiavotemi.org



Michigan
**Campaign** Finance
Network

May 17, 2011

House Redistricting and Elections Committee
State Capitol
Lansing, Michigan

Dear Chairman Lund and Committee Members:

I am writing to request that the committee give consideration to two fundamental points in this year's redistricting process.

First, make your actions as transparent as possible. When you believe you have a sound redistricting plan, publish your proposed maps and allow the citizens of this state to comment on them and suggest improvements to your plan.

Secondly, make competitiveness a desirable criterion, when you can, in drawing district boundaries. Competitiveness allows changing voter sentiments to find expression in changing legislative representation. That serves democracy in a way that partisan "packing" of districts does not.

Thank you for your consideration. I am sure all Michigan's citizens hope your work will nurture democracy in our fair state.

Sincerely,

Richard L. Robinson
Executive Director



### TESTIMONY OF PROFESSOR JOCELYN BENSON, ESQ.
### FOUNDER AND CEO, MICHIGAN CENTER FOR ELECTION LAW
### DIRECTOR, MICHIGAN CITIZENS' REDISTRICTING COMPETITION
BEFORE THE MICHIGAN HOUSE COMMITTEE ON REDISTRICTING AND ELECTIONS
MAY 17, 2010

Good morning. I would like to thank the House Committee on Redistricting and Elections for holding this hearing and for inviting me to present testimony this morning.

I am here today in my capacity as the Founder and CEO of the Michigan Center for Election Law, and as the Director of the Michigan Citizens' Redistricting Competition. I thus will limit my remarks to two areas, a description of the Competition and its winning entries, which I hope you will consider, and my recommendations to the committee on one aspect of federal law relating to redistricting.

**Michigan Citizens' Redistricting Competition[1]**
The 2011 "Michigan Citizens' Redistricting Competition" is a nonpartisan project of the Michigan Center for Election Law and Administration, in partnership with the Michigan Redistricting Collaborative (which includes groups such as Common Cause, the League of Women Voters, and Michigan Nonprofit Association).

Our concern is, simply, that the current process has led to increased gerrymandering, and has allowed political parties to increase their majorities and limit competition, which is the foundation of a healthy functioning democracy.

Our hope is that, through providing tools for any Michigan citizen to craft and design their own redistricting maps for Congressional or Michigan legislative districts, we will help to provide citizens with a meaningful voice in the 2011 redistricting process. We also hope to demonstrate that an open, transparent redistricting process based on objective criteria and citizen input can produce fair legislative districts in Michigan.

The 2011 "Michigan Citizens' Redistricting Competition" therefore will allow any Michigan citizen with the tools and opportunity to produce potential district maps for Michigan's 14 Congressional Seats, or Michigan's state senate or legislative seats. The maps will be then scored based upon objective criteria, such as how well they keep county and city residents in one district or how close each district comes to having the same number of people.

---

[1] Attached please find several news articles describing the competition, including an article posted by a contributor to the Detroit News' Conservative Website, "The Michigan View."

I developed the idea after being inspired by the former Ohio Secretary of State, Jennifer Brunner, who held the first competition of this kind in 2009. Information about that competition can be found at www.ohioredistricting.org. More recently, Christopher Newport University and the Public Mapping Project sponsored the Virginia College and University Legislative Redistricting Competition earlier this year, which invited college student teams to draw legislative lines for the Virginia House of Delegates, Senate of Virginia, and federal congressional lines for the House of Representatives.

For our competition here in Michigan, citizens are invited to produce district maps that will be then scored based upon objective criteria. The maps that best fit with objective and fair criteria will be submitted to you for consideration at 5pm on May 23, 2011.

Entrants can visit http://www.michiganredistricting.org, enter some basic information and begin drawing their maps. The site provides a variety of mapping tools, as well as population information and legal guidance to help each entrant develop fair, legal maps.

The entrants will use redistricting software hosted online by the Midwest Democracy Network and developed by George Mason University Professor Michael McDonald and the Public Mapping Project. To learn more about the Public Mapping Project, contact Dr. Michael McDonald (mmcdon@gmu.edu) or visit www.publicmapping.org.

*Judges and Judging Criteria*
A nonpartisan panel of seven judges developed the criteria to evaluate and score the plans, based upon the criteria used in the aforementioned competitions in Ohio and Virginia. The seven judges are:
- Jowei Chen, Assistant Professor of Political Science, University of Michigan
- Kristen Clarke, Esq. Co-Director of Political Participation Project, NAACP Legal Defense and Education Fund
- Marcia Johnson-Blanco, Esq., Co-Director of Voting Rights Project, Lawyers Committee for Civil Rights
- Kurt Metzger, Director, Data Driven Detroit
- Anthony Salciccioli, Teacher, Clarenceville Public Schools & President-Elect, Michigan Council on Social Studies
- Jeff Williams, Chief Executive Officer, Public Sector Consultants
- Hal Ziegler, Former Republican State Senator, Michigan State Senate

The panel developed the following objective criteria for evaluating the plans. The criteria is based on federal and state law, as well as traditional redistricting principles that legal experts generally agree should be adhered to in the creation of objective and fair redistricting plans.[2] Winning plans will be selected based upon how well they meet eight objective traditional redistricting factors:
1. Contiguity: is every part of every district connected?
2. Voting Rights Act Compliance: does the plan contain the required number of majority African American districts? (per the recommendation of the Black Legislative Caucus)

---

[2] See, e.g., The Brennan Center for Justice at New York University School of Law's comprehensive *Citizens Guide to Redistricting*.

3. Equipopulation: Does each district have roughly the same number of people in it? (You can deviate up to 1% for Congressional districts, 5% for State legislative and Senate districts)

4. Preserve existing city and county boundaries: Do districts avoid splitting counties and cities as much as possible?

5. Compactness: Is the shape of districts as close to a circle or square as possible?

6. Competitiveness: Does the map contain districts where there is a balanced percentage (i.e., close to 50%/50%) of Republican and Democratic voters?

7. Partisan Representation: Does the map create roughly the same number of majority Democratic and majority Republican districts?

8. Preserving Communities of Interest: Does the map make an effort to keep some smaller communities (college campuses, language minority populations) together in one district to preserve their voting strength?

Once a map is completed, it must be submitted to the competition by noon ET on Monday May 23, 2011 to receive full consideration.

This nonpartisan competition is a unique and meaningful opportunity for us as citizens to contribute to decisions that affect our future as Michigan voters. And it's important because, ultimately, voters should have the sole authority to choose their representatives, not the other way around.

## The U.S. Constitution and the Voting Rights Act

Finally, I would like to touch upon about a legal issue that I recommend you consider in selecting a districting plan to select.

The United States Constitution and Section 5 of the Voting Rights Act have a historically supportive and amicable relationship, as the U.S Supreme Court articulated shortly after the 1965 passage of Section 5 in *South Carolina v. Katzenbach*.[3] You are already aware that, in its opinion in *Reynolds v. Sims*,[4] the U.S. Supreme Court has stated the importance of ensuring that each district has an equal population under the one person, one vote principle implicit in the Equal Protection Clause of the U.S. Constitution. And I know that you also are informed on some of the issues to consider in complying with Sections 2 and 5 of the Voting Rights Act.

I want to comment, just briefly on the intersection of Supreme Court's 1994 opinion in *Shaw v. Reno*,[5] authored by Justice O'Connor. The opinion concluded that a citizen in an racially gerrymandered district could state a claim under the Fourteenth Amendment if they could feasibly allege that traditional districting principles, such as respect for political subdivisions, compactness, and contiguity, had been set aside in deference to considerations of the racial makeup of the district.[6] Most notably, the opinion expressed great concern over the

---

[3] 383 U.S. 301 (1966).

[4] 377 U.S. 533 (1964)

[5] 113 S. Ct. 2816 (1993). For a detailed analysis of *Shaw v. Reno* and its implications, see, e.g., Richard H. Pildes, *Expressive Harms, "Bizarre Districts," And Voting Rights: Evaluating Election-District Appearances After Shaw V. Reno*, 92 Mich. L. Rev. 483, 494-497 (1993).

[6] See, Shaw, 113 S. Ct. at 2824 ("Today we hold only that appellants have stated a claim under the Equal Protection Clause by alleging that the North Carolina General Assembly adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race, and that the separation lacks sufficient justification.")

shape of the districts in North Carolina's plan, referring to them as "dramatically irregular,"[7] and "bizarre."[8] O'Connor emphasized the importance of appearance in redistricting, pontificating that when "redistricting legislation ... is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles," the legislation could violate the Equal Protection Clause of the Fourteenth Amendment.[9]  Under *Shaw*, such legislation would be subjected to strict scrutiny, surviving judicial review only if the state could show a compelling interest in the plan, and that the consideration of racial demographics when drawing the plan was narrowly tailored to advance that interest.[10]

*Shaw* was groundbreaking because it created a new, "analytically distinct" cause of action under the Equal Protection Clause.[11] After *Shaw*, any plaintiff living in a gerrymandered district could allege that an apportionment plan, though facially neutral, violated the Equal Protection Clause where it rationally could not be understood as anything other than an effort to separate voters into different districts on the basis of race, without sufficient justification.

The issue in *Shaw*, importantly, was not whether Voting Rights Act compliance was unconstitutional.  The issue was whether race could be the only or predominant consideration in drawing district lines.  It cannot.

The Supreme Court clarified this issue four years after *Shaw*, in a case called *Miller v. Johnson*.[12] Justice Kennedy delivered the opinion and emphasized the permissibility of considering racial demographics, but said that this could not be the "predominant factor" for motivating the legislature to draw districts a certain way.  In a case called *Bush v. Vera*,[13] Justice O'Connor reaffirmed and clarified this, finding that a Texas legislature went well beyond what was necessary to comply with the Voting Rights Act in drawing district lines.

I bring these cases to your attention because it is important to ensure that Voting Rights Act compliance remains a critical component of your selection of a district plan.  I mention them also to encourage you to consider many other factors in drawing district lines as well, such as the aforementioned criteria that the competition judges are considering in evaluating what we affectionately term the "People's Plans."

Thank you again for the opportunity to testify before you today, and for inviting public comment on the redistricting process at this hearing.

---

[7] Id 2820.

[8] Id. at 2822.

[9] Id. O'Connor also emphasized her "belie[f] that reapportionment is one area in which appearances do matter.  A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid.  It reinforces the perception that members of the same racial group -- regardless of their age, education, economic status, or the community in which they live -- think alike, share the same political interests, and will prefer the same candidates at the polls.  We have rejected such perceptions ... as impermissible racial stereotypes."

[10] Id.

[11] Shaw at 2820. ("Nothing ... precludes white voters (or voters of any other race) from bringing the analytically distinct claim that a reapportionment plan rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification.")

[12] 515 U.S. 900 (1995).

[13] 517 US 952 (1996) (challenging the constitutionality of Texas' 1990 congressional redistricting plan).



May 3, 2011

http://detnews.com/article/20110503/MIVIEW/105030301

# Reboot redistricting

*DAN CALABRESE*

The once-a-decade ritual of legislative redistricting is one of those issues on which most people's positions are entirely partisan. (Sort of like the way Democrats used to complain about the president's usurpation of power, and Republicans complain about the same thing now.)

If you're a Democrat in most places these days, you worry that the whole thing will be political. If you're a Republican, you're pretty pumped about the fact that your side won control of legislatures all across the country at just the right time, so they can manipulate the process - er, I mean, redraw the lines in a spirit of nonpartisan fairness.

Ha ha! You're funny.

If one can peel away the partisan scales over their eyes, one would have to recognize that the process of redistricting is inherently corrupt regardless of who is in charge. You have elected representatives essentially choosing their voters, usually leaving the outcome a foregone conclusion when the voters get the chance to choose their representatives. If you can think of a more blatant conflict of interest, let me know.

If you've ever wondered how easy it would be to draw the district map - assuming you were just trying to draw a fair map and not try to manipulate it for your own political purposes - Michigan residents have a chance to give it a shot right now.

The Michigan Citizens Redistricting Competition, which started on Monday, is one of the coolest things I've seen in politics in a long time. It gives Michigan residents a chance to go online at http://www.michiganredistricting.org/">www.michiganredistricting.org, access software and essential information, and take their own shot at redrawing the districts for members of Congress, state senators and state representatives.

It is the brainchild of a Democrat, Jocelyn Benson, the 2010 secretary of state candidate and Wayne State election law professor. She didn't invent the concept, as it's already been done successfully in several other states. But Benson has spearheaded the effort to make the competition happen in Michigan.

Now, because a liberal Democrat is leading the effort, I am duty-bound as a conservative pundit to thoroughly examine the whole thing, digging deep into the real motivation behind it, and bring you the complete, untold story. So I have delved deep. And here's what I've found.

The competition is awesome. Sorry, conservatives. I guess it's time for you to drum me out of the movement. *Again.* In fact, I'd say the redistricting competition is a test of Michigan conservatives' intellectual honesty. Conservatives always criticize liberals for trusting government instead of the people. Benson's competition gives the people the chance to show they can tackle redistricting better than government can. She's put together a bipartisan panel of judges who will pick out the best entries and submit them to the legislature. Explain to me what the principled conservative objection to that is.

The outcome of the competition just might put some pressure on the Republicans who are drawing the real maps. It just might expose attempts to manipulate the process in their favor. Does that bother you because you vote Republican and you want them to take any advantage they can get? It doesn't bother me. If you believe in Republican policies, what you should be looking for is Republicans who are willing to take their message to voters of all stripes, not make themselves fat and happy by setting themselves up in districts they can't lose - regardless of whether they actually govern for the benefit of the people.

If you ask me, we'd be better off if elected officials got out of the way and let someone else draw the district lines. I know they're the ones accountable to the people, but this is such an egregious conflict of interest, there's simply no way theoretical accountability can make up for it - especially when the whole game is designed to *protect* them from accountability at the polls.

Enter the competition. See how you do. And if you discover - as I think you will - that fair districts are easy to draw if you actually want to, then give some thought to holding your own side accountable for a change. And don't dismiss the whole thing just because a Democrat made it happen.

(Michigan residents can enter the Michigan Citizens Redistricting Competition at
http://www.michiganredistricting.org/">www.michiganredistricting.org. The competition began on May 2.)

*Dan Calabrese is a Michigan View.com columnist. He is also editor-in-chief of The North Star National and author of the spiritual thriller "Powers and Principalities," a story set in Royal Oak, Michigan(*
*http://www.dancalabresebooks.com)*

© Copyright 2011 The Detroit News. All rights reserved.

5/16/11 11:31 PM

# Testimony of Mark Brewer Regarding Congressional Redistricting

# Before the Michigan House of Representatives Redistricting and Elections Committee June 21, 2011

Mr. Chairman and members of the Committee, I am Mark Brewer, Chair of the Michigan Democratic Party. I have been involved in Legislative and Congressional redistricting in Michigan since the early 1980's. Thank you for allowing me to submit this testimony on Congressional redistricting.

## Introduction

On behalf of the voters of Michigan, the Michigan Democratic Party is very disappointed in the partisan hijacking of the redistricting process represented by the Congressional redistricting plan proposed by Republicans on June 17, 2011. Never in Michigan's history has a redistricting map been gerrymandered to be so overtly partisan and disrespectful of community interests to build partisan political advantage. This map zigs and zags throughout Southeastern Michigan to create non-competitive seats that do not represent the demographics of the state and will disenfranchise voters. Outstate districts also are plainly redrawn to advantage Republican incumbents.

The people of Michigan deserve Congressional districts produced by the State Legislature and signed by the Governor that will ensure fair representation in keeping with Michigan's history of competitive districts that respect communities of interest. The people of Michigan deserve to choose their Representatives in Congress - this map clearly was drawn to let the Republican Representatives choose their voters.

## Analysis

At a time when population loss over the last decade reduces our State's influence in Congress by one Congressional seat, it is absolutely essential that redistricting be conducted in a fair manner to fully reflect all of the citizens of our State.

The Congressional plan released by State Legislative Republicans fails any test of fairness, preservation of community and county boundaries, and meaningful representation.

The map shreds counties and communities, eliminates competitive districts, and reduces representation in the 2nd largest county in the State.

## Gerrymandered Districts

Never before in Michigan's history have districts zigged and zagged all over a large geographic region for partisan advantage.

The two Detroit districts are no longer centered in Detroit.  For example, District 14 starts at the edge of River Rouge, sweeps over the Pointes, loops west to Southfield and Farmington Hills, before heading north and using a small stretch of land at Sylvan Lake to get to Pontiac.  The district is over 50 miles long but at some points less than half a mile wide.

District 11, previously a Western Wayne and Western Oakland County district now starts in Canton and stretches all the way over and around Pontiac, cutting through a slice of Rochester Hills to connect to Troy before looping around to capture Birmingham and Bloomfield Hills.  By taking in Farmington, it is literally only a few blocks wide at one point.

As a result, Oakland County, the 2nd largest county in Michigan, is shredded into four different districts that all start somewhere else. As a result Oakland County will not have one district centered there.

Oakland County Executive L. Brooks Patterson agreed, saying the county should get more respect.  "We'll have nobody to call our own. We won't get the attention or the call back (residents would get) if we had our own congressman, Republican or Democrat," he said. (Detroit Free Press, June 16, 2011)

Examples of partisan gerrymandering exist outstate as well.

The 3rd District now includes Calhoun County. Why? It is clearly an attempt to make the 7th District more Republican to help Republican Congressman Tim Walberg, and hinder former Democratic Congressman Mark Schauer, a resident of Calhoun County, from running again.

In the 1st District, several Democratic leaning counties were removed and several Republican leaning counties added. Why? To help ensure the reelection of Republican Congressman Dan Benishek.

## Non-Competitive Districts

Competitive districts are better for voters and better for democracy.  Over the last decade, Michigan has seen competitive Congressional races in at least four districts and in the decade before that five districts were competitive.  They reflected the competitive nature of our state overall as surveys show that the state is equally divided between Democrats, and Republicans.

The Republican plan would reduce the number of competitive districts. There is not one district under the Republican plan that is 50-50 in partisan make-up when one reviews previous election results.  It is clear they sought solely to strengthen the partisan make-up for their Congressional Republican incumbents.

By reducing competitive districts, this plan disenfranchises not only Democrats and Republicans but independent voters – by making partisan primaries the key elections and making general elections irrelevant.

Violates Community Boundaries

Michigan has a tradition of respecting city and county lines in redistricting. This plan ignores that tradition to seek partisan advantage for Republican incumbents.

For example, in Oakland County, the City of Farmington is an "island" surrounded by Farmington Hills. For the first time, Republicans use a narrow path to cut through to the City of Farmington and separate it from Farmington Hills. Similarly, the City of Bloomfield Hills is separated from Bloomfield Township. Rochester Hills is split up simply to allow the Republicans to make their gerrymander contiguous. In Montcalm County, the City of Greenville is also an "island".

In the short space of 18 miles in southeast Michigan, a voter could go through 8 Congressional districts. Driving south from Orion Township in the 8th District, you then enter the 11th Congressional District in Auburn Hills before passing into the 14th District in Pontiac. You will then enter the 9th District in Bloomfield Township before re-entering the 11th District in Bloomfield Hills before entering the 9th District again before going through the 14th District again in Southfield before finally entering the 13th District in Detroit.

If you drove on Woodward from Pontiac to Detroit you would start in the 14th District, and drive through the 9th District in Bloomfield Township. You would then enter the 11th District while driving through Bloomfield Hills, drive through the 9th again in Bloomfield Township. You then re-enter the 11th in Birmingham before re-entering the 9th District in Royal Oak. When you hit 8 Mile you would enter the 14th District again until you got downtown when you enter the 13th District. You would then arrive at the Detroit River waterfront, 24 miles later, in the same district you left, the 14th District. On this straightforward drive on Woodward you pass through the 14th District 3 times, the 9th District 3 times, the 11th District twice, and the 13th District once.

## Conclusion

Voters in Michigan have never before faced such a shamelessly partisan redrawing of Congressional boundaries. Instead of drawing fair lines that follow community and county borders in a logical way, the Republican plan is so skewed that it exploits every trick in the book to gerrymander districts in ways that benefit Republican incumbents. The Legislature and Governor Snyder should reject this gerrymandered plan and draw Congressional boundaries in a way that puts Michigan voters' interests squarely ahead of flagrant partisan advantage.

TESTIMONY OF
DR. JEROME L. REIDE
REGIONAL FIELD DIRECTOR
NAACP
FIELD OPERATIONS & MEMBERSHIP DEPARTMENT
4805 MT. HOPE DRIVE
BALTIMORE, MD 21215


THE HOUSE COMMITTEE ON REDISTRICTING AND
ELECTIONS
521 HOUSE OFFICE BUILDING
TUESDAY JUNE 21, 2011 9 A.M.

**To the Committee through the Chair, Hon. Peter J. Lund,**

The Committee may wish to continue with the important process of redistricting by articulating the redistricting principles it follows. We need to know your redistricting principles, *e.g.*, compactness, contiguity, no splitting precincts, so that we can incorporate those traditional redistricting principles in the alternative redistricting plans we will be proposing. Those principles should include transparency, fairness, and compliance with the Voting Rights Act and with Equal Protection.

You should ensure "one person one vote." You should redistrict in a way that avoids minority vote dilution.

- You should be careful to avoid: *packing* which is drawing district lines so that the minority population is over-concentrated or "packed" into election districts.
- You should also be careful to avoid *cracking* (or "fracturing") which is drawing district lines so that an area of concentrated minority population, which is large enough for separate representation in that it could constitute one or more majority minority or majority-black districts, is divided and spread among several districts that are predominantly white.
- You should be careful to avoid *stacking* which is drawing district lines so that a large minority population concentration is included with a larger white population with the purpose or effect of depriving minority voters of a
  voting majority. Stacking most classically happens in the creation or redistricting of multi-member districts, although it can occur in the redistricting of single-member districts. We also respectfully request that you avoid drawing plans that erode minority rights relative to the status quo, that is, that you avoid creating retrogressive redistricting plans.

A key traditional redistricting principle is respect for communities of interest. These are defined by three characteristics:
- the extent to which non-members identify members as a distinct community;
- the extent to which members identify themselves as a distinct community; and
- the extent to which members are similarly affected by governmental action.

Black citizens form one of the strongest communities of interest in the State of Michigan and the redistricting plan should have as a priority the fashioning of districts that accord appropriate representation to communities of interest.

Parenthetically, what federal financial assistance does Michigan currently receive and from what federal agencies or departments? As you know, Title VI of the Civil Rights Act, along with other federal laws, prohibits entities that receive federal funding from discriminating based on race or national origin.

We ask that as part of the transparency and increased community access to the process that the Committee provide interested community members with access to the State's redistricting software or on-line system and, of course, training for members to use that mapping system. We request that you indicate the terminals that will be available to the community and when they will be available. We also request a schedule of the remainder of the redistricting process.

In closing, I respectfully ask that you contact Ms. Yvonne White, President, Michigan State Conference, regarding potential additional opportunities for community access to the redistricting process, and we look forward to receiving the requested information.  We appreciate your assistance.

Yours for Civil Rights,

Dr. Jerome L. Reide
Regional Field Director
NAACP Field Operations & Membership Department
4805 Mt. Hope Drive
Baltimore, MD 21215



Michigan Citizens'
Redistricting
Competition 2011

### TESTIMONY OF PROFESSOR JOCELYN BENSON, ESQ.
### FOUNDER AND CEO, MICHIGAN CENTER FOR ELECTION LAW
### DIRECTOR, MICHIGAN CITIZENS' REDISTRICTING COMPETITION
BEFORE THE MICHIGAN HOUSE COMMITTEE ON REDISTRICTING AND ELECTIONS
JUNE 21, 2011

Good morning. I would like to thank the House Committee on Redistricting and Elections for holding this hearing and for providing an opportunity to present testimony this morning. I am here today in my capacity as the Founder and CEO of the Michigan Center for Election Law, and as the Director of the Michigan Citizens' Redistricting Competition.

**Michigan Citizens' Redistricting Competition**
The 2011 "Michigan Citizens' Redistricting Competition" is a nonpartisan project of the Michigan Center for Election Law and Administration, in partnership with the Michigan Redistricting Collaborative (which includes groups such as Common Cause, the League of Women Voters, and Michigan Nonprofit Association).

Through providing tools for any Michigan citizen to craft and design their own redistricting maps for Congressional or Michigan legislative districts, we offered citizens an opportunity to take part in producing potential district maps for Michigan's 14 Congressional Seats, or Michigan's state senate or legislative seats.

As discussed in my previous testimony before this committee, the maps were scored based upon objective criteria, and a nonpartisan panel of seven judges convened to evaluate and score the plans. The top nine scoring Congressional plans were submitted for your consideration on May 23, 2011.

When citizens draw the plans, as our competition entrants showed, they do an excellent and fair job while respecting the law. It is not too late for you to follow their example before finalizing their plans, and I urge you to do so.

Today I submit to you additional details about the competition's winning plan, attached to this testimony.

Nathan Inks, a Lincoln Park resident and Central Michigan University undergraduate student is the first-prize winner of the Michigan Citizens' Redistricting Commission. Inks, who also serves as president of the CMU College Republicans, is a meteorology major with plans to go to law school and practice election law. His plan was selected as best overall by a nonpartisan panel of judges, based on its excellent performance in the areas of equipopulation, compactness, limiting of county splits, high number of competitive districts and partisan fairness.

In a statement made shortly after learning his plan received the Competition's top honors, Inks stated that he encourages you to "adopt a plan that is fair to voters:"

"[A]s a life-long Republican," Inks said, "when I saw District 14 from the proposed [congressional] map, even I cringed because of how awkward and mangled it was. Such gerrymandering takes the focus off of the good things the GOP has done for the state and makes the party look like they need to 'cheat' to win."

All nine of the top congressional plans excelled in demonstrating that there are multiple ways in which Congressional districts may be drawn to comply with the law. Nathan's plan was the best of the best in a wide variety of key areas. And his plan demonstrates that it is possible to draw fair, legal maps without gerrymandering or creating oddly shaped districts.

Finally, on that last point regarding oddly shaped districts, I reiterate my urging from my previous testimony that you consider the United States Supreme Court holding in *Shaw v. Reno* before enacting this Congressional District plan into law. That opinion, as you recall, concluded that a citizen in an racially gerrymandered district could state a claim under the Fourteenth Amendment if they could feasibly allege that traditional districting principles, such as respect for political subdivisions, compactness, and contiguity, had been set aside in deference to considerations of the racial makeup of the district. Most notably, the opinion expressed great concern over the shape of the districts in North Carolina's plan, referring to them as "dramatically irregular," and "bizarre." O'Connor emphasized the importance of appearance in redistricting, pontificating that when "redistricting legislation ... is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles," the legislation could violate the Equal Protection Clause of the Fourteenth Amendment.

I will not reiterate all aspects of my previous testimony on this legal issue. I simply raise it as a cautionary factor in determining whether to enact this plan, as one could feasibly and, I believe, legitimately question the strange appearance of District 14 in your map.

And as Nathan Ink's plan and several others in our competition demonstrated, you need not draw districts with such a strange appearance in order to comply with the requirements of the Voting Rights Act.

Thank you again for the opportunity to testify before you today, and for inviting public comment on the redistricting process at this hearing.

MCRC Winning Plan available at:
https://districtbuilder.michiganredistricting.org/districtmapping/plan/359/view/
- High Scoring in Equipopulation, Compactness, and Least # of County Splits
- High number of Competitive Districts, High Ranking in Partisan Representation Fairness

**Average Equipopulation:** 0.416%
Rank (of 9): 3 (96 points)

**Number of County Splits:** 7
Rank (of 9): 2 (98 points)

**Average Compactness Score:** 68.61
Rank (of 9): 2 (98 points)

Competitive District Score: 6
  # of "heavily competitive" (partisan differential less than 5%): 3 (+6)
  # of "generally competitive" (P. Diff. between 5-10%): 5 (+5)
  # of noncompetitive districts (P. Diff. between 10-15%): 1 (+0)
  # of heavily noncompetitive districts (P.Diff. 15%+): 5 (-5)
Rank (of 9): 1 (100 points)

Partisan Representation Parity: (difference: +3 GOP); # of Competitive: 7
  Rank (of 9): 2 (98 points)

| Dist. | Tot Pop | Compactness | Black VAP | His. VAP | Dem Pl | Rep Pl |
|-------|---------|-------------|-----------|----------|--------|--------|
| 1  | 706,811 | 62.53% | 1.56%  | 1.02% | 43.66% | 56.34% |
| 2  | 706,217 | 80.45% | 4.67%  | 4.49% | 37.97% | 62.03% |
| 3  | 705,620 | 77.74% | 8.89%  | 6.93% | 38.66% | 61.34% |
| 4  | 706,965 | 67.13% | 6.50%  | 3.55% | 45.91% | 54.09% |
| 5  | 708,837 | 73.66% | 12.13% | 2.43% | 51.20% | 48.80% |
| 6  | 708,398 | 84.40% | 8.25%  | 4.10% | 44.28% | 55.72% |
| 7  | 704,209 | 72.64% | 8.12%  | 4.09% | 45.78% | 54.22% |
| 8  | 707,807 | 71.89% | 3.54%  | 2.54% | 36.93% | 63.07% |
| 9  | 707,014 | 67.76% | 9.83%  | 2.86% | 45.99% | 54.01% |
| 10 | 703,039 | 71.38% | 7.07%  | 1.94% | 45.75% | 54.25% |
| 11 | 705,564 | 59.55% | 12.53% | 2.52% | 47.64% | 52.36% |
| **12** | **704,073** | **56.68%** | **51.92%** | **6.85%** | **73.87%** | **26.13%** |
| **13** | **705,391** | **41.23%** | **53.04%** | **2.66%** | **70.94%** | **29.06%** |
| 14 | 703,695 | 73.57% | 8.93%  | 3.51% | 52.30% | 47.70% |

# Comparison of Legislature's maps and MCRC competition winner



Full state: Legislature's version



Full state: MCRC competition winner



Tri-county area: Legislature's version



Tri-county area: MCRC competition winner





# MichUHCAN

**Testimony**
**House Redistricting Committee**
**June 21,2011**

My name is Marjorie Mitchell. I am Executive Director of the Michigan Universal Health Care Access Network (MichUHCAN).  We are an education and advocacy organization dealing health care access issues and building healthy communities by addressing the social determinants of health that go beyond access.

I am here today to speak strongly for slowing down the process for the redrawing of Congressional and state districts. Regardless of which party is in power, the people of Michigan deserve the opportunity to be educated and provide input on the proposed changes, We all talk about the need for greater transparency in government and listening to the electorate. It is time to also "walk the walk". Delaying decisions until the fall would be a way this state legislature could set an example on how to govern adhering to the premise that government in America should be "of the people, by the people and for the people". Democracy is cumbersome and sometimes messy, but the effort to inform and let the electorate speak is what has made us great.

People have a right to know how these proposed redistricting maps will affect them and their community. If they cannot be defended to the people's satisfaction, then they should be changed. If the people are convinced that they are the best, then they should be adopted. It would be good to present alternatives with pro and cons for the discussion The goal should be to meet federal requirements while supporting a community's need for representation that reflects their needs and culture.

Again, I urge you to slow down the process and consider future legislation that will assure that the next redistricting opportunity will truly be transparent and involve strong participation by our citizens, regardless of which party is in power.

Thank you for your consideration of my comments.



*Michigan*
## COMMON CAUSE
*Holding Power Accountable*

Thank you Chairman Lund and members of the Committee for the opportunity to testify, today.  My name is Christina Kuo and I am the Executive Director for Common Cause Michigan.

First I want to thank the committee members for posting maps prior to the committee hearing.  This is a big step forward compared to the 2001 redistricting.  Although, the proposed maps were released a few days before this meeting and included some data, the initial analysis showed that what was not released does not allow the public to does not have cannot do an in-depth analysis based on their community's concern.  In turn, the public does not have meaningful opportunity to give the Legislature feedback on the proposed maps.  The public needs more data and time to look at the implication of these maps and what it means for the issues they care most about.   Friday's release of data is the equivalent to green-washing by corporations; at first blush it gives the appearance of openness and transparency.  However, a closer look shows that the data does not say much beyond generalized lines, some partisan information, and very little demographic information; not the census tracts, which can easily be produced.  The public must have a real opportunity to provide meaningful feedback in a process that will impact their democratic representation in Congress for the next decade.

The other issue of concern is the proposed time-frame by legislative leadership.  The arbitrary deadline of July 1, 2011, which is less than 2 weeks away, hurries a process that will affect voters for the next 10 yrs.  This fast-tracking, coupled with the gloss of transparency, seems to be an attempt to limit public input, and reduce the ability of the media, the public and others to review the new districts.  Under Michigan law, the legislature has until November 1, 2011 to finish this task.  By taking the summer and having hearings outside of Lansing, it would provide ample opportunity for input by all interested parties.  It would also allow the legislature time to develop the best maps for the people of Michigan, instead of the best maps for politicians.

From the limited data, the public can only see that on its face the Voting Rights Act was complied with and the partisan break-down of the Congressional districts.  But we cannot say for certain because the requisite data was not released.  From the limited analysis we were able to do, it shows that the map drawers probably engaged in some partisan gerrymandering to achieve the very uniquely shaped districts we see for the proposed 9th, 11th, and 14th Congressional districts.  This is not a surprise since Michigan takes the to-the-winner-goes-the-spoils approach to redistricting; whichever party is in charge, it gets to draw maps to their advantage.  This process has become the ultimate perk for politicians:  politicians are picking their voters, instead of voters picking their politicians.

Just because we have always done something one way does not mean it is the right way.  A number of states, like Iowa and Arizona, have taken the initiative and truly opened up their redistricting process to public participation and scrutiny.  The

transparency and ample opportunities for public input have reduced the partisan advantage taking that we see here in Michigan. It is not too late for the Michigan Legislature to provide voters with real opportunities to participate in the redistricting process by adopting the procedures proposed by my partners in the Michigan Redistricting Collaborative:

- Post redistricting plans (including ALL data behind maps) to be available on the Legislature's web site for 30 days before passage.
- Each chamber holds least two committee meetings to receive testimony about the plan.
- The Legislature holds at least four public hearings around the state to allow direct comment by the public.
- The Legislature provides a statement for each district explaining how the boundaries were drawn and how the district has been changed.

I hope this committee will consider doing the right thing and release the data that is needed for the public and media to do meaningful analyses of the proposed plans and to slow down a process that does not need to be fast-tracked.



Asian & Pacific Islander American Vote-Michigan

### Written Testimony for the Michigan State House Redistricting & Elections Committee

Stephanie Chang, *President*, Asian & Pacific Islander American Vote – Michigan

June 21, 2011

Thank you for the opportunity to testify today. My name is Stephanie Chang and I am the president of Asian & Pacific Islander American Vote – Michigan.

Asian and Pacific Islander American Vote - Michigan is a nonpartisan nonprofit 501(c)(3) organization that serves the Asian Pacific Islander American (APIA) community through civic participation, advocacy, and education. The APIA community includes Pacific Islanders and Native Hawaiians, South Asians, Southeast Asians, East Asians, multiracial Asians, and anyone who self-identifies as Asian.

As you know, the Census 2010 data showed that the APIA population is the fastest growing population in Michigan. Our state's APIA population grew by 34.9% from 2000 to 2010. In some cities, the APIA population more than doubled in that time span.

APIAVote-Michigan has closely monitored the redistricting process in several areas and actively participated in the county reapportionment process in Oakland and Wayne counties by submitting proposed maps and testimony. In addition, in Washtenaw, Kent and Macomb Counties, we submitted letters with comparison maps in order to educate reapportionment commissioners about key geographic areas in which the APIA population grew significantly between 2000 and 2010.

It was a great experience to participate in the reapportionment process in these counties. Our participation influenced the final map agreed upon by the commission in Oakland County and hope we were considered a significant voice in the other counties previously mentioned.

APIAVote-Michigan is a proud member of the Michigan Redistricting Collaborative. Like our colleagues, we were glad to see that the House majority released proposed redistricting maps prior to a conference committee this time around. We are also glad to see that some data is available to the public.

P.O. Box 44613 ♦ Detroit, MI 48244 ♦ michigan@apiavote.org
www.apiavotemi.org

More time and information is needed to ensure that voters and all Michigan residents are able to look at information that matters to us in this redistricting process. For example, communities of interest like my own, the APIA community, would need more time to conduct a thorough analysis of how our demographic group is impacted by the proposed district lines.

This is a great opportunity to continue making redistricting an open and transparent process that all Michiganders can participate in. Today we join the other Michigan Redistricting Collaborative members in calling for:

- The posting of the plans with full detail on the legislature's website for 30 days before passage of legislation;

- Two or more committee hearings in each chamber to receive comment about the plans;

- Four or more public hearings around the state to allow a greater amount of public comment; and

- An official statement from the legislature about each district explaining why the proposed boundaries were drawn the way they were.

The November 1 deadline is still several months away, meaning that there is time to ensure that the best plan possible is adopted. I hope that this committee will consider these recommendations. Thank you for your time.



Testimony on Redistricting
Sue Smith, League of Women Voters of Michigan
House Committee on Redistricting and Elections
June 21, 2011

On behalf the Michigan Redistricting Collaborative, thank you for the opportunity to testify today. My name is Sue Smith and I am the President of the League of Women Voters of Michigan and a member of the Michigan Redistricting Collaborative.

As you may already know, the Michigan Redistricting Collaborative is a coalition of nonprofits from all segments of the community, including business, labor and public interest, that believe redistricting must be more transparent and open, with more involvement from the public. More than 40 organizations are members of the Collaborative, working together because we all believe that voters should choose their elected officials, not the other way around.

Unfortunately, Michigan, unlike other states, does not have a history of providing opportunities for public input on redistricting plans. On behalf of the Michigan Redistricting Collaborative, we urge you to provide more time and information to allow for adequate public comment on proposed redistricting plans.

We are glad to see, that unlike in 2001, the House majority has released maps prior to a conference committee. And we are pleased that some level of data has been released to allow for public review. However, more time and information is needed to ensure voters can look at a variety of issues that matter to them more than partisan breakdown – communities of interest, competitive nature of districts, etc.

We encourage you to make this more of a transparent process and to build on your action to date by:
- Posting redistricting plans (including data behind maps) to be available on the Legislature's web site for 30 days before passage.
- Holding at least two committee meetings (in each chamber) to receive testimony about the plan.
- Holding at least four public hearings around the state to allow direct comment by the public.
- Providing a statement for each district explaining how the boundaries were drawn and how the district has been changed.

Our request is simple. We are asking for meaningful dialogue on an issue that will impact communities for the next ten years. However, for meaningful dialogue to occur, the public must be given the opportunity to provide feedback on the legislature's redistricting plans.

These simple steps would allow for redistricting plans to be more transparent, open and accountable to the public. Other states already are taking the lead in this matter, and giving the people a bigger say in redistricting. Iowa and about nine others have taken steps to reduce partisan legislative redistricting. Now it's time for Michigan to take that step.

Considering the significant impact of these plans, there is no need to rush a process that happens only once every ten years and is not required to be completed until Nov. 1.

Thank you again for the opportunity to testify today.

TESTIMONY OF ALAN L. CANADY
ON BEHALF OF CONGRESSMAN JOHN CONYERS

BEFORE THE MICHIGAN HOUSE OF REPRESENTATIVES
REDISTRICTING AND ELECTIONS COMMITTEE
JUNE 21, 2011

Thank you Mr. Chairman and members of the Committee, I am here today on behalf of Congressman John Conyers to express opposition to HB 4780 as substituted.

The Voting Rights Act, as interpreted by the courts, requires that black and Hispanic majority districts be drawn when reasonably possible.  In Michigan, there must be two black-majority districts in the Detroit area.

The Voting Rights Act is an important federal requirement that ensures our representatives reflect America's racial and ethnic diversity.

Special attention must be paid to the Voting Rights Act whenever redistricting occurs. Section 2 requires that officials draw plans that do not unfairly dilute minority voting strength. If officials draw and enact plans that violate Section 2, such plans could be subject to legal challenge. A Section 2 lawsuit can be filed by the Attorney General of the United States, who bears primary enforcement responsibility under the Act, or by private individuals and organizations. Redistricting-related litigation can prove both costly and protracted, preventing the implementation of a final plan for several years.  Thus, the legislature must be vigilant in demanding adherence to, and officials should make a good-faith effort to comply with, Section 2 of the Voting

State standards require that districts be contiguous by land with no cut-points', adhere to political boundaries, preserve communities of interest, and be contiguous and compact.. It also requires that there not be unreasonably many breaks of counties and cities/townships.

The district proposed for Congressman Conyers fails to meet any of the aforementioned standards. Congressman Conyers requests that this committee consider an alternative plan for the Detroit Area. The plan that he is offering fully complies with the requirements of the VRA and state law and is vastly more compact and preserves historic communities of interest.

Congressman Conyers understands the difficult challenge this Committee faces and appreciates all the hard work this committee has done.  He is  also appreciates this opportunity to testify and he looks forward to working with the Legislature to avoid costly litigation and to maintain a fair and open process

Thank you.



Testimony on Redistricting
Sue Smith, League of Women Voters of Michigan
House Committee on Redistricting and Elections
June 28, 2011

On behalf the Michigan Redistricting Collaborative, thank you for the opportunity to testify today. My name is Sue Smith and I am the President of the League of Women Voters of Michigan and a member of the Michigan Redistricting Collaborative.

On behalf of the more than 40 organizational members of the Collabortative, I want to continue to voice our concern about the lack of transparency in this redistricting process.

Let me be clear. We are not asking for you to wait until November 1. We are simply asking for 30 days so that the proposed plans may be analyzed and meaningful dialogue can occur.  The proposed plans have not been provided to the public in a format that is easily analyzed or understood.

As part of the Michigan Redistricting Collaborative, the Center for Michigan recently conducted community conversations to inform Michigan citizens about redistricting, hear their views on it, and discuss how they can get involved in the process. Community conversations took place in Detroit, Grand Rapids, Lansing, Livonia and Traverse City. More than 200 people voiced their opinions on the redistricting process by voting on questions posed to the group.

When asked about their priorities for how legislative districts are drawn, 88% said that transparency is very important to them. Another question asked participants what process would be best, only 3% said the current process is best, compared to 34% that indicated support for a new legislative system with more transparency, public hearings, clear map rationale and 63% that said they would prefer a non-partisan redistricting commission independent of legislature.

With public support for transparency, we encourage you to build on your action to date by:
- Posting redistricting plans (including data behind maps) to be available on the Legislature's web site for 30 days before passage.
- Holding at least two committee meetings (in each chamber) to receive testimony about the plan.
- Holding at least four public hearings around the state to allow direct comment by the public.
- Providing a statement for each district explaining how the boundaries were drawn and how the district has been changed.

Our request is simple. We are asking for meaningful dialogue on an issue that will impact communities for the next ten years. However, for meaningful dialogue to occur, the public must be given the opportunity to provide feedback on the legislature's redistricting plans.  We are asking you not to rush this process.

Considering the significant impact of these plans, there is no need to rush a process that happens only once every ten years.

MICHIGAN LEGISLATURE(www.legislature.mi.gov)
Printed on Thursday, September 22, 2011
Michigan Compiled Laws Complete Through PA Compiled through Act 87 and includes 89-140 of 2011

# House Bill 4780 (2011)  rss

## Public Act 128 of 2011 (Effective: SINE DIE) Find this PA in the MCL

**Sponsor**
Pete Lund

**Categories** Legislature, apportionment; Legislature, other

Legislature; apportionment; redistricting of congressional districts; provide for. Amends title & secs. 3 & 5 of 1964 PA 282 (MCL 3.53 & 3.55) & adds secs. 1a & 4a.

Bill Document Formatting Information

(gray icons indicate that the action did not occur or that the document is not available)

**Documents**

 **House Introduced Bill**
Introduced bills appear as they were introduced and reflect no subsequent amendments or changes.

 **As Passed by the House**
As Passed by the House is the bill, as introduced, that includes any adopted House amendments.

 **As Passed by the Senate**
As Passed by the Senate is the bill, as received from the House, that includes any adopted Senate amendments.

 **House Concurred Bill**
Concurred bill is the version passed in identical form by both houses of the Legislature, issued prior to availability of the Enrolled bill.

 **Public Act**
Public Act is a bill that has become law.

**History** (House actions in lowercase, Senate actions in UPPERCASE)

| Date ▲ | Journal | Action |
|---|---|---|
| 6/16/2011 | HJ 57 Pg. 1475 | introduced by Representative Pete Lund |
| 6/16/2011 | HJ 57 Pg. 1475 | read a first time |
| 6/16/2011 | HJ 57 Pg. 1475 | referred to Committee on Redistricting and Elections |
| 6/21/2011 | HJ 58 Pg. 1484 | printed bill filed 06/17/2011 |
| 6/21/2011 | HJ 58 Pg. 1485 | reported with recommendation with substitute H-2 |
| 6/21/2011 | HJ 58 Pg. 1485 | referred to second reading |
| 6/21/2011 | HJ 58 Pg. 1485 | read a second time |
| 6/21/2011 | HJ 58 Pg. 1485 | substitute H-2 adopted |
| 6/21/2011 | HJ 58 Pg. 1485 | placed on third reading |
| 6/22/2011 | HJ 59 Pg. 1511 | read a third time |
| 6/22/2011 | HJ 59 Pg. 1511 | passed Roll Call # 213 Yeas 63 Nays 47 |
| 6/22/2011 | HJ 59 Pg. 1511 | title amended |
| 6/22/2011 | HJ 59 Pg. 1511 | transmitted |
| 6/23/2011 | SJ 58 Pg. 1658 | REFERRED TO COMMITTEE ON REDISTRICTING |
| 6/29/2011 | SJ 60 Pg. 1905 | REPORTED FAVORABLY WITHOUT AMENDMENT |
| 6/29/2011 | SJ 60 Pg. 1905 | COMMITTEE RECOMMENDED IMMEDIATE EFFECT |

| | | |
|---|---|---|
| 6/29/2011 | SJ 60 Pg. 1905 | REFERRED TO COMMITTEE OF THE WHOLE |
| 6/29/2011 | SJ 60 Pg. 1704 | REPORTED BY COMMITTEE OF THE WHOLE FAVORABLY WITHOUT AMENDMENT(S) |
| 6/29/2011 | SJ 60 Pg. 1704 | PLACED ON ORDER OF THIRD READING |
| 6/29/2011 | SJ 60 Pg. 1705 | RULES SUSPENDED |
| 6/29/2011 | SJ 60 Pg. 1705 | PLACED ON IMMEDIATE PASSAGE |
| 6/29/2011 | SJ 60 Pg. 1705 | SUBSTITUTE S-2 DEFEATED |
| 6/29/2011 | SJ 60 Pg. 1705 | AMENDMENT(S) DEFEATED |
| 6/29/2011 | SJ 60 Pg. 1705 | PASSED ROLL CALL # 375 YEAS 25 NAYS 13 EXCUSED 0 NOT VOTING 0 |
| 6/29/2011 | SJ 60 Pg. 1705 | IMMEDIATE EFFECT DEFEATED |
| 6/29/2011 | HJ 62 Pg. 1997 | returned from Senate without amendment |
| 6/29/2011 | HJ 62 Pg. 1997 | bill ordered enrolled |
| 7/27/2011 | HJ 64 Pg. 2072 | presented to the Governor 7/26/2011 @ 2:32 PM |
| 8/24/2011 | HJ 65 Pg. 2118 | approved by the Governor 8/9/2011 @ 11:06 AM |
| 8/24/2011 | HJ 65 Pg. 2118 | filed with Secretary of State 8/9/2011 @ 1:31 PM |
| 8/24/2011 | HJ 65 Pg. 2118 | assigned PA 128'11 |

The Michigan Legislature Website is a free service of the Legislative Internet Technology Team in cooperation with the Michigan Legislative Council, the Michigan House of Representatives, and the Michigan Senate. The information obtained from this site is not intended to replace official versions of that information and is subject to revision. The Legislature presents this information, without warranties, express or implied, regarding the accuracy of the information, timeliness, or completeness. If you believe the information is inaccurate, out-of-date, or incomplete or if you have problems accessing or reading the information, please send your concerns to the appropriate agency using the online Comment Form in the bar above this text.

# No. 57

## STATE OF MICHIGAN

### JOURNAL
#### OF THE

# House of Representatives

## 96th Legislature
### REGULAR SESSION OF 2011

House Chamber, Lansing, Thursday, June 16, 2011.

12:00 Noon.

The House was called to order by the Speaker.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was present.

| | | | |
|---|---|---|---|
| Agema—present | Gilbert—present | Lipton—present | Pscholka—present |
| Ananich—present | Glardon—present | Liss—present | Rendon—present |
| Barnett—present | Goike—present | Lori—present | Rogers—present |
| Bauer—present | Haines—present | Lund—present | Rutledge—present |
| Bledsoe—present | Hammel—present | Lyons—present | Santana—present |
| Bolger—present | Haugh—excused | MacGregor—present | Schmidt, R.—present |
| Brown—present | Haveman—present | MacMaster—present | Schmidt, W.—present |
| Brunner—present | Heise—present | McBroom—present | Scott—present |
| Bumstead—present | Hobbs—present | McCann—present | Segal—present |
| Byrum—present | Hooker—present | McMillin—present | Shaughnessy—present |
| Callton—present | Horn—present | Meadows—present | Shirkey—present |
| Cavanagh—present | Hovey-Wright—present | Melton—present | Slavens—present |
| Clemente—present | Howze—present | Moss—present | Smiley—present |
| Constan—present | Hughes—present | Muxlow—present | Somerville—present |
| Cotter—present | Huuki—present | Nathan—present | Stallworth—present |
| Crawford—present | Irwin—present | Nesbitt—present | Stamas—present |
| Daley—present | Jackson—excused | O'Brien—present | Stanley—present |
| Damrow—present | Jacobsen—present | Oakes—present | Stapleton—present |
| Darany—present | Jenkins—present | Olson—present | Switalski—present |
| Denby—present | Johnson—present | Olumba—present | Talabi—present |
| Dillon—present | Kandrevas—present | Opsommer—present | Tlaib—present |
| Durhal—present | Knollenberg—present | Ouimet—present | Townsend—present |
| Farrington—present | Kowall—present | Outman—present | Tyler—present |
| Forlini—present | Kurtz—present | Pettalia—present | Walsh—present |
| Foster—present | LaFontaine—present | Poleski—present | Womack—present |
| Franz—present | Lane—present | Potvin—present | Yonker—present |
| Geiss—present | LeBlanc—present | Price—present | Zorn—present |
| Genetski—present | Lindberg—present | | |

e/d/s = entered during session

Rep. Opsommer introduced
**House Bill No. 4777, entitled**
A bill to amend 1947 PA 336, entitled "An act to prohibit strikes by certain public employees; to provide review from disciplinary action with respect thereto; to provide for the mediation of grievances and the holding of elections; to declare and protect the rights and privileges of public employees; and to prescribe means of enforcement and penalties for the violation of the provisions of this act," by amending section 15 (MCL 423.215), as amended by 2011 PA 25.
The bill was read a first time by its title and referred to the Committee on Local, Intergovernmental, and Regional Affairs.

Reps. Rogers, Denby, Callton, Heise, Liss, McMillin, Olson, Haines, Moss, Johnson, Nathan, Horn, Geiss, LeBlanc, Hooker, Knollenberg, Zorn, Genetski and Lori introduced
**House Bill No. 4778, entitled**
A bill to amend 1970 PA 91, entitled "Child custody act of 1970," by amending sections 5 and 6a (MCL 722.25 and 722.26a), section 5 as amended by 1993 PA 259 and section 6a as added by 1980 PA 434.
The bill was read a first time by its title and referred to the Committee on Judiciary.

Rep. Lund introduced
**House Bill No. 4779, entitled**
A bill to amend 2001 PA 116, entitled "An act to divide this state into 110 representative and 38 senatorial districts; and to prescribe the powers and duties of certain state departments and officers," by amending the title and sections 3 and 6 (MCL 4.2003 and 4.2006) and by adding sections 1a, 2a, and 5a; and to repeal acts and parts of acts.
The bill was read a first time by its title and referred to the Committee on Redistricting and Elections.

Rep. Lund introduced
**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a; and to repeal acts and parts of acts.
The bill was read a first time by its title and referred to the Committee on Redistricting and Elections.

Reps. Wayne Schmidt, Lyons, MacGregor, Haveman, Foster and Lund introduced
**House Bill No. 4781, entitled**
A bill to amend 1936 (Ex Sess) PA 1, entitled "Michigan employment security act," by amending section 27 (MCL 421.27), as amended by 2011 PA 14.
The bill was read a first time by its title and referred to the Committee on Commerce.

Reps. Haveman, Lyons, Wayne Schmidt, MacGregor, Damrow, Nesbitt and Bumstead introduced
**House Bill No. 4782, entitled**
A bill to amend 1936 (Ex Sess) PA 1, entitled "Michigan employment security act," by amending section 29 (MCL 421.29), as amended by 2008 PA 480.
The bill was read a first time by its title and referred to the Committee on Commerce.

Reps. Denby, Johnson, Santana, Price, Horn, Crawford, Kurtz, Wayne Schmidt, Somerville, MacMaster and Rogers introduced
**House Bill No. 4783, entitled**
A bill to amend 1995 PA 279, entitled "Horse racing law of 1995," by amending the title and section 20 (MCL 431.320), section 20 as amended by 2006 PA 185.
The bill was read a first time by its title and referred to the Committee on Appropriations.

Reps. Denby, Johnson, Santana, Price, Horn, Crawford, Kurtz, Wayne Schmidt, Somerville, MacMaster and Rogers introduced
**House Bill No. 4784, entitled**
A bill to amend 1995 PA 279, entitled "Horse racing law of 1995," by amending the title and section 20 (MCL 431.320), section 20 as amended by 2006 PA 185.
The bill was read a first time by its title and referred to the Committee on Appropriations.

# No. 58

# STATE OF MICHIGAN

## JOURNAL

### OF THE

# House of Representatives

### 96th Legislature
### REGULAR SESSION OF 2011

House Chamber, Lansing, Tuesday, June 21, 2011.

1:30 p.m.

The House was called to order by the Speaker.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was present.

| | | | |
|---|---|---|---|
| Agema—present | Gilbert—present | Lipton—present | Pscholka—present |
| Ananich—present | Glardon—present | Liss—present | Rendon—present |
| Barnett—present | Goike—present | Lori—present | Rogers—present |
| Bauer—present | Haines—present | Lund—present | Rutledge—present |
| Bledsoe—present | Hammel—present | Lyons—present | Santana—present |
| Bolger—present | Haugh—present | MacGregor—present | Schmidt, R.—present |
| Brown—present | Haveman—present | MacMaster—present | Schmidt, W.—present |
| Brunner—present | Heise—present | McBroom—present | Scott—present |
| Bumstead—present | Hobbs—present | McCann—present | Segal—present |
| Byrum—present | Hooker—present | McMillin—present | Shaughnessy—present |
| Callton—present | Horn—present | Meadows—present | Shirkey—present |
| Cavanagh—present | Hovey-Wright—excused | Melton—present | Slavens—present |
| Clemente—present | Howze—present | Moss—present | Smiley—present |
| Constan—present | Hughes—present | Muxlow—present | Somerville—present |
| Cotter—present | Huuki—present | Nathan—present | Stallworth—present |
| Crawford—present | Irwin—present | Nesbitt—present | Stamas—present |
| Daley—present | Jackson—present | O'Brien—present | Stanley—present |
| Damrow—present | Jacobsen—present | Oakes—present | Stapleton—present |
| Darany—present | Jenkins—present | Olson—present | Switalski—present |
| Denby—present | Johnson—present | Olumba—present | Talabi—present |
| Dillon—present | Kandrevas—present | Opsommer—present | Tlaib—present |
| Durhal—present | Knollenberg—present | Ouimet—present | Townsend—present |
| Farrington—present | Kowall—present | Outman—present | Tyler—present |
| Forlini—present | Kurtz—present | Pettalia—present | Walsh—present |
| Foster—present | LaFontaine—present | Poleski—present | Womack—present |
| Franz—present | Lane—present | Potvin—present | Yonker—present |
| Geiss—present | LeBlanc—present | Price—present | Zorn—present |
| Genetski—present | Lindberg—present | | |

e/d/s = entered during session

**Nays—63**

| | | | |
|---|---|---|---|
| Agema | Goike | Lund | Potvin |
| Bolger | Haines | Lyons | Price |
| Bumstead | Haveman | MacGregor | Pscholka |
| Callton | Heise | MacMaster | Rendon |
| Cotter | Hooker | McBroom | Rogers |
| Crawford | Horn | McMillin | Schmidt, W. |
| Daley | Hughes | Moss | Scott |
| Damrow | Huuki | Muxlow | Shaughnessy |
| Denby | Jacobsen | Nesbitt | Shirkey |
| Farrington | Jenkins | O'Brien | Somerville |
| Forlini | Johnson | Olson | Stamas |
| Foster | Knollenberg | Opsommer | Tyler |
| Franz | Kowall | Ouimet | Walsh |
| Genetski | Kurtz | Outman | Yonker |
| Gilbert | LaFontaine | Pettalia | Zorn |
| Glardon | Lori | Poleski | |

In The Chair: Walsh

Rep. Townsend moved to amend the bill as follows:
1. Amend page 3, following line 6, by inserting:
"Enacting section 2. This amendatory act does not take effect unless House Concurrent Resolution No. 5 of the 96th Legislature is adopted by both the senate and the house of representatives.".
The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.
Rep. Haveman moved that the bill be placed on the order of Third Reading of Bills.
The motion prevailed.

———

The Speaker Pro Tempore called Associate Speaker Pro Tempore O'Brien to the Chair.

**House Bill No. 4727, entitled**
A bill to amend 1978 PA 90, entitled "Youth employment standards act," by amending section 4 (MCL 409.104), as amended by 2010 PA 221.
The bill was read a second time.
Rep. Goike moved that the bill be placed on the order of Third Reading of Bills.
The motion prevailed.

**House Bill No. 4639, entitled**
A bill to amend 1998 PA 386, entitled "Estates and protected individuals code," by amending sections 3206 and 3209 (MCL 700.3206 and 700.3209), section 3206 as amended by 2008 PA 41 and section 3209 as added by 2006 PA 299.
Was read a second time, and the question being on the adoption of the proposed substitute (H-1) previously recommended by the Committee on Military and Veterans Affairs and Homeland Security,
The substitute (H-1) was adopted, a majority of the members serving voting therefor.
Rep. Damrow moved that the bill be placed on the order of Third Reading of Bills.
The motion prevailed.

By unanimous consent the House returned to the order of
**Announcement by the Clerk of Printing and Enrollment**

The Clerk announced that the following bills had been printed and placed upon the files of the members on Friday, June 17:

| House Bill Nos. | 4766 | 4767 | 4768 | 4769 | 4770 | 4771 | 4772 | 4773 | 4774 | 4775 | 4776 | 4777 | 4778 | 4779 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4780 | 4781 | 4782 | 4783 | 4784 | 4785 | 4786 | 4787 | 4788 | 4789 | 4790 | 4791 | 4792 | |
| Senate Bill Nos. | 473 | 474 | 475 | 476 | 477 | 478 | 479 | 480 | 481 | 482 | 499 | | | |

The Clerk announced that the following Senate bills had been received on Tuesday, June 21:
**Senate Bill Nos.    441    442**

### Reports of Standing Committees

The Committee on Redistricting and Elections, by Rep. Lund, Chair, reported
**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a; and to repeal acts and parts of acts.
With the recommendation that the substitute (H-2) be adopted and that the bill then pass.
The bill and substitute were referred to the order of Second Reading of Bills.

### Favorable Roll Call

To Report Out:
Yeas: Reps. Lund, McBroom, Knollenberg, Scott, Tyler and Outman
Nays: Reps. Byrum, Nathan and Stanley

### COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Lund, Chair, of the Committee on Redistricting and Elections, was received and read:
Meeting held on: Tuesday, June 21, 2011
Present: Reps. Lund, McBroom, Knollenberg, Scott, Tyler, Outman, Byrum, Nathan and Stanley

### Second Reading of Bills

**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a; and to repeal acts and parts of acts.
Was read a second time, and the question being on the adoption of the proposed substitute (H-2) previously recommended by the Committee on Redistricting and Elections,
The substitute (H-2) was adopted, a majority of the members serving voting therefor.

Rep. Byrum moved to amend the bill as follows:
1. Amend page 189, line 14, after "Sec. 3." by striking out "(1)".
2. Amend page 189, line 23, by striking out all of subsection **(2)**.
The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.
Rep. Lund moved that the bill be placed on the order of Third Reading of Bills.
The motion prevailed.

———

Rep. Stamas moved that House Committees be given leave to meet during the balance of today's session.
The motion prevailed.

# No. 59
# STATE OF MICHIGAN
## JOURNAL
### OF THE
# House of Representatives
## 96th Legislature
### REGULAR SESSION OF 2011

House Chamber, Lansing, Wednesday, June 22, 2011.

1:30 p.m.

The House was called to order by the Speaker.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was present.

| | | | |
|---|---|---|---|
| Agema—present | Gilbert—present | Lipton—present | Pscholka—present |
| Ananich—present | Glardon—present | Liss—present | Rendon—present |
| Barnett—present | Goike—present | Lori—present | Rogers—present |
| Bauer—present | Haines—present | Lund—present | Rutledge—present |
| Bledsoe—present | Hammel—present | Lyons—present | Santana—present |
| Bolger—present | Haugh—present | MacGregor—present | Schmidt, R.—present |
| Brown—present | Haveman—present | MacMaster—present | Schmidt, W.—present |
| Brunner—present | Heise—present | McBroom—present | Scott—present |
| Bumstead—present | Hobbs—present | McCann—present | Segal—present |
| Byrum—present | Hooker—present | McMillin—present | Shaughnessy—present |
| Callton—present | Horn—present | Meadows—present | Shirkey—present |
| Cavanagh—present | Hovey-Wright—present | Melton—present | Slavens—present |
| Clemente—present | Howze—present | Moss—present | Smiley—present |
| Constan—present | Hughes—present | Muxlow—present | Somerville—present |
| Cotter—present | Huuki—present | Nathan—present | Stallworth—present |
| Crawford—present | Irwin—present | Nesbitt—present | Stamas—present |
| Daley—present | Jackson—present | O'Brien—present | Stanley—present |
| Damrow—present | Jacobsen—present | Oakes—present | Stapleton—present |
| Darany—present | Jenkins—present | Olson—present | Switalski—present |
| Denby—present | Johnson—present | Olumba—present | Talabi—present |
| Dillon—present | Kandrevas—present | Opsommer—present | Tlaib—present |
| Durhal—present | Knollenberg—present | Ouimet—present | Townsend—present |
| Farrington—present | Kowall—present | Outman—present | Tyler—present |
| Forlini—present | Kurtz—present | Pettalia—present | Walsh—present |
| Foster—present | LaFontaine—present | Poleski—present | Womack—present |
| Franz—present | Lane—present | Potvin—present | Yonker—present |
| Geiss—present | LeBlanc—present | Price—present | Zorn—present |
| Genetski—present | Lindberg—present | | |

e/d/s = entered during session

**House Bill No. 4780, entitled**

A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a; and to repeal acts and parts of acts.

Was read a third time and passed, a majority of the members serving voting therefor, by yeas and nays, as follows:

**Roll Call No. 213**                              **Yeas—63**

| | | | |
|---|---|---|---|
| Agema | Goike | Lori | Potvin |
| Bolger | Haines | Lund | Price |
| Bumstead | Haveman | Lyons | Pscholka |
| Callton | Heise | MacGregor | Rendon |
| Cotter | Hooker | MacMaster | Rogers |
| Crawford | Horn | McBroom | Schmidt, W. |
| Daley | Hughes | Moss | Scott |
| Damrow | Huuki | Muxlow | Shaughnessy |
| Denby | Jacobsen | Nesbitt | Shirkey |
| Farrington | Jenkins | O'Brien | Somerville |
| Forlini | Johnson | Olson | Stamas |
| Foster | Kandrevas | Opsommer | Tyler |
| Franz | Knollenberg | Ouimet | Walsh |
| Geiss | Kowall | Outman | Yonker |
| Gilbert | Kurtz | Pettalia | Zorn |
| Glardon | LaFontaine | Poleski | |

**Nays—47**

| | | | |
|---|---|---|---|
| Ananich | Durhal | Lipton | Segal |
| Barnett | Genetski | Liss | Slavens |
| Bauer | Hammel | McCann | Smiley |
| Bledsoe | Haugh | McMillin | Stallworth |
| Brown | Hobbs | Meadows | Stanley |
| Brunner | Hovey-Wright | Melton | Stapleton |
| Byrum | Howze | Nathan | Switalski |
| Cavanagh | Irwin | Oakes | Talabi |
| Clemente | Jackson | Olumba | Tlaib |
| Constan | Lane | Rutledge | Townsend |
| Darany | LeBlanc | Santana | Womack |
| Dillon | Lindberg | Schmidt, R. | |

In The Chair: Walsh

The question being on agreeing to the title of the bill,

Rep. Stamas moved to amend the title to read as follows:

A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.

The motion prevailed.

The House agreed to the title as amended.

# No. 58
## STATE OF MICHIGAN

# Journal of the Senate
## 96th Legislature
### REGULAR SESSION OF 2011

Senate Chamber, Lansing, Thursday, June 23, 2011.

10:00 a.m.

The Senate was called to order by the President pro tempore, Senator Tonya Schuitmaker.

The roll was called by the Secretary of the Senate, who announced that a quorum was present.

| | | |
|---|---|---|
| Anderson—present | Hood—present | Pappageorge—present |
| Bieda—present | Hopgood—present | Pavlov—present |
| Booher—present | Hune—present | Proos—present |
| Brandenburg—present | Hunter—present | Richardville—present |
| Casperson—present | Jansen—present | Robertson—present |
| Caswell—present | Johnson—present | Rocca—present |
| Colbeck—present | Jones—present | Schuitmaker—present |
| Emmons—present | Kahn—present | Smith—present |
| Gleason—present | Kowall—present | Walker—present |
| Green—present | Marleau—present | Warren—present |
| Gregory—present | Meekhof—present | Whitmer—present |
| Hansen—present | Moolenaar—present | Young—present |
| Hildenbrand—excused | Nofs—present | |

1658                     JOURNAL OF THE SENATE [June 23, 2011]                     [No. 58

Senators Caswell, Kahn, Proos, Pappageorge, Jansen, Colbeck, Walker, Jones, Green, Moolenaar, Robertson and Rocca introduced
**Senate Bill No. 522, entitled**
A bill to amend 1974 PA 163, entitled "C.J.I.S. policy council act," by amending section 4 (MCL 28.214), as amended by 2005 PA 311.
The bill was read a first and second time by title and referred to the Committee on Appropriations.

Senators Colbeck, Green, Caswell, Pappageorge, Emmons, Brandenburg, Hunter, Rocca, Jansen, Robertson, Hildenbrand, Pavlov, Moolenaar, Jones, Casperson, Walker, Nofs, Kowall, Booher, Proos, Hansen, Schuitmaker and Marleau introduced
**Senate Bill No. 523, entitled**
A bill to amend 1978 PA 368, entitled "Public health code," by amending section 17515 (MCL 333.17515), as added by 1993 PA 133, and by adding section 17015a.
The bill was read a first and second time by title and referred to the Committee on Health Policy.

**House Bill No. 4394, entitled**
A bill to amend 1936 (Ex Sess) PA 1, entitled "Michigan employment security act," (MCL 421.1 to 421.75) by adding section 27c.
The House of Representatives has passed the bill and ordered that it be given immediate effect.
The bill was read a first and second time by title and referred to the Committee on Economic Development.

**House Bill No. 4419, entitled**
A bill to amend 1978 PA 566, entitled "An act to encourage the faithful performance of official duties by certain public officers and public employees; to prescribe standards of conduct for certain public officers and public employees; to prohibit the holding of incompatible public offices; and to provide certain judicial remedies," by amending section 3 (MCL 15.183), as amended by 2009 PA 210.
The House of Representatives has passed the bill and ordered that it be given immediate effect.
The bill was read a first and second time by title and referred to the Committee on Local Government and Elections.

**House Bill No. 4639, entitled**
A bill to amend 1998 PA 386, entitled "Estates and protected individuals code," by amending sections 3206 and 3209 (MCL 700.3206 and 700.3209), section 3206 as amended by 2008 PA 41 and section 3209 as added by 2006 PA 299.
The House of Representatives has passed the bill and ordered that it be given immediate effect.
The bill was read a first and second time by title and referred to the Committee on Veterans, Military Affairs and Homeland Security.

**House Bill No. 4727, entitled**
A bill to amend 1978 PA 90, entitled "Youth employment standards act," by amending section 4 (MCL 409.104), as amended by 2010 PA 221.
The House of Representatives has passed the bill and ordered that it be given immediate effect.
The bill was read a first and second time by title and referred to the Committee on Economic Development.

**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.
The House of Representatives has passed the bill.
The bill was read a first and second time by title and referred to the Committee on Redistricting.

## Committee Reports

The Committee on Transportation reported
**House Bill No. 4316, entitled**
A bill to amend 1949 PA 300, entitled "Michigan vehicle code," by amending section 705 (MCL 257.705), as amended by 2000 PA 214.

# No. 60
## STATE OF MICHIGAN

# Journal of the Senate

## 96th Legislature
### REGULAR SESSION OF 2011

Senate Chamber, Lansing, Wednesday, June 29, 2011.

10:00 a.m.

The Senate was called to order by the President, Lieutenant Governor Brian N. Calley.

The roll was called by the Secretary of the Senate, who announced that a quorum was present.

| | | |
|---|---|---|
| Anderson—present | Hood—present | Pappageorge—present |
| Bieda—present | Hopgood—present | Pavlov—present |
| Booher—present | Hune—present | Proos—present |
| Brandenburg—present | Hunter—present | Richardville—present |
| Casperson—present | Jansen—present | Robertson—present |
| Caswell—present | Johnson—present | Rocca—present |
| Colbeck—present | Jones—present | Schuitmaker—present |
| Emmons—present | Kahn—present | Smith—present |
| Gleason—present | Kowall—present | Walker—present |
| Green—present | Marleau—present | Warren—present |
| Gregory—present | Meekhof—present | Whitmer—present |
| Hansen—present | Moolenaar—present | Young—present |
| Hildenbrand—present | Nofs—present | |

### Recess

Senator Meekhof moved that the Senate recess until 4:00 p.m.
The motion prevailed, the time being 3:01 p.m.

The Senate reconvened at the expiration of the recess and was called to order by the President, Lieutenant Governor Calley.

### Recess

Senator Meekhof moved that the Senate recess subject to the call of the Chair.
The motion prevailed, the time being 4:01 p.m.

5:01 p.m.

The Senate was called to order by the President, Lieutenant Governor Calley.

Senator Meekhof moved that the rules be suspended and that the following bills, now on Committee Reports, be placed on the General Orders calendar for consideration today:
**House Bill No. 4780**
**House Bill No. 4359**
The motion prevailed, a majority of the members serving voting therefor.

By unanimous consent the Senate returned to the order of
### General Orders

Senator Meekhof moved that the Senate resolve itself into the Committee of the Whole for consideration of the General Orders calendar.
The motion prevailed, and the President, Lieutenant Governor Calley, designated Senator Hopgood as Chairperson.
After some time spent therein, the Committee arose; and the President, Lieutenant Governor Calley, having resumed the Chair, the Committee reported back to the Senate, favorably and without amendment, the following bills:
**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.

**House Bill No. 4700, entitled**
A bill to amend 1976 PA 451, entitled "The revised school code," (MCL 380.1 to 380.1852) by adding section 1255a.

**House Bill No. 4792, entitled**
A bill to amend 1957 PA 261, entitled "Michigan legislative retirement system act," by amending section 63 (MCL 38.1063), as amended by 2002 PA 97.
The bills were placed on the order of Third Reading of Bills.

The Committee of the Whole reported back to the Senate, favorably and with a substitute therefor, the following bill:
**House Bill No. 4359, entitled**
A bill to amend 1949 PA 300, entitled "Michigan vehicle code," by amending section 803i (MCL 257.803i), as amended by 1998 PA 68.
Substitute (S-1).

The following is the amendment to the substitute recommended by the Committee of the Whole:
1. Amend page 1, line 5, after "numbers" by inserting "**FOR PASSENGER VEHICLES ONLY**".
The Senate agreed to the substitute, as amended, recommended by the Committee of the Whole, and the bill as substituted was placed on the order of Third Reading of Bills.

By unanimous consent the Senate returned to the order of
**Third Reading of Bills**


Senator Meekhof moved that the rules be suspended and that the following bill, now on the order of Third Reading of Bills, be placed on its immediate passage at the head of the Third Reading of Bills calendar:
**House Bill No. 4780**
The motion prevailed, a majority of the members serving voting therefor.


The following bill was read a third time:
**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.
The question being on the passage of the bill,
Senator Whitmer offered the following substitute:
Substitute (S-2).
The substitute was not adopted, a majority of the members serving not voting therefor.
Senator Hunter requested the yeas and nays.
The yeas and nays were ordered, 1/5 of the members present voting therefor.
The substitute was not adopted, a majority of the members serving not voting therefor, as follows:

**Roll Call No. 373**                                        **Yeas—12**

| | | | |
|---|---|---|---|
| Anderson | Gregory | Hunter | Warren |
| Bieda | Hood | Johnson | Whitmer |
| Gleason | Hopgood | Smith | Young |

**Nays—26**

| | | | |
|---|---|---|---|
| Booher | Hansen | Marleau | Proos |
| Brandenburg | Hildenbrand | Meekhof | Richardville |
| Casperson | Hune | Moolenaar | Robertson |
| Caswell | Jansen | Nofs | Rocca |
| Colbeck | Jones | Pappageorge | Schuitmaker |
| Emmons | Kahn | Pavlov | Walker |
| Green | Kowall | | |

**Excused—0**


**Not Voting—0**


In The Chair: President

Senator Smith offered the following amendment:
1. Amend page 62, line 13, by striking out all of line 13 through line 13 of page 189 and inserting:
   "DISTRICT 13
   OAKLAND COUNTY (PART)
       FARMINGTON HILLS CITY
       KEEGO HARBOR CITY
       LATHRUP VILLAGE CITY
       OAK PARK CITY
       ORCHARD LAKE VILLAGE CITY
       PONTIAC CITY
       ROYAL OAK CHARTER TOWNSHIP
       SOUTHFIELD CITY
       SYLVAN LAKE CITY
       WEST BLOOMFIELD CHARTER TOWNSHIP (PART)
           TRACT 156000 INCLUDING BLOCK(S)
               1000, 1001, 1002, 1003, 1004, 1005,
               1006, 1007, 1008, 1009, 1010, 1011,
               1012, 1013, 1014, 1015, 1016, 1017,
               1018, 1019, 1020, 1021, 1022, 1023,
               1024, 1025, 1026, 1027, 1028, 1029,
               1030, 1031, 1032, 1033, 1034, 1035,
               1036, 1037, 1038, 1039, 1040, 1041,
               2000, 2001, 2002, 2003, 2004, 2005,
               2006, 2007, 2008, 2009, 2010, 2011,
               2012, 2014, 2015, 2016, 2017, 2018,
               2019, 2020, 3000, 3001, 3002, 3003,
               3004, 3005, 3006, 3007, 3008, 3009,
               3010, 3011, 3012, 3013, 3014, 3015,
               3016, 3017, 3018, 3019, 3020, 3021,
           TRACT 156200 INCLUDING BLOCK(S)
               2000, 2002, 2006, 2007, 2008, 2009,
               2011, 2012, 2013, 2014, 2018, 2019,
               2020, 2028
           TRACT 156300
           TRACT 156400
           TRACT 156500
           TRACT 156900
           TRACT 157000
           TRACT 157100
           TRACT 157200
           TRACT 157300
           TRACT 157400
           TRACT 157500
           TRACT 157600
           TRACT 157700
           TRACT 157800
           TRACT 157900
   WAYNE COUNTY (PART)
       DETROIT CITY (PART)
           TRACT 500100
           TRACT 500200
           TRACT 500300
           TRACT 500400
           TRACT 500500
           TRACT 500600
           TRACT 500700
           TRACT 500800
           TRACT 500900
           TRACT 501000

TRACT 501100
TRACT 501200
TRACT 501300
TRACT 501400
TRACT 501500
TRACT 501600
TRACT 501700
TRACT 501800
TRACT 501900
TRACT 502000
TRACT 503100
TRACT 503200
TRACT 503300
TRACT 503400
TRACT 503500
TRACT 503600
TRACT 503900
TRACT 504000
TRACT 504100
TRACT 504200
TRACT 504300
TRACT 504400
TRACT 504700
TRACT 504800
TRACT 504900
TRACT 505000
TRACT 505100
TRACT 505200
TRACT 505400
TRACT 505500
TRACT 506100
TRACT 506200
TRACT 506300
TRACT 506400
TRACT 506500
TRACT 506600
TRACT 506700
TRACT 506800
TRACT 506900
TRACT 507000
TRACT 507100
TRACT 507200
TRACT 507300
TRACT 507400
TRACT 507500
TRACT 507800
TRACT 507900
TRACT 508000 INCLUDING BLOCK(S)
    1000, 1001, 1002, 1003, 1004, 1005,
    1006, 1007, 1008, 1009, 1010, 1011,
    1012, 1013, 1014, 1015, 1016, 1017,
    1018, 1019, 1020, 1021, 1022, 1023,
    1025, 2000, 2001, 2002, 2003, 2004,
    2005, 2006, 2007, 2008, 2009, 2010,
    2011, 2013, 2014, 2015, 2016, 2017,
    2018, 2019, 2020, 2021, 2022, 2023,
TRACT 508100
TRACT 510400

TRACT 510500 INCLUDING BLOCK(S)
 1000, 1001, 1002, 1003, 1004, 1005,
 1006, 1007, 1008, 1009, 1010, 1011,
 1012, 1013, 1014, 1015, 1016, 1017,
 1018, 1019, 1020, 1021, 1022, 1023,
 1024, 1025, 1026, 1027, 1029, 1030,
 1031, 1032, 1033, 1034, 1035, 1036,
 1037, 2000, 2001, 2002, 2003, 2004,
 2005, 2006, 2007, 2008, 2009, 3000,
 3001, 3002, 3003, 3004, 3005, 3006,
 3007, 3008, 3009, 3010, 3011, 3012,
 3013, 3014, 3015, 3016, 3017, 3018,
 3019, 3020, 3021, 3022, 3023, 3024,
 3025, 3026, 3027, 3028, 3029, 3030,
 3031, 4000, 4001, 4002, 4003, 4004,
 4005, 4006, 4007, 4008, 4009, 4010,
 4011, 4012, 4013, 4014
TRACT 510600
TRACT 510700
TRACT 511000
TRACT 511200
TRACT 511300
TRACT 511400
TRACT 511900
TRACT 512100
TRACT 512200
TRACT 512300
TRACT 512400
TRACT 512600
TRACT 512900
TRACT 513200
TRACT 513300
TRACT 513600
TRACT 513700
TRACT 513900
TRACT 514100
TRACT 514200
TRACT 514300
TRACT 514500
TRACT 515200
TRACT 515300
TRACT 515400
TRACT 515600
TRACT 515700
TRACT 515900
TRACT 516000
TRACT 516100
TRACT 516200
TRACT 516300
TRACT 516400
TRACT 516500
TRACT 516600
TRACT 516700
TRACT 516800
TRACT 516900
TRACT 517000
TRACT 517100
TRACT 517200
TRACT 517300

TRACT 517500
TRACT 518000
TRACT 518400
TRACT 518500
TRACT 518600
TRACT 518800
TRACT 518900
TRACT 520200
TRACT 520300
TRACT 520400
TRACT 520700
TRACT 520800
TRACT 521100
TRACT 521300
TRACT 521400
TRACT 521500
TRACT 521800
TRACT 521900
TRACT 522000
TRACT 522300
TRACT 522400
TRACT 522500
TRACT 523100 INCLUDING BLOCK(S)
   1000, 1001, 1002, 1003, 1004, 1005,
   1006, 1007, 1008, 1009, 1010, 1011,
   1012, 1013, 1014, 1015, 1016, 1017,
   1018, 1019, 1020, 1021, 1022, 1023,
   1024, 1025, 1026, 1027, 1028, 1029,
   1030, 1031, 1032, 1033, 1034, 1035,
   1036, 1037, 1038, 1039, 1040, 1041,
   1042, 1043, 1044, 1045, 1046, 1047,
   1056
TRACT 523200
TRACT 523300
TRACT 523400
TRACT 523800 INCLUDING BLOCK(S)
   1000, 1001, 1002, 1003, 1004, 1005,
   1006, 1007, 1008, 1009, 1014, 1015,
   2000, 2001, 2002, 2003, 2004, 2005,
   2006, 2007, 2008, 2009, 2010, 2011,
   2012, 3000, 3001, 3002, 3003, 3004,
   3005, 3006, 3007, 3008, 3009, 3010,
   4000, 4001, 4002, 4003, 4004, 4005,
   4006, 4007, 4008, 4009, 4010, 4011,
   4012, 4013, 4014, 4015, 4016, 4017,
   4018, 4019, 4020
TRACT 524000 INCLUDING BLOCK(S)
   1005, 1006
TRACT 524900 INCLUDING BLOCK(S)
   1000, 1001, 1002, 1003, 1004, 1005,
   1006, 1007, 1008, 1009, 1010, 1011,
   1012, 1013, 1014, 1015, 1016, 1017,
   1018, 1019, 1020, 1021, 1022, 1023,
   1024, 1029, 1030, 1035, 1036, 1062,
   1063, 1064, 1065, 1066, 1067, 1068,
   1069, 1070, 1071
TRACT 525000
TRACT 532200
TRACT 532300

      TRACT 532400
      TRACT 532600
      TRACT 532700
      TRACT 533000
      TRACT 533300 INCLUDING BLOCK(S)
        1003, 1004, 1005, 1006, 1007, 1008,
        1009, 2007, 2008, 2011, 2012, 2013,
        2014, 2015, 2016, 2017, 2019
      TRACT 533900
      TRACT 538100
      TRACT 539000
      TRACT 551600 INCLUDING BLOCK(S)
        1010, 1011
      TRACT 985100
      TRACT 985200
      TRACT 985300
      TRACT 985500
      TRACT 985900
    GROSSE POINTE FARMS CITY (PART)
      TRACT 550600
      TRACT 550700
      TRACT 550800
    GROSSE POINTE PARK CITY (PART)
      TRACT 550100
      TRACT 550200
      TRACT 550300
    GROSSE POINTE WOODS CITY
    GROSSE POINTE CITY (PART)
      TRACT 550400
      TRACT 550500
    HAMTRAMCK CITY
    HARPER WOODS CITY
    VILLAGE OF GROSSE POINTE SHORE (PART)
      TRACT 550900
DISTRICT 14
  WAYNE COUNTY (PART)
    DEARBORN HEIGHTS CITY (PART)
      TRACT 571500
      TRACT 571600
      TRACT 571700
      TRACT 571800
      TRACT 571900
      TRACT 572000
      TRACT 572100
      TRACT 572200
      TRACT 572400
      TRACT 572500
      TRACT 572600
      TRACT 572700 INCLUDING BLOCK(S)
        1003, 1004, 2010, 2011, 2012, 2015,
        2016, 2018, 3000, 3001, 3002, 3003,
        3004, 3005, 3006, 3007, 3008, 3009,
        3010, 3011, 3012, 3013, 3014, 3015,
        3016, 3017, 3018, 3019, 4000, 4001,
        4002, 4003, 4004, 4005, 4006, 4007,
        4008, 4009, 4010, 4011, 4012, 4013,
        4014, 4015, 4016, 4017
      TRACT 573000
      TRACT 573100

DETROIT CITY (PART)
  TRACT 508000 INCLUDING BLOCK(S)
    1024, 2012
  TRACT 510500 INCLUDING BLOCK(S)
    1028
  TRACT 522100
  TRACT 522200
  TRACT 523100 INCLUDING BLOCK(S)
    1048, 1049, 1050, 1051, 1052, 1053,
    1054, 1055
  TRACT 523800 INCLUDING BLOCK(S)
    1010, 1011, 1012, 1013, 1016
  TRACT 524000 INCLUDING BLOCK(S)
    1000, 1001, 1002, 1003, 1004, 1007,
    1008, 1009, 1010, 1011, 1012, 1013,
    1014, 2000, 2001, 2002, 2003, 2004,
    2005, 2006, 2007, 2008, 3000, 3001,
    3002, 3003, 3004, 3005, 3006
  TRACT 524100
  TRACT 524200
  TRACT 524300
  TRACT 524500
  TRACT 524700
  TRACT 524800
  TRACT 524900 INCLUDING BLOCK(S)
    1025, 1026, 1027, 1028, 1031, 1032,
    1033, 1034, 1037, 1038, 1039, 1040,
    1041, 1042, 1043, 1044, 1045, 1046,
    1047, 1048, 1049, 1050, 1051, 1052,
    1053, 1054, 1055, 1056, 1057, 1058,
    1059, 1060, 1061, 1072, 1073, 1074,
    1075, 1076, 1077, 1078, 1079, 1080,
    1081, 1082, 1083, 1084, 2000, 2001,
    2002, 2003, 2004, 2005, 2006, 2007,
    2008, 2009, 2010, 2011, 2012, 2013,
    2014, 2015, 2016, 2017, 2018, 2019,
    2020, 2021, 2022, 2023, 2024, 2025,
    2026, 2027, 2028, 2029, 2030, 2031,
    2032, 2033, 2034, 2035, 2036, 2037,
    2038, 2039, 2040, 2041, 2042, 2043,
    2044, 2045, 2046, 2047, 2048, 2049,
    2050, 2051, 2052, 2053, 2054, 2055,
    2056, 2057, 2058, 2059
  TRACT 525400
  TRACT 525500
  TRACT 525600
  TRACT 525700
  TRACT 525800
  TRACT 526000
  TRACT 526100
  TRACT 526200
  TRACT 526300
  TRACT 526400
  TRACT 526500
  TRACT 527200
  TRACT 527300
  TRACT 530100
  TRACT 530200
  TRACT 530300

TRACT 530400
TRACT 530500
TRACT 530800
TRACT 530900
TRACT 531100
TRACT 531200
TRACT 531300
TRACT 531400
TRACT 531500
TRACT 531600
TRACT 531700
TRACT 531800
TRACT 531900
TRACT 533100
TRACT 533200
TRACT 533300 INCLUDING BLOCK(S)
    1000, 1001, 1002, 2000, 2001, 2002,
    2003, 2004, 2005, 2006, 2009, 2010,
    2018
TRACT 533400
TRACT 533500
TRACT 533600
TRACT 533700
TRACT 534100
TRACT 534200
TRACT 534300
TRACT 534400
TRACT 534500
TRACT 534600
TRACT 534700
TRACT 535000
TRACT 535100
TRACT 535200
TRACT 535300
TRACT 535400
TRACT 535500
TRACT 535600
TRACT 535700
TRACT 536100
TRACT 536200
TRACT 536300
TRACT 536400
TRACT 536500
TRACT 536600
TRACT 536700
TRACT 536800
TRACT 536900
TRACT 537000
TRACT 537100
TRACT 537200
TRACT 537300
TRACT 537500
TRACT 537600
TRACT 537700
TRACT 537800
TRACT 538200
TRACT 538300
TRACT 538400
TRACT 538500

TRACT 538600
TRACT 538700
TRACT 538800
TRACT 538900
TRACT 539100
TRACT 539200
TRACT 539300
TRACT 539400
TRACT 539500
TRACT 539600
TRACT 539700
TRACT 540100
TRACT 540200
TRACT 540300
TRACT 540400
TRACT 540500
TRACT 540600
TRACT 540700
TRACT 540800
TRACT 540900
TRACT 541000
TRACT 541100
TRACT 541200
TRACT 541300
TRACT 541400
TRACT 541500
TRACT 541700
TRACT 541800
TRACT 542100
TRACT 542200
TRACT 542300
TRACT 542400
TRACT 542500
TRACT 542600
TRACT 542700
TRACT 542800
TRACT 542900
TRACT 543000
TRACT 543100
TRACT 543200
TRACT 543400
TRACT 543500
TRACT 543600
TRACT 543700
TRACT 543800
TRACT 543900
TRACT 544000
TRACT 544100
TRACT 544200
TRACT 544300
TRACT 545100
TRACT 545200
TRACT 545300
TRACT 545400
TRACT 545500
TRACT 545600
TRACT 545700
TRACT 545800
TRACT 545900

**TRACT 546000**
**TRACT 546100**
**TRACT 546200**
**TRACT 546300**
**TRACT 546400**
**TRACT 546500**
**TRACT 546600**
**TRACT 546700**
**TRACT 546800**
**TRACT 546900**
**TRACT 985000**
**ECORSE CITY**
**GARDEN CITY CITY**
**HIGHLAND PARK CITY**
**INKSTER CITY**
**MELVINDALE CITY**
**REDFORD CHARTER TOWNSHIP**
**RIVER ROUGE CITY**
**ROMULUS CITY**
**WAYNE CITY**
**WESTLAND CITY".**

The amendment was not adopted, a majority of the members serving not voting therefor.
Senator Hunter requested the yeas and nays.
The yeas and nays were ordered, 1/5 of the members present voting therefor.
The amendment was not adopted, a majority of the members serving not voting therefor, as follows:

**Roll Call No. 374**                              **Yeas—7**

| | | | |
|---|---|---|---|
| Gregory | Hunter | Pavlov | Young |
| Hood | Johnson | Smith | |

**Nays—31**

| | | | |
|---|---|---|---|
| Anderson | Gleason | Kahn | Richardville |
| Bieda | Green | Kowall | Robertson |
| Booher | Hansen | Marleau | Rocca |
| Brandenburg | Hildenbrand | Meekhof | Schuitmaker |
| Casperson | Hopgood | Moolenaar | Walker |
| Caswell | Hune | Nofs | Warren |
| Colbeck | Jansen | Pappageorge | Whitmer |
| Emmons | Jones | Proos | |

**Excused—0**

**Not Voting—0**

In The Chair: President

The question being on the passage of the bill,
The bill was passed, a majority of the members serving voting therefor, as follows:

**Roll Call No. 375**                                     Yeas—25

| | | | |
|---|---|---|---|
| Booher | Hildenbrand | Marleau | Proos |
| Brandenburg | Hune | Meekhof | Richardville |
| Casperson | Jansen | Moolenaar | Robertson |
| Caswell | Jones | Nofs | Rocca |
| Colbeck | Kahn | Pappageorge | Schuitmaker |
| Green | Kowall | Pavlov | Walker |
| Hansen | | | |

Nays—13

| | | | |
|---|---|---|---|
| Anderson | Gregory | Hunter | Warren |
| Bieda | Hood | Johnson | Whitmer |
| Emmons | Hopgood | Smith | Young |
| Gleason | | | |

Excused—0

Not Voting—0

In The Chair: President

The question being on concurring in the committee recommendation to give the bill immediate effect,
The recommendation was not concurred in, 2/3 of the members serving not voting therefor.
The Senate agreed to the title of the bill.

**Protest**

Senator Whitmer, under her constitutional right of protest (Art. 4, Sec. 18), protested against the passage of House Bill No. 4780 and moved that the statement she made during the discussion of the bill be printed as her reasons for voting "no."
The motion prevailed.
Senator Whitmer's statement is as follows:
I rise in support and to speak in favor of my substitute. This substitute corrects the ridiculous gerrymander created to protect Congressman McCotter, who apparently wants to be President instead of serving in Congress. He won't be able to hide behind a gerrymander if that is the track that he takes.
Moreover, this substitute proves that we don't have to make a mockery of the Voting Rights Acts by creating districts that are so strange that future generations of school kids might learn about them as examples of gerrymanders. I know what the majority will say. They will point to state law and say their hands are tied. That is ridiculous. There is no need to stuff the minority voters in Pontiac with the Grosse Pointes. This substitute proves it.
Moreover, we know that the majority doesn't seriously believe that a Southfield-to-Pontiac district is required because they rejected my substitute for the State Senate bill that would have created exactly such a district for the State Senate. They said it wasn't warranted in that circumstance, but apparently, now believe it is in this circumstance.
However, the Voting Rights Act applies with equal force and logic to both state and federal maps. If they believe that a majority-minority district needs to be created running to Pontiac for the Congress, then the same district needs to be created for the State Senate. We proved that there are certainly enough minority voters for a sixth Senate seat, so why didn't it happen? If, on the other hand, they believe that a map with the fewest breaks—however awkwardly that word is defined in the statute—wins, then they must adopt the five-break plan that I offered for the State Senate map.

If someone looks at the legislative history of this redistricting and compares the maps offered for all three legislative bodies, they will see that this wasn't about county breaks. This wasn't about the Voting Rights Act. This was only about protecting incumbents at the expense of the integrity of this institution, and thus, I ask for your support of this substitute.

Senators Hune and Richardville asked and were granted unanimous consent to make statements and moved that the statements be printed in the Journal.

The motion prevailed.

Senator Hune's statement is as follows:

What we have before us are congressional redistricting plans. It is the epitome of transparency. These maps have been released to the public for quite some time, passed through the State House on a bipartisan vote, passed through the Senate in a redistricting committee, and is before us without amendment.

The public has seen these maps that are before us. What we have in front of us are a fair, a legal, and a constitutional plan for our new congressional districts. I urge all of my colleagues to support it, and it deserves bipartisan support.

Senator Richardville's statement is as follows:

Michigan has lost one congressional district as a result of the 2010 census. Nonetheless, this congressional redistricting plan preserves the cores of 14 existing districts and preserves two African-American majority districts. Of equal or greater importance, we have also continued to have two predominately Detroit-based districts, giving our state's largest city two likely Representatives in the Congress, notwithstanding the significant population loss of the city of Detroit. We have done this with the fewest number of county and municipal breaks of any plan we have seen, thus complying with Michigan's longstanding and traditional redistricting policies.

By unanimous consent the Senate returned to the order of

**Messages from the House**

**Senate Bill No. 498, entitled**

A bill to amend 2001 PA 116, entitled "An act to divide this state into 110 representative and 38 senatorial districts; and to prescribe the powers and duties of certain state departments and officers," by amending the title and sections 3 and 6 (MCL 4.2003 and 4.2006), and by adding sections 1a, 2a, and 5a.

The House of Representatives has amended the bill as follows:

1. Amend page 1, line 8, by striking out the balance of the page through line 26 on page 399 and inserting:

"**DISTRICT 001**
   **WAYNE COUNTY (PART)**
     **DETROIT CITY (PART)**
      **TRACT 500100 INCLUDING BLOCK(S)**
        **1000, 1001, 1002, 1003, 1004, 1005,**
        **1006, 1007, 1008, 1009, 1010, 1011,**
        **1012, 1013, 1014, 1015, 1016, 1017,**
        **1018, 1019, 1020, 1021, 2000, 2001,**
        **2002, 2003, 2004, 2005, 2006, 2007,**
        **2008, 2009, 2010, 2011, 2012, 2013,**
        **2014, 3000, 3001, 3002, 3003, 3004,**
        **3005, 3006, 3007, 3008, 3009, 3010,**
        **3011, 4000, 4001, 4002, 4003, 4004,**
        **4005, 4006, 4007, 4008, 4009.**
      **TRACT 500200 INCLUDING BLOCK(S)**
        **1000, 1001, 1002, 1003, 1004, 1005,**
        **1006, 1007, 1008, 1009, 1010, 1011,**
        **2000, 2001, 2002, 2003, 2004, 2005,**
        **2006, 2007, 2008, 2009, 2010, 2011,**
        **3000, 3001, 3002, 3003, 3004, 3005,**
        **3006, 3007, 3008, 4000, 4001, 4002,**
        **4003, 4004, 4005, 4006, 4007, 4008,**
        **4009, 4010.**
      **TRACT 500300 INCLUDING BLOCK(S)**
        **1000, 1001, 1002, 1003, 1004, 1005,**
        **1006, 1007, 1008, 1009, 1010, 1011,**
        **1012, 1013, 2000, 2001, 2002, 2003,**

### COMMITTEE ATTENDANCE REPORT

The Committee on Judiciary submitted the following:
Meeting held on Tuesday, June 28, 2011, at 2:30 p.m., Room 110, Farnum Building
Present: Senators Jones (C), Schuitmaker and Rocca
Excused: Senator Bieda

The Committee on Health Policy reported
**Senate Resolution No. 67.**
A resolution to urge the Secretary of the United States Department of Health and Human Services to continue the Perinatology Research Branch facility in Detroit.
(For text of resolution, see Senate Journal No. 58, p. 1656.)
With the recommendation that the resolution be adopted.

James A. Marleau<br>Chairperson

To Report Out:
Yeas: Senators Marleau, Robertson, Emmons, Hune, Jones, Schuitmaker, Warren and Gleason
Nays: None
The resolution was placed on the order of Resolutions.

### COMMITTEE ATTENDANCE REPORT

The Committee on Health Policy submitted the following:
Meeting held on Tuesday, June 28, 2011, at 1:30 p.m., Rooms 402 and 403, Capitol Building
Present: Senators Marleau (C), Robertson, Emmons, Hune, Jones, Schuitmaker, Warren and Gleason

The Committee on Energy and Technology reported
**Senate Resolution No. 57.**
A resolution to memorialize the President and the United States Congress to support the continued and increased importation of oil derived from Canadian oil sands and to urge the United States Secretary of State to approve the TransCanada Keystone Coast Expansion pipeline project.
(For text of resolution, see Senate Journal No. 47, p. 1099.)
With the recommendation that the resolution be adopted.

Mike Nofs<br>Chairperson

To Report Out:
Yeas: Senators Nofs, Proos, Jones, Marleau, Schuitmaker and Walker
Nays: Senator Young
The resolution was placed on the order of Resolutions.

### COMMITTEE ATTENDANCE REPORT

The Committee on Energy and Technology submitted the following:
Meeting held on Tuesday, June 28, 2011, at 2:00 p.m., Senate Hearing Room, Ground Floor, Boji Tower
Present: Senators Nofs (C), Proos, Jones, Marleau, Schuitmaker, Walker, Hopgood, Bieda and Young

The Committee on Redistricting reported
**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.
With the recommendation that the bill pass.
The committee further recommends that the bill be given immediate effect.

Joseph R. Hune<br>Chairperson

# No. 62

# STATE OF MICHIGAN

## JOURNAL

### OF THE

# House of Representatives

## 96th Legislature
### REGULAR SESSION OF 2011

House Chamber, Lansing, Wednesday, June 29, 2011.

10:00 a.m.

The House was called to order by the Speaker Pro Tempore.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was present.

| | | | |
|---|---|---|---|
| Agema—present | Gilbert—present | Lipton—present | Pscholka—present |
| Ananich—present | Glardon—present | Liss—present | Rendon—present |
| Barnett—present | Goike—present | Lori—present | Rogers—present |
| Bauer—present | Haines—present | Lund—present | Rutledge—present |
| Bledsoe—present | Hammel—present | Lyons—present | Santana—present |
| Bolger—present | Haugh—present | MacGregor—present | Schmidt, R.—present |
| Brown—present | Haveman—present | MacMaster—present | Schmidt, W.—present |
| Brunner—present | Heise—present | McBroom—present | Scott—present |
| Bumstead—present | Hobbs—present | McCann—present | Segal—present |
| Byrum—present | Hooker—present | McMillin—present | Shaughnessy—excused |
| Callton—present | Horn—present | Meadows—present | Shirkey—present |
| Cavanagh—present | Hovey-Wright—present | Melton—present | Slavens—present |
| Clemente—present | Howze—present | Moss—present | Smiley—present |
| Constan—present | Hughes—present | Muxlow—present | Somerville—present |
| Cotter—present | Huuki—present | Nathan—present | Stallworth—present |
| Crawford—present | Irwin—present | Nesbitt—present | Stamas—present |
| Daley—present | Jackson—present | O'Brien—present | Stanley—present |
| Damrow—present | Jacobsen—present | Oakes—present | Stapleton—present |
| Darany—present | Jenkins—present | Olson—present | Switalski—present |
| Denby—present | Johnson—present | Olumba—present | Talabi—present |
| Dillon—present | Kandrevas—present | Opsommer—present | Tlaib—present |
| Durhal—present | Knollenberg—present | Ouimet—present | Townsend—present |
| Farrington—present | Kowall—present | Outman—present | Tyler—present |
| Forlini—present | Kurtz—present | Pettalia—present | Walsh—present |
| Foster—present | LaFontaine—present | Poleski—present | Womack—present |
| Franz—present | Lane—present | Potvin—present | Yonker—present |
| Geiss—present | LeBlanc—present | Price—present | Zorn—present |
| Genetski—present | Lindberg—present | | |

e/d/s = entered during session

By unanimous consent the House returned to the order of

**Announcement by the Clerk of Printing and Enrollment**

The Clerk announced that the following bills had been printed and placed upon the files of the members on Wednesday, June 29:

**House Bill Nos.**   4817   4818   4819   4820   4821   4822   4823   4824   4825   4826   4827   4828   4829   4830
                      4831   4832   4833

**Senate Bill Nos.**   524   525   526   527   528   529   530   531   532   533

The Clerk announced that the following Senate bill had been received on Wednesday, June 29:

**Senate Bill No.**     386

### Messages from the Senate

**House Bill No. 4780, entitled**
A bill to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.
The Senate has passed the bill.
The bill was referred to the Clerk for enrollment printing and presentation to the Governor.

**House Bill No. 4366, entitled**
A bill to amend 1978 PA 566, entitled "An act to encourage the faithful performance of official duties by certain public officers and public employees; to prescribe standards of conduct for certain public officers and public employees; to prohibit the holding of incompatible public offices; and to provide certain judicial remedies," by amending section 3 (MCL 15.183), as amended by 2009 PA 210.
The Senate has substituted (S-1) the bill.
The Senate has passed the bill as substituted (S-1) and ordered that it be given immediate effect.
The Speaker announced that pursuant to Rule 42, the bill was laid over one day.

**House Bill No. 4584, entitled**
A bill to amend 2010 PA 370, entitled "Michigan professional employer organization regulatory act," by amending sections 7, 9, 15, 17, 21, 23, and 27 (MCL 338.3727, 338.3729, 338.3735, 338.3737, 338.3741, 338.3743, and 338.3747).
The Senate has substituted (S-1) the bill.
The Senate has passed the bill as substituted (S-1), ordered that it be given immediate effect and amended the title to read as follows:
A bill to amend 2010 PA 370, entitled "An act to license and regulate professional employer organizations; to define certain relationships and allocate certain rights and duties between those relationships; to provide for certain powers and duties for state agencies; to impose certain fees and provide for certain security devices; and to provide for penalties and remedies," by amending sections 7, 9, 13, 15, 17, 21, 23, and 27 (MCL 338.3727, 338.3729, 338.3733, 338.3735, 338.3737, 338.3741, 338.3743, and 338.3747).
The Speaker announced that pursuant to Rule 42, the bill was laid over one day.

**Senate Bill No. 386, entitled**
A bill to amend 1931 PA 328, entitled "The Michigan penal code," (MCL 750.1 to 750.568) by adding section 286.
The Senate has passed the bill.
The bill was read a first time by its title and referred to the Committee on Judiciary.

———

Rep. Knollenberg moved that the House adjourn.
The motion prevailed, the time being 6:05 p.m.

# No. 64
# STATE OF MICHIGAN
## JOURNAL
### OF THE
# House of Representatives
## 96th Legislature
### REGULAR SESSION OF 2011

House Chamber, Lansing, Wednesday, July 27, 2011.

10:00 a.m.

The House was called to order by the Speaker.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was not present.

Rep. Jim Stamas, from the 98th District, offered the following invocation:

"Lord, in Whom we live and breathe and have our being, we give You thanks for this beautiful day and for the privilege of serving this great state. Continue to bless us as we work. Bless our nation's leaders and our state leaders today, as always. Bless us as we participate and partake in the Democratic process, both here and in our districts. Bless us all. In Your name, Lord, and be with our children, Lord. Give those healing that need healing, and be with those who seek You. In Your name we pray. Amen."

### Announcement by the Clerk of Printing and Enrollment

The Clerk announced that the following bills had been printed and placed upon the files of the members on Friday, July 1:

| House Bill Nos. | 4835 | 4836 | 4837 | 4838 | 4839 | 4840 | 4841 | 4842 | 4843 | 4844 | 4845 | 4846 | 4847 | 4848 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4849 | 4850 | 4851 | 4852 | 4853 | 4854 | 4855 | 4856 | 4857 | | | | | |
| Senate Bill Nos. | 543 | 544 | 545 | 546 | 547 | 548 | 549 | 550 | 551 | 552 | 553 | 554 | 555 | 556 |
| | 557 | 558 | 559 | 560 | | | | | | | | | | |

The Clerk announced the enrollment printing and presentation to the Governor on Wednesday, July 6, for his approval of the following bills:

**Enrolled House Bill No. 4192 at 3:20 p.m.**
**Enrolled House Bill No. 4232 at 3:22 p.m.**
**Enrolled House Bill No. 4233 at 3:24 p.m.**
**Enrolled House Bill No. 4234 at 3:26 p.m.**
**Enrolled House Bill No. 4315 at 3:28 p.m.**
**Enrolled House Bill No. 4347 at 3:30 p.m.**
**Enrolled House Bill No. 4350 at 3:32 p.m.**
**Enrolled House Bill No. 4359 at 3:34 p.m.**
**Enrolled House Bill No. 4371 at 3:36 p.m.**
**Enrolled House Bill No. 4379 at 3:38 p.m.**
**Enrolled House Bill No. 4416 at 3:40 p.m.**
**Enrolled House Bill No. 4456 at 3:42 p.m.**

**Enrolled House Bill No. 4534 at 3:44 p.m.**
**Enrolled House Bill No. 4577 at 3:46 p.m.**
**Enrolled House Bill No. 4579 at 3:48 p.m.**
**Enrolled House Bill No. 4666 at 3:50 p.m.**
**Enrolled House Bill No. 4700 at 3:52 p.m.**
**Enrolled House Bill No. 4727 at 3:54 p.m.**
**Enrolled House Bill No. 4746 at 3:56 p.m.**
**Enrolled House Bill No. 4750 at 3:58 p.m.**
**Enrolled House Bill No. 4759 at 4:00 p.m.**
**Enrolled House Bill No. 4792 at 4:02 p.m.**
**Enrolled House Bill No. 4522 at 4:04 p.m.**
**Enrolled House Bill No. 4625 at 4:06 p.m.**

The Clerk announced the enrollment printing and presentation to the Governor on Thursday, July 7, for his approval of the following bills:
**Enrolled House Bill No. 4436 at 2:28 p.m.**
**Enrolled House Bill No. 4533 at 2:30 p.m.**
**Enrolled House Bill No. 4567 at 2:32 p.m.**
**Enrolled House Bill No. 4627 at 2:34 p.m.**
**Enrolled House Bill No. 4628 at 2:36 p.m.**
**Enrolled House Bill No. 4749 at 2:38 p.m.**

The Clerk announced the enrollment printing and presentation to the Governor on Friday, July 8, for his approval of the following bills:
**Enrolled House Bill No. 4366 at 11:27 a.m.**
**Enrolled House Bill No. 4367 at 11:29 a.m.**
**Enrolled House Bill No. 4565 at 11:31 a.m.**
**Enrolled House Bill No. 4584 at 11:33 a.m.**

The Clerk announced the enrollment printing and presentation to the Governor on Wednesday, July 13, for his approval of the following bill:
**Enrolled House Bill No. 4626 at 9:28 a.m.**

The Clerk announced that the following bills had been printed and placed upon the files of the members on Thursday, July 14:
**Senate Bill Nos.    561    562    563    564    565    566    567    568    569    570**

The Clerk announced the enrollment printing and presentation to the Governor on Tuesday, July 26, for his approval of the following bill:
**Enrolled House Bill No. 4780 at 2:32 p.m.**

### Messages from the Senate

**House Bill No. 4747, entitled**
A bill to amend 1949 PA 300, entitled "Michigan vehicle code," by amending section 819 (MCL 257.819), as amended by 2009 PA 137.
The Senate has substituted (S-2) the bill.
The Senate has passed the bill as substituted (S-2), ordered that it be given immediate effect and pursuant to Joint Rule 20, inserted the full title.
The Speaker announced that pursuant to Rule 42, the bill was laid over one day.

**House Bill No. 4748, entitled**
A bill to amend 1987 PA 231, entitled "An act to create a transportation economic development fund in the state treasury; to prescribe the uses of and distributions from this fund; to create the office of economic development and to prescribe its powers and duties; to prescribe the powers and duties of the state transportation department, state transportation commission, and certain other bodies; and to permit the issuance of certain bonds," by amending section 11 (MCL 247.911), as amended by 2009 PA 136.

# No. 65
# STATE OF MICHIGAN
## JOURNAL
### OF THE
# House of Representatives
## 96th Legislature
### REGULAR SESSION OF 2011

House Chamber, Lansing, Wednesday, August 24, 2011.

10:00 a.m.

The House was called to order by the Speaker.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was present.

| | | | |
|---|---|---|---|
| Agema—present | Gilbert—present | Lipton—present | Pscholka—present |
| Ananich—present | Glardon—present | Liss—present | Rendon—present |
| Barnett—present | Goike—present | Lori—present | Rogers—present |
| Bauer—present | Haines—present | Lund—present | Rutledge—present |
| Bledsoe—present | Hammel—present | Lyons—present | Santana—present |
| Bolger—present | Haugh—present | MacGregor—present | Schmidt, R.—present |
| Brown—present | Haveman—present | MacMaster—present | Schmidt, W.—present |
| Brunner—present | Heise—present | McBroom—present | Scott—present |
| Bumstead—present | Hobbs—present | McCann—present | Segal—present |
| Byrum—present | Hooker—present | McMillin—present | Shaughnessy—present |
| Callton—present | Horn—present | Meadows—present | Shirkey—present |
| Cavanagh—present | Hovey-Wright—present | Melton—present | Slavens—present |
| Clemente—present | Howze—present | Moss—present | Smiley—excused |
| Constan—present | Hughes—present | Muxlow—present | Somerville—present |
| Cotter—present | Huuki—present | Nathan—e/d/s | Stallworth—present |
| Crawford—present | Irwin—present | Nesbitt—present | Stamas—present |
| Daley—present | Jackson—present | O'Brien—present | Stanley—present |
| Damrow—present | Jacobsen—present | Oakes—present | Stapleton—present |
| Darany—present | Jenkins—present | Olson—present | Switalski—present |
| Denby—present | Johnson—present | Olumba—present | Talabi—excused |
| Dillon—present | Kandrevas—present | Opsommer—present | Tlaib—present |
| Durhal—present | Knollenberg—present | Ouimet—present | Townsend—present |
| Farrington—present | Kowall—present | Outman—present | Tyler—present |
| Forlini—present | Kurtz—present | Pettalia—present | Walsh—present |
| Foster—present | LaFontaine—present | Poleski—present | Womack—present |
| Franz—present | Lane—present | Potvin—present | Yonker—present |
| Geiss—present | LeBlanc—present | Price—present | Zorn—present |
| Genetski—present | Lindberg—present | | |

e/d/s = entered during session

JOURNAL OF THE HOUSE [August 24, 2011]

**Messages from the Governor**

Date: August 9, 2011
Time: 11:06 a.m.

To the Speaker of the House of Representatives:
Sir—I have this day approved and signed
**Enrolled House Bill No. 4780 (Public Act No. 128), being**
An act to amend 1964 PA 282, entitled "An act to divide the state into 15 congressional districts; to prescribe the powers and duties of certain state departments and officers; and to repeal acts and parts of acts," by amending the title and sections 3 and 5 (MCL 3.53 and 3.55), the title as amended and sections 3 and 5 as added by 2001 PA 115, and by adding sections 1a and 4a.
(Filed with the Secretary of State August 9, 2011, at 1:31 p.m.)

**Introduction of Bills**

Rep. LeBlanc introduced
**House Bill No. 4879, entitled**
A bill to amend 1961 PA 236, entitled "Revised judicature act of 1961," (MCL 600.101 to 600.9947) by adding section 2170.
The bill was read a first time by its title and referred to the Committee on Judiciary.

Rep. LeBlanc introduced
**House Bill No. 4880, entitled**
A bill to amend 1978 PA 368, entitled "Public health code," by amending section 2841 (MCL 333.2841).
The bill was read a first time by its title and referred to the Committee on Judiciary.

Rep. Horn introduced
**House Bill No. 4881, entitled**
A bill to amend 1961 PA 236, entitled "Revised judicature act of 1961," by repealing sections 819 and 824 (MCL 600.819 and 600.824).
The bill was read a first time by its title and referred to the Committee on Judiciary.

Reps. MacMaster, Potvin and Rogers introduced
**House Bill No. 4882, entitled**
A bill to amend 1994 PA 451, entitled "Natural resources and environmental protection act," by amending sections 1301, 32501, 32503, 32512, 76101, 76102, 76103, 76104, 76105, 76107, 76108, 76109, 76110, 76111, 76112, 76113, 76114, 76115, and 76118 (MCL 324.1301, 324.32501, 324.32503, 324.32512, 324.76101, 324.76102, 324.76103, 324.76104, 324.76105, 324.76107, 324.76108, 324.76109, 324.76110, 324.76111, 324.76112, 324.76113, 324.76114, 324.76115, and 324.76118), section 1301 as amended by 2009 PA 120, sections 32501 and 32512 as amended by 2003 PA 14, sections 32503, 76105, and 76109 as amended by 2004 PA 325, sections 76101 and 76115 as added by 1995 PA 58, sections 76102, 76103, 76104, 76108, 76110, 76111, 76112, 76113, 76114, and 76118 as amended by 2001 PA 75, and section 76107 as amended by 2001 PA 155, and by adding sections 32512b and 76112a.
The bill was read a first time by its title and referred to the Committee on Natural Resources, Tourism, and Outdoor Recreation.

Reps. MacMaster and Potvin introduced
**House Bill No. 4883, entitled**
A bill to amend 1956 PA 205, entitled "The paternity act," by amending section 2 (MCL 722.712), as amended by 2009 PA 235.
The bill was read a first time by its title and referred to the Committee on Judiciary.